**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT R. FENICHEL, M.D.       )
                                    )
         Plaintiff,           )
                                      )
v.                                       )       C.A. No. 1:07-CV-768
                                      )
WASHINGTON METROPOLITAN      )
AREA TRANSIT AUTHORITY, et al.    )
                                      )
         Defendants.       )

**PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS DISCLOSURE**

Plaintiff Robert R. Fenichel, M.D., individually and as Personal Representative of the Estate and Next of Kin, by and through his counsel, hereby submits his disclosures required by Rule 26(a)(2) of the Federal Rules of Civil Procedure.

Plaintiff expects to call the following expert witnesses at the trial of this action. Each of these witnesses has prepared a preliminary report, attached, stating opinions that they intend to express at trial, the current basis and reasons therefore, the data considered so far by the witness, and other information required by Rule 26(a)(2). The witnesses' curriculum vitae have been provided to opposing counsel.

Plaintiff reserves the right to file, amend or supplement his expert reports as additional discovery or expert-witness analysis is completed. Plaintiff will promptly disclose any additional or changed opinions, and provide all information required by Rule 26(a)(2).

      1. Kris Sperry, M.D.
         3121 Panthersville Road, Decatur, Georgia 30034
         (Pathology/Conscious pain and suffering/Pre-impact fright/Cause of Death/
         All aspects of non-economic damages)

2.  Babak Sarani, M.D.
    University of Pennsylvania, 3440 Market Street, 1st Floor
    Philadelphia, PA 19104
    (Emergency Medicine/Conscious pain and suffering/Pre-impact fright/
    Cause of Death/All aspects of non-economic damages)

3.  Scott D. Batterman, Ph.D.
    1415 Route 70 East, Suite 307, Cherry Hill, NJ 08034
    (Accident Reconstruction, Occupant Kinematics, Human Factors and Safety)

4.  David A. Stopper
    6200 Evergreen Mountain Road, Broad Run, Virginia 20137-1907
    (Accident Reconstruction, Bus Safety, Bus Design, Bus Operation)

5.  Richard Lurito, Ph.D.
    1491 Chain Bridge Road, #300, McLean, Virginia 22101
    (Economic Losses)


                    Respectfully submitted,

                    BRUCE J. KLORES & ASSOCIATES, P.C.

                    By_____/s/ Scott M. Perry_____
                      Bruce J. Klores (358548)
                      Scott M. Perry (#459841)
                      1735 20th Street, N.W.
                      Washington, DC 20009
                      P: 202-628-8100
                      F: 202-628-1240
                      Attorneys for Plaintiffs


1845/26b2.disclosure

## Kris Sperry, M.D.
### Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

February 25, 2008

Dear Mr. Perry:

I have reviewed materials that you have provided me concerning the death of Emily Fenichel. These materials include the paramedic records, hospital medical records, two police reports, the Medical Examiner's autopsy report, the autopsy photographs, other documents relating to her death, and the depositions of Dr. Aysha Farooqi and Luis Urbina.

Emily Fenichel was a 64 year old female who, on June 8, 2006 at approximately 10:59 pm (2259 hours), was struck and dragged by a bus, and when the bus stopped, she was pinned beneath the bus, beneath the left front wheel. Multiple witness accounts, including the deposition testimony of both Dr. Farooqi and Mr. Urbina, note that she was alive, conscious, and able to speak and interact coherently during this time. After she was extricated, her evaluation in the ambulance revealed a Glasgow Coma Scale score of 15 out of 15. Upon arrival at the hospital, she was described as being agitated and complained of difficulty breathing, with pale skin and a blue face. She became apneic and bradycardic, and resuscitative attempts were without success. She was pronounced dead at 2350 hours.

The autopsy examination revealed that Mrs. Fenichel had sustained abrasions and contusions involving the scalp and face, but no skull fractures and a very small area of subarachnoid and non-displacing subdural hemorrhage over the right hemisphere and vertices. Multiple contusions involved the chest and back, and multiple fractures were found on the right anterior 2nd-5th ribs, 1st-7th lateral ribs, 1st-7th posterior lateral ribs, 6th-9th posterior ribs, and left 4th anterior rib, 1st-6th lateral ribs, and 3rd-4th posterior ribs. The chest was described as being "flail," which means that the chest wall was unstable and would collapse during respiratory movements. The right chest cavity contained 800 ml of blood, and the lower left lung lobe exhibited lacerations. A pelvic fracture was observed, and the spleen had two superficial small lacerations. The upper and lower extremities revealed multiple abrasions, contusions, and lacerations, with large (up to 4 X 7 inches) avulsions of the skin and subcutaneous tissues of the right arm.

Based upon these records and the information contained therein, it is my opinion, to a reasonable degree of medical certainty, that Emily Fenichel died of progressive respiratory insufficiency with associated internal hemorrhage (bleeding) caused by crushing chest injuries, which caused the bleeding and instability of the chest wall. Mrs. Fenichel was clearly conscious and able to meaningfully communicate after she was overrun and trapped, up to the point where she deteriorated at the hospital following her

Sperry Forensic Pathology Consultants
170 Nixon Road
Senoia, Georgia 30276-3291
Telephone: (770) 599-9528
e-mail Dr. Sperry: stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/25/2008
Page 2 of 2

transport for treatment. As a result of these injuries, it is my opinion, to a reasonable degree of medical certainty, that Mrs. Fenichel sustained significant conscious pain and suffering, both from the pain caused by her soft tissue blunt trauma (and most significantly the avulsions of the right arm, which indicate that large portions of the skin and subjacent tissues were torn loose and away from the arm), and from the crushing chest injuries with multiple bilateral rib fractures. The chest trauma would furthermore have been painful in and of itself, but also have produced sensations of panic, fear, and anxiety as the consequence of the progressive difficulty she experienced in her ability to breathe. Every breath she took would have been painful as she tried to move her chest wall in the breathing process, and progressively, the advancing compromise in her ability to breathe would then produce the panic, fear and anxiety that accompanies this inability to breathe adequately.

All of the aforementioned opinions are expressed to a reasonable degree of medical certainty.

My training and experience are accurately delineated in my Curriculum Vitae, which accompanies this report. My experience in providing both deposition and courtroom testimony over the previous five years is tabulated in the accompanying list. I charge $400 per hour for the review of materials and consultation, $1500 for providing deposition testimony up to a period of two hours and $750 per hour thereafter, and $4500 per day (plus applicable travel and lodging expenses) for providing live courtroom testimony.

Sincerely,

Kris Sperry, M. D.



UNIVERSITY OF
PENNSYLVANIA
HEALTH SYSTEM

**Babak Sarani, MD**
Assistant Professor of Surgery

Division of Traumatology and Surgical Critical Care

January 9, 2008

Scott M. Perry, Esq.
Bruce J. Klores & Associates, P.C.
1735 20th Street, N.W.
Washington, DC 20009

Re: Emily Fenichel

Dear Mr. Perry:

I am board certified in General Surgery with a Certification in Critical Care. I am an attending surgeon in the Division of Trauma Surgery and Surgical Critical Care at the Hospital of the University of Pennsylvania in Philadelphia, Pennsylvania where I am Co-Director of the Rapid Response Team. I am also an Assistant Professor of Surgery.

At your request, I have reviewed the following materials in this matter:
**The paramedic's report, hospital medical records, police report, medical examiners report autopsy report**

The following is a summary of my conclusions:

Based on my review of the above, and my extensive clinical experience treating trauma patients with injuries similar to Mrs. Fenichel, I conclude to reasonable degree of medical certainty that Mrs. Fenichel experienced severe pain during the period that she was conscious after being struck by the bus.

According to police reports and witness testimony, Mrs. Fenichel was struck at approximately 10:59 p.m. She was pronounced dead at the Washington Hospital Center at 11:50 p.m. It is my understanding that the eyewitnesses, including Mr. Luis Urbina, confirm that was Mrs. Fenichel was talking immediately after the accident. Thus, we know that she was conscious. As noted in detail below, this is further corroborated by the paramedic and hospital documentation that her Glasgow Coma Score, a measure of a person's mental status, varied between 10-15, levels which are consistent with a state of consciousness. Mr. Urbina graphically described what he saw as "plenty of pink matter, guts" on the roadway. Urbina Dep. at 28. He then notes that Mrs. Fenichel pled for Mr. Urbina to help her, by getting "this tire off my chest" and that she was struggling to talk, stating "I can't breathe." Urbina Dep. at 29. Mr. Urbina also confirms the presence of torn flesh. Urbina Dep. at 41.



**The Trauma Center at Penn**
A Regional Resource Facility of the
University of Pennsylvania Health System

3440 Market Street • Philadelphia, PA 19104 • 215-662-7323 • FAX: 215-349-5917 • babak.sarani@uphs.upenn.edu
2 Dulles • 3400 Spruce Street • Philadelphia, PA 19104-4283 • 215-662-7320 • FAX: 215-614-0375

In addition to Mr. Urbina's testimony, the medical records indicate that Mrs. Fenichel suffered the following injuries: closed head injury (evidenced by decreasing Glasgow Coma Score), avulsion of soft tissues with exposed bone on right upper extremity, abrasions on right back, and abrasions on both knees. The autopsy report confirms that she suffered multiple bilateral rib fractures, bilateral flail chest, left lung laceration (and therefore tension pneumothorax), right hemothorax, avulsion of large areas of skin in the right arm and forearm, abrasions about the face, scattered contusions over the whole body, pelvic fracture, and splenic laceration, and a closed head injury with right sided subdural and subarachnoid hemorrhage.

A person suffering from these injuries would be in tremendous pain. Her Glasgow Coma Score (GCS) and ability to respond to questions confirm that she was sufficiently awake to experience and perceive pain. Her multiple broken ribs would have resulted in severe pain with each respiratory effort. Moreover, the lung injuries and resultant hemo-, pneumothorax caused a severe sense of inability to breathe, thereby augmenting her discomfort. The pelvic fracture and the extensive soft tissue injuries would also be very painful, particularly with movement.

As I previously indicated, the record indicates that the period of time from when Mrs. Fenichel was struck was approximately 50 minutes. Mrs. Fenichel was conscious for the vast majority of that time. A Glasgow Coma Score of 9 or higher is consistent with a state of consciousness. The paramedics document a GCS score of 15 (a normal state of consciousness) on their arrival and during transport to the hospital. The validity of this GCS score is supported by several eyewitness accounts in the police report stating that the patient was talking and alert and was able to give a brief medical history of herself to Dr. Farooqi at the scene of the accident. The hospital documents an initial GCS score of 12 at 11:35pm. This is consistent with the nursing notes which state that the patient was talking and complaining of difficulty breathing on arrival to the hospital. According to the hospital records, the patient became unconscious at 11:40pm when she was intubated without the need for medications to facilitate this procedure. This means that Mrs. Fenichel was conscious from the time of injury to 11:40pm, approximately 41 minutes. During the time that Mrs. Fenichel was conscious, she would have been feeling the tremendous pain described above.

I reserve the right to supplement my opinions as I understand discovery is ongoing.

My fees for testimony are $3,000 for a deposition in Washington, D.C., plus travel costs, and my fee for appearing in court is $3,000 for the first day and $1,500 for each successive trial day, plus travel costs.

With regard to my previous expert experience, this is the first time that I have been retained by an attorney to provide expert testimony. I have, however, been subpoenaed to testify on four other occasions by the States' Attorney. On each of those occasions I was qualified to give expert testimony. Because I testified only by subpoena, and was not compensated as an expert witness, I have not kept a list of those cases.

Thank you for allowing me to review this interesting case. I will remain available if further consultation is required.

Sincerely,

Babak Sarani, M.D.

# BATTERMAN ENGINEERING, LLC
## ENGINEERING CONSULTANTS: *Forensics, Accident Reconstruction and Biomechanics*

**1415 ROUTE 70 EAST, SUITE 307, CHERRY HILL, NEW JERSEY 08034-2210**
**(856) 795-3993 / FAX (856) 795-4454**
**e-mail: batterman@aol.com**

10 March 2008

Scott M. Perry, Esq.
Bruce J. Klores & Associates
1735 20th Street, N.W.
Washington, D.C. 20009

**RE: Fenichel v. WMATA**

Dear Mr. Perry:

The purpose of this preliminary report is to apprise you of the results of my investigation and analysis to date in the above captioned matter. I note at the outset that I shall supplement this report as may be necessary or required, or as additional information becomes available necessitating a supplement.

During my investigation to date, the following case specific materials have been used or made available to me.

1) Washington, D.C. Metropolitan Police Department Traffic Accident report of the subject accident, which occurred on 8 June 2006 at approximately 10:59 p.m.

2) CD containing police photographs of the accident scene taken prior to the removal of the subject bus, labeled Night of Accident, Fenichel #1845.

3) WMATA Motor Vehicle Accident Report prepared by bus driver, Michelle Ferguson, as a result of the subject accident, dated 9 June 2006.

4) WMATA Street Supervisor Accident Report of the subject accident prepared by Norman E. Williams and Paul Ways.

5) WMATA Accident Report Form, Investigation By The Division Superintendent Or Supervisor for the subject accident, dated 29 June 2006.

Scott M. Perry, Esq.
10 March 2008
Page 2

6) Washington Metropolitan Area Transit Authority Separation Personnel Action Report for the subject accident, dated August 2006.

7) Document entitled, Department Of Operations Policy Governing The Discipline For Accidents Involving Non-Revenue Vehicles.

8) Report (and miscellaneous calculations, diagrams and data) provided by Detective Michael Miller, Major Crash Unit, Metropolitan Police Department, undated.

9) CD containing photographs, labeled Accident Reconstruction of D.C. Police, Fenichel #1845.

10) DVD of miscellaneous news clips concerning the subject accident, labeled News Channel 4, Fenichel.

11) Report of autopsy (case number 06-1373) performed on Emily S. Fenichel on 9 June 2006 by Sarah M. Colvin, M.D. (with CD containing autopsy photographs).

12) Miscellaneous data labeled, Traffic Signal Operation, Wisconsin Avenue and Jennifer Street, NW, D.C. Department of Transportation Traffic Services Administration, Traffic Signal System Division.

13) District of Columbia Municipal Regulations, Chapter 23 (Pages 23-1 to 23-3), Commissioners' Order 274,310/949 effective September 1, 1949, 17 DCRR *SS*55, 56 (October 19, 1970).

14) Copies of miscellaneous handwritten notes prepared during the investigation of the subject accident by Police Officer William Belton, Badge #4272, Metropolitan Police Department.

15) Copies of miscellaneous handwritten notes prepared during the investigation of the subject accident by Police Officer Sandra Connor, Badge #3700, Metropolitan Police Department.

16) The following deposition transcripts and related exhibits: Robert L. Ballard (2/8/08), Matthew Clark (1/4/08), Robert R. Fenichel, M.D. (11/20/07), Michelle Ferguson (2/13/08), Chris D. McGuire (1/30/08), Luis Urbina (9/27/07), Norman Williams (12/7/07).

17) Document entitled WMATA Standard Operating Procedures.

18) Miscellaneous interrogatories and answers.

19) Scale diagrams of the subject intersection and accident area prepared by David Stopper, Stopper & Associates.

20) Inspection of the subject bus on 4 September 2007 at which time measurements were made and photographs were taken. A set of photographs was previously provided to your office.

Scott M. Perry, Esq.
10 March 2008
Page 3

21) Inspection of the accident scene on 4 September 2007 at which time photographs were taken and short video clips were made. A set of photographs and video clips were previously provided to your office.

22) Anthropometric data for Michelle Ferguson.

23) Vehicle data and specifications for the subject Metro bus (Metro #3916, manufactured by Orion Bus Industries, Inc., VIN 1VH519P7XV6033736).

The happening of the subject accident is described in the materials listed above and shall not be repeated in detail herein. Suffice it to say that on 8 June 2006 at approximately 10:59 p.m., Emily Fenichel was attempting to cross Wisconsin Avenue from west to east at the intersection with Jennifer Street in Washington D.C. Mrs. Fenichel was within the confines of the crosswalk on the south side of Jennifer Street and proceeding across the souththbound lanes of Wisconsin Avenue when she was impacted by the front of a WMATA Metro bus (#3916) being operated by Michelle Ferguson, turning right from eastbound Jennifer Street onto southbound Wisconsin Avenue. As a result of the initial impact Mrs. Fenichel was knocked to the ground and was subsequently run over by the left front of the bus, where she became entrapped by the left front tire / adjacent structure, requiring extrication by emergency personnel. According to the information provided, Mrs. Fenichel was conscious and speaking with police / rescue personnel at the scene prior to her extrication and transportation to the hospital, where she was subsequently pronounced dead. At the time of the accident there were no passengers on the bus, the weather was clear and the roadway was dry.

I have analyzed this accident consistent with the available information and standard, rigorous engineering methods applied in the field of vehicular accident reconstruction. As a result of my analysis I have reached the following conclusions, which I state as my professional opinions to date in this matter to a reasonable degree of engineering and scientific certainty.

1) In my opinion, the subject accident would have been completely prevented if Michelle Ferguson had been making proper observations and been maintaining proper control of her vehicle (bus) as she attempted to make a right turn from eastbound Jennifer Street onto southbound Wisconsin Avenue. According to the information and witness statements provided, at the time of the accident eastbound Jennifer Street (Ferguson direction of travel) had a green light and there was time on the crosswalk signal timer for pedestrians crossing Wisconsin Avenue. At the crosswalk where Mrs. Fenichel was crossing at the time of the accident, upon activation of the walk phase to cross Wisconsin Avenue a white illuminated walking figure appears and a timer display commences a countdown from 27 seconds. At fifteen seconds a flashing red hand replaces the illuminated white walk signal as the timer continues to count down to zero. Upon reaching (and displaying) zero, the flashing red hand changes to a solid illuminated red hand and the traffic signal for eastbound vehicular traffic on Jennifer Street simultaneously changes to yellow.

According to information provided to date, Ms. Ferguson was looking to her left (east) and not looking to her right, or in front of the bus as she was executing the right turn from Jennifer Street onto Wisconsin Avenue. The WMATA Street Supervisor Accident Report of

Scott M. Perry, Esq.
10 March 2008
Page 4

the subject accident (item 4) states, "...*Vehicle #2: Metrobus 3916 was traveling southbound in the second lane Wisconsin Avenue N.W. in the crosswalk 5 ft. south of Jenifer (sp) Street N.W. completing a right turn from eastbound Jenifer (sp) Street. There was a parked van in the curb lane southbound Wisconsin Avenue. The female pedestrian was walking eastbound in the crosswalk 5 ft. south of Jenifer (sp) Street from the west side curb of Wisconsin Avenue N.W. to the east side curb. Vehicle #2: The operator stated that she was dead heading to Dupont Circle. When the light changed green she waited for the pedestrians to clear the crosswalk and began to make her right turn at a speed of 2 mph. As she started to turn there was a male pedestrian who began to enter the crosswalk from the east side of Wisconsin Avenue walking toward the bus. The operator was watching the male pedestrian when she felt a bump and stopped the bus because she thought that she had hit something...The female pedestrian was able to give her name, date of birth and telephone number to the police officer while being attended to by the paramedics. Witnesses: MPD second district officer Connor #3700, stated that she and her partner Officer Belton #4272 were in their police cruiser at the east side of Jenifer (sp) Street at the intersection of Wisconsin Avenue waiting to turn left onto southbound Wisconsin Avenue. Officer Connor stated that the operator was turning right and was watching the male pedestrian who was walking toward the bus on the cell phone from the east side of Wisconsin Avenue...*".  In her handwritten notes from the accident scene (item 15), MPD Officer Sandra Connor wrote, "...*Bus driver - stated, "I didn't see her, she came from no where". "I know, maybe I should have looked again".*" The investigation by the WMATA Division Superintendent Or Supervisor (item 5) concluded, "...*Operator Ferguson further stated she never saw the pedestrian before making contact. The front center bumper of the bus made contact to the pedestrian who was walking in the crosswalk knocking her to the ground, the bus dragged the pedestrian a few feet wedging her under the bus...Operators must make the proper observations before attempting to make a right turn. Operator failed to observe the crosswalk on the left and right side of the bus while turning. For pedestrians. While moving through the intersection, yield to vehicles or pedestrians crossing the path of the bus, operator failed be (sp) fully alert and totally aware of traffic conditions. Operator further failed to proceed only when she was certain that pedestrian was clear of the bus. Based on all available information, the Operator's report, the Street Supervisor's report and The Guide to Determining Preventable Accidents, this accident rated Preventable Major. Operator failed to follow Standard Operating Procedure #5 Right Turn, #8 Intersection Operation, #12 Observation, and #13 Defensive Driving. Operator is primarily responsible for this accident, her actions were clearly negligent, and reckless. Operator showed disregard for principles of bus safety. Operator failed to make proper observations while turning. She further failed to enter the crosswalk with caution. The pedestrian was in the crosswalk when she was struck with the front bumper of the bus. Operator had multiple violations of Standard Operating Procedures therefore, she is dismissed effective June 29, 2006...*".  The decision to discharge Ms. Ferguson from her duties with WMATA by the District of Columbia Department of Employment Services states that as a result of the subject accident, "...*Gross misconduct has been established...*".

In her sworn deposition testimony (item 16), bus driver Michelle Ferguson testified that she did not see Emily Fenichel prior to the impact. However, she did observe pedestrians on the

Scott M. Perry, Esq.
10 March 2008
Page 5

sidewalk in front of the Booeymonger restaurant on the southwest corner of the intersection from where Mrs. Fenichel commenced her crossing. She further testified (item 16) that she was watching a pedestrian crossing from her left to her right (same crosswalk but opposite direction to Mrs. Fenichel) as she was *"...inching and it was still clear...".* Ms. Ferguson further testified (item 16), *"...As I'm turning he cleared the intersection and I'm still inching, going slow, still looking down the curb lane, looking through my door and still looking and then I felt a bump...".* As shown in the photographs taken during my inspection of the subject bus (item 20), the double doors situated to the right of the driver's seat contain glass panels that extend essentially from the tops of the doors to the bottoms, allowing the driver to make observations to his / her right outside of the bus. Also, as shown in the photographs, a side view mirror was externally mounted at the top right corner of the bus to further assist the driver in making observations of the exterior right side of the bus.

In my opinion, the available evidence clearly indicates that Michelle Ferguson failed to act in an ordinarily prudent manner, failed to make proper observations, and failed to maintain proper control of her vehicle as she executed a right turn from eastbound Jennifer Street onto southbound Wisconsin Avenue.

It is further part of my opinion, based on the available evidence, that there is no sound engineering and scientific basis for the speculation by investigators and witnesses that a "blind spot" created by the structure of the bus was causally related to the happening of the subject accident. In this regard I note the following.

(i)     From a stopped position on Jennifer Street it would have taken the bus several seconds to reach the point of impact in the crosswalk, as shown in the video clips made during my inspection of the accident scene (item 21) and previously provided to your office. In the moments immediately preceding the initial impact, both the bus and Mrs. Fenichel were moving relative to one another and Mrs. Fenichel would not have occupied a continuous "blind spot" in Ms. Ferguson's field of view. I also note that Ms. Ferguson testified (item 16) that she was able to see the pedestrians in front of the Booeymonger restaurant prior to the accident, which is at the corner from which Mrs. Fenichel commenced her crossing. It is further noted that Michelle Ferguson testified (item 16) that she observed a male pedestrian (Matthew Clark) crossing from east to west, walking in the opposite direction to Mrs. Fenichel, clear the intersection prior to her attempting to complete her turn. Mr. Clark testified (item 16) that Mrs. Fenichel was entering the street and passed him on his left as he was exiting the crosswalk. Therefore, if Michelle Ferguson had been making proper observations and had been watching Mr. Clark clear the intersection, as she testified, then she should have also seen Emily Fenichel walk past Mr. Clark.

(ii)    Based on Ms. Ferguson's own sworn deposition testimony (item 16), it cannot be concluded to a reasonable degree of engineering and scientific certainty that there were any vision obstructions (or blind spots) that

Scott M. Perry, Esq.
10 March 2008
Page 6

would have prevented Ms. Ferguson from being able to observe Emily
Fenichel and from being able to avoid the subject accident if she had been
making proper observations and been maintaining proper control of her
vehicle (bus). Upon feeling the impact Ms. Ferguson stopped and exited
her bus, at which time she observed Emily Fenichel for the first time,
when she saw her wedged under the left front of the bus. In my opinion,
Michelle Ferguson's failure to observe Emily Fenichel at any time prior to
seeing her wedged under the left front of the bus in it's final rest position
is completely consistent with the independent eyewitness observations that
Michelle Ferguson was looking to her left, and was not making necessary /
proper observations to the right as she turned right from Jennifer Street
onto Wisconsin Avenue. It is further noted and emphasized that even if it
is argued by the defendants that there was a blind spot on the right side of
the bus, this is completely irrelevant, with no causal relationship to the
happening of the subject accident, since Ms. Ferguson was looking to the
left immediately prior to, and at the time of, the subject impact. It is
further noted that in her sworn deposition testimony (item 16) Michelle
Ferguson acknowledged that any reference to a blind spot caused by the
*"A-frame"* of the bus is pure speculation. During her deposition (item 16),
Ms. Ferguson testified:

> Q: *"Miss Ferguson, would you agree that you do not know where
> Mrs. Fenichel was prior to this accident?"*

> A: *"Yes."*

In referring to the "A-frame" she further testified (item 16):

> Q: *"What I'm saying is do you have any knowledge specifically of
> how it contributed to this accident or are you just speculating
> that it might have?"*

> A: *"I'm going on the frame of the bus and as I'm making my turn
> we have to maneuver. You have to look around."*

> Q: *"So to answer my question, do you have specific knowledge
> that this A-frame caused or contributed to the accident?"*

> Mr. Stief: *"Asked and answered, plus my other objections. You
> can answer."*

BY MR. BURD:

> Q: *"It's a yes or no or is it just speculation based on - -"*

Scott M. Perry, Esq.
10 March 2008
Page 7

> A: *"How I operate, yes."*
>
> Q: *"Are you speculating that it may have or do you actually have specific knowledge of how it did cause or contribute to the accident?"*
>
> A: *"It may have had contributing - -"*
>
> Q: *"Okay, when you say "may have had" does that just mean that you're speculating that it's a possibility?"*
>
> A: *"Yes, it is a possibility."*

Therefore, in my opinion, there is no evidence to support a conclusion to a reasonable degree of engineering and scientific certainty that a vision obstruction created by the structure(s) of the bus was causally related to the happening of the subject accident. In my opinion, the available evidence indicates that the subject accident would have been completely prevented if Michelle Ferguson had acted in an ordinarily prudent manner, had made proper observations and had maintained proper control of her bus as she made the right turn from eastbound Jennifer Street onto southbound Wisconsin Avenue.

2) In my opinion, the opinions and conclusions reached by Detective Michael Miller (item 8) concerning the happening of the subject accident are incorrect and without a sound engineering, scientific and factual basis.

In attempting to perform a reconstruction of the subject accident Detective Miller had Metro bus #3916 brought to the accident scene. Police Officer Connor, who witnessed the accident, was also present to help position the bus, as she remembered it, at the commencement of the accident sequence. The police paint markings on the pavement were used to approximate the path of the bus on the night of the accident. As a result, Detective Miller concluded that the bus traveled approximately 40 feet from its initial stopped position on Jennifer Street to the point of impact in the crosswalk. Based on an assumed walking speed for Emily Fenichel of 4.1 to 4.3 feet/second Detective Miller then concluded that it would have taken Emily Fenichel approximately 5 seconds to reach the area of impact from the time she entered the crosswalk / roadway. He then concluded (item 8), *"...For the bus to travel 40 feet in approximately 5 seconds revealed an 8 feet per second velocity..."* at the time of impact. Detective Miller then utilized this computed travel speed for the bus and Ms. Fenichel's assumed walking speed to hypothetically position Ms. Fenichel relative to the bus in the seconds leading up to the impact. A WMATA employee represented to be approximately the same height as Mrs. Fenichel was used as a surrogate pedestrian for Detective Miller's observations and photographs (item 9). Photographs (item 9) were taken in an attempt to demonstrate the relative positions of the bus and pedestrian at various points in time in the moments leading up to the accident. Detective Miller also made observations from inside the vehicle, as described in his report (item 8). Based upon this attempted reenactment Detective Miller concluded that structures on / within the bus would have prevented Ms. Ferguson from

Scott M. Perry, Esq.
10 March 2008
Page 8

observing Emily Fenichel at 4 seconds and 1 second prior to the initial impact. Although he attempts to minimize the significance, Detective Miller did conclude, based upon this reenactment that Mrs. Fenichel could have been seen at 2 and 3 seconds prior to the initial impact. In his report (item 8) he states, *"...At time "3 seconds", Ms. Fenichel was 8.2 feet in the road and the bus was further in the intersection. Ms. Fenichel can be seen briefly because she is in between the "A pillar" and the center door frame. At time "2 second", Ms. Fenichel is 12.3 feet in the road and the bus has broken the plane of the north crosswalk bar. Only the extreme front portion can be seen of Ms. Fenichel because of the "A pillar" blocking the line of sight...".* As a result of this analysis, Detective Miller concluded, *"...Conducting a time distance reconstruction revealed that it was possible for Ms. Ferguson not to see Ms. Fenichel prior to the impact...".* It is noted and emphasized that Detective Miller does not conclude that Ms. Ferguson should not, or would not, have been able to observe Emily Fenichel and to have avoided the subject accident if she had been making proper observations and been maintaining proper control of her vehicle. Although Detective Miller's reenactment and reconstruction may seem impressive to a layperson, it is fundamentally, scientifically and factually flawed, and does lead to misleading and incorrect conclusions concerning the happening of the subject accident. In this regard I note the following.

(i)     At the time of the accident, the bus did not travel at a constant speed from it's starting position on Jennifer Street to the point of impact, as assumed by Detective Miller. The bus accelerated from an initially stopped position, and Michelle Ferguson testified (item 16) that although she did not see Emily Fenichel prior to the impact, she did observe, and was waiting for, another pedestrian (Matthew Clark) in the subject crosswalk who was crossing from the opposite side of the street, and was walking in the opposite direction, towards Mrs. Fenichel. (See the video clips from my inspection of the accident scene (item 21), previously provided to your office, for examples of how Metro buses typically execute the subject turn.) Ms. Ferguson further testified (item 16), *"...As I'm turning he cleared the intersection and I'm still inching, going slow, still looking down the curb lane, looking through my door and still looking and then I felt a bump...".* Matthew Clark testified (item 16), *"...I was on my cell phone waiting for the light to indicate I could cross. Once it did so I crossed...On Jennifer Street I saw a Metro bus preparing to make a right turn. It had its not-in-service sign on and it had its right turn signal on...It seemed to me that the bus was waiting for me to cross while at the same time it was inching forward...".* Therefore, Detective Miller's assumption that the bus was traveling at a constant speed from its initial position on Jennifer Street to the point of impact is contrary to the witness statements and is factually incorrect. In addition, it is noted that Matthew Clark had walked in front of the bus and completely across the street prior to hearing the impact. Utilizing the distance walked by Matthew Clark to cross the street and published walking speed data for males in Matthew Clark's age range, calculations indicate that it would have likely taken Mr. Clark on the order of 10.0 to 11.2 seconds, and perhaps longer, to cross the street from curb to curb.

Scott M. Perry, Esq.
10 March 2008
Page 9

Therefore, in my opinion, Detective Miller's analysis is incorrect, and there is no engineering, scientific or factual basis for Detective Miller's opinion that it took the Ferguson bus approximately 5.0 seconds to reach the point of impact from it's stopped position on Jennifer Street.

(ii)    In his report (item 8), Detective Miller indicated that the area of impact was approximately 21 feet west of the southbound curb line of Wisconsin Avenue. This would place Mrs. Fenichel (in the east-west direction) in the general vicinity of the lane markings separating the second and third travel lanes of southbound Wisconsin Avenue, which contains three travel lanes in each direction. Therefore, at the time of impact, Mrs. Fenichel was approximately two-thirds (2/3) of the way across the southbound lanes of Wisconsin Avenue. Utilizing published walking speed data; Detective Miller then concluded that it would have taken Mrs. Fenichel approximately 5.0 second to reach the area of impact from the time she stepped into the street. In performing his analysis and choosing walking speeds for Mrs. Fenichel, Detective Miller apparently ignores the fact that Emily Fenichel had a history of severe osteoarthritis and was post-surgeries for bilateral knee replacements in the summer and fall of 2005. Robert Fenichel, M.D., Emily Fenichel's husband, testified (item 16) that his wife had a tendency to walk more slowly than most, and furthermore, that her knees were bothering her on the day of the accident. He further indicated that she had been using a cane on the morning of the accident prior to leaving for work. Therefore, in my opinion, Detective Miller potentially, and likely, overestimated Emily Fenichel's walking speed, thereby; likely underestimating the length of time that she was in the crosswalk prior to the impact. It is also noted that based on his analysis, Detective Miller concluded (item 8) that *"...Using the 5 seconds in which Ms. Fenichel traveled in the roadway, and the fact that officer Connor observed the pedestrian signal at "4 seconds" at the time of impact, revealed that if Ms. Fenichel started to walk off the curb at 9 seconds, the pedestrian signal would have been flashing the amber hand signal..."*. I note and emphasize that, in my opinion, this conclusion reached by Detective Miller is based on a scientifically flawed analysis and is also contrary to the eyewitness testimony of Chris D. McGuire, who witnessed the accident from the sidewalk on the southbound side of Wisconsin Avenue. Mr. McGuire testified (item 16):

> Q: *"I want to take you back - - and I am almost done here - - to prior to the accident. When you were standing near the bus stop and you first saw Ms. Fenichel step into the crosswalk was there anything obstructing your vision of Mrs. Fenichel?"*

> A: *"I don't remember actually seeing her until it was essentially almost the collision point. So, I'm not sure if there was something that actually blocked my view or if I didn't notice her in the crosswalk."*

Scott M. Perry, Esq.
10 March 2008
Page 10

> Q: *"Did you at any point notice what we call the pedestrian signal, the walk/don't walk signs?"*
>
> A: *"Yes."*
>
> Q: *"Do you know if when Ms. Fenichel stepped into the crosswalk what it was showing?"*
>
> A: *"It was the little white walk guy."*

(iii) In my opinion, the available evidence indicates that Emily Fenichel likely saw the bus waiting and / or inching forward as it approached the crosswalk and it was reasonable for her to assume that Michelle Ferguson was waiting for her to cross in front of the bus prior to completing the turn. It is noted and emphasized that this is the same assumption that Matthew Clark made as he was crossing the same street, in the same crosswalk, in front of the same bus, but walking in the opposite direction to Emily Fenichel.

(iv) As previously discussed, in performing his time-distance analysis Detective Miller incorrectly assumes a constant travel speed for the bus and also likely underestimates the amount of time that Mrs. Fenichel was in the crosswalk prior to the impact. Therefore, in my opinion, the relative positions of the bus and the surrogate pedestrian depicted in Detective Miller's reenactment (item 9) are not accurate representations of the relative positions of the bus and Mrs. Fenichel immediately prior to the subject impact. It is also noted that although Detective Miller indicates that he utilized a surrogate pedestrian of approximately the same height as Emily Fenichel, there is no mention of the anthropometry of the surrogate driver, driver's seat position or mirror adjustments during the reenactment. Therefore, it cannot be concluded to a reasonable degree of engineering and scientific certainty that the observations from the driver's seat reported by Detective Miller during the reenactment were substantially similar to those that would, or could, have been made by Ms. Ferguson. However, as discussed above, it is again noted and emphasized that Detective Miller indicated in his report (item 8) that Mrs. Fenichel could have been observed by Ms. Ferguson at various positions on the bus's approach to the impact area. It is further noted, and emphasized, that Michelle Ferguson testified (item 16) that drivers are taught to compensate for blind spots. She testified (item 16):

> Q: *"And did you also maneuver so that you could see through any blind spots?"*
>
> A: *"Yes."*

Scott M. Perry, Esq.
10 March 2008
Page 11

> Q: "You said most of the time you can compensate for blind spots. That's your testimony earlier. When was it not possible for you to compensate for blind spots?"
>
> A: "You can compensate. You just have to maneuver. That's what I keep saying, keep maneuvering."
>
> Q: "So all the time you can always compensate for the blind spot if you maneuver, correct?"
>
> A: "The majority of the time, yes."
>
> Q: "You're not aware of any circumstances when you would not be able to compensate for a blind spot?"
>
> A: "No."

Therefore, in my opinion, based on the available information and a proper analysis, it cannot be concluded to a reasonable degree of engineering and scientific certainty that there were any vision obstructions, or blind spots, created by the structure of the bus that were causally related to the happening of the subject accident.

In summary, and to avoid ambiguity, it is my professional opinion to a reasonable degree of engineering and scientific certainty that the subject accident would have been completely prevented if Michelle Ferguson had been making proper observations and been maintaining proper control of her bus as she made a right turn from eastbound Jennifer Street onto southbound Wisconsin Avenue. It is further part of my opinion that Emily Fenichel likely saw Matthew Clark crossing the street and walking towards her, as well as the bus waiting and/or inching forward as it approached the crosswalk with time left on the crosswalk timer, and it was reasonable for Mrs. Fenichel to assume that Michelle Ferguson was waiting for her to cross in front of the bus, as she had for Mr. Clark. It is additionally part of my opinion that the analysis and resulting opinions expressed by Detective Michael Miller (item 8) are incorrect, and are lacking in a sound engineering and scientific foundation.

At the risk of being redundant, I note that I shall supplement this report as may be necessary or required, or as additional information becomes available necessitating a supplement.

Do not hesitate to contact me if you require clarification or elaboration on any item contained herein.

Sincerely,

Scott D. Batterman, Ph.D., P.E.

MOTOR CARRIER SAFETY * HIGHWAY COLLISION RESEARCH

**STOPPER**

WASHINGTON, D.C.

**& ASSOCIATES** LLC

RECEIVED
MAR 0 4 2008
BY:_____

February 29, 2008

Scott Perry, Esquire
Klores & Associates
1735 20th Street, N.W.
Washington, DC   20009
(202) 628-8100 FAX (202) 628-1240

RE:  Fenichel v. WMATA

Dear Mr. Perry:

As you requested, I have reviewed the following materials pursuant to my analysis of the above referenced matter:

- Washington, DC Metropolitan Police Department Traffic Accident Report and Investigation File
- Photo CD entitled "Accident Reconstruction of DC Police Fenichel #1845"
- Photo CD entitled "Night of Accident Fenichel #1845"
- Photo CD entitled "News Channel 4" Fenichel
- Photo CD entitled "Autopsy Photos" Fenichel
- News Report: WJLA-ABC Investigative Report - WMATA Crashes Aired 12/05/2007
- U.S. DOT Federal Motor Carrier Safety Administration's Carrier Snapshot for Washington Metropolitan Area Transit Authority
- Transit Cooperative Research Program, TCRP Report No. 66, "Effective Practices to Reduce Bus Accidents," Technology Management Systems, Inc., Washington, DC, 20001.
- Metro Customer Service, Operations & Safety Committee, October 12, 2006, Safety Annual Report-Out
- "Pedestrian Detection in Transit Bus Application:  Sensing Technologies and Safety Solutions," Fanping Bu, Ching-Yao Chan, Member IEEE, University of California at Berkeley, Richmond, CA 94804
- "Driving in Traffic:  Short-Range Sensing for Urban Collision Avoidance," Chuck Thorpe, Dave Duggins, Jay Gowdy, Rob MacLaughlin, et al, Robotics Institute, Carnegie Mellon University, Pittsburgh, PA

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 4 of 11

> *Wisconsin Avenue. After the initial impact, pedestrian #1 was then "run over" by the left front tire of the bus. After being extricated by the D.C. Fire Department, the pedestrian was transported to the Washington Hospital Center where she succumbed to her injuries....*

**Vehicle, Driver and Pedestrian**



**Vehicle 1** – 1997 Orion V Transit Bus, VIN 1VH51907XV6033736, Bus No. 3916, owned by the Washington Area Metropolitan Transit Authority of Washington, DC and operated by Michelle N. Ferguson of Washington, DC. Bus No. 3916 was not in service at the time of the collision and was not carrying any passengers as the driver had not yet started her route. Ms. Ferguson held a District of Columbia Class B Commercial Drivers License with passenger endorsement.

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 2 of 11

- "Side Collision Warning Systems for Transit Buses," Mertz, C., McNeil, S., Thorpe, C., Robotics Institute, Carnegie Mellon University, Pittsburgh, PA.
- DC Commercial Driver's License Manual
- Federal Highway Administration Interpretations of 49 CFR Part 383, Commercial Driver's License Standards: Requirements & Penalties: Based on Regulatory Text as Revised through February 8, 1991
- Federal Motor Carrier Safety Regulations (49 CFR, Parts 382, 387, 390-399, 40)
- Interpretations – Federal Motor Carrier Safety Regulations ( 49 CFR parts 382, 387, 390-399, 40) – J.J. Keller & Associates
- Carfax Record Search Results
- NHTSA Vehicle Recall Database
- A Policy on Geometric Design of Highways and Streets;  American Association of State Highway and transportation Officials (AASHTO); 2004, 5th Edition
- National Climatic Data Center Local Climatological Data for Area of Collision Scene
- SunTimes and Astrocalc astronomical software
- Stopper & Associates Bus Inspection , September 4, 2007
- Examination and forensic mapping of collision scene
- Traffic Light Sequence-Department of Transportation, Washington, DC, Traffic Services Administration; Wisconsin Avenue and Jenifer Street, Dated 07/12/05
- Transcript of Proceedings; Office of Administrative Hearings  Michelle Ferguson vs. WMATA  03/14/07
- Deposition of Norman Williams  12/07/07
- Deposition of Chris D. McGuire  01/30/08
- Deposition of Michelle Ferguson  02/13/08
- Deposition of Matthew Clark  01/04/08

After a review of the above-listed information, I offer the following opinions within a reasonable degree of scientific and professional certainty in the field of commercial vehicle investigations, collision reconstruction, accident cause analysis, driver training and applicability of the Federal Motor Carrier Safety Regulations, the Commercial Driver's License Standards, and safe operating practices of motor vehicles.

In forming these opinions I utilize over 30 years of experience and specialized training which include but are not limited to certification as an accident reconstructionist in 1985, as well as continued education to the present time as outlined in my Curriculum Vitae.

I have developed as well as taught CMV collision investigation and reconstruction courses for the University of North Florida's Institute of Police Technology and Management (IPTM) as well as the Texas A&M University System – Texas Engineering and Extension Service (TEEX). I continue to lecture at professional accident reconstruction seminars and courses in Commercial Motor Vehicle (CMV) Safety, CMV collision reconstruction, Advanced CMV collision reconstruction.  I have taught CMV investigation and reconstruction courses to national and

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 3 of 11

international collision reconstruction investigators including Federal, State Police as well as local law enforcement agencies since 1986.

I hold a Commercial Drivers License (CDL) for all classes of CMVs, including the type involved in this collision and regularly operate CMVs in the course of my work and collision research activities. I regularly attend professional and motor carrier industry seminars as well as review professional publications to keep my education and experience current.

## The Collision

This fatal collision involving a pedestrian occurred at 10:59 p.m. on Wednesday, June 8, 2006, at the intersection of Wisconsin Avenue and Jenifer Street NW, in Washington, DC. Wisconsin Avenue is a main thoroughfare through the District of Columbia. It is a commuter route from the center of the city into Bethesda, Maryland and runs predominantly northwest to southeast. It is heavily traveled and carries a large volume of traffic throughout the day. Wisconsin Avenue has a total of 6 lanes. There are 3 through lanes in each direction. Opposing lanes are separated by a double yellow center line. At 10:59 p.m. on Wednesday, June 8, 2006, the traffic was lighter but still moving.

Jenifer Street, runs east to west. It intersects Wisconsin Avenue in a shopping and residential district of the city. The intersection is beside the Mazza Gallerie in Friendship Heights. There is a large volume of pedestrian traffic in this area due to the shopping mall, restaurants and the Jenifer Street residential streets. Numerous pedestrians are also present on summer evenings that have traveled from the Friendship Heights Metro subway station approximately 150 feet south of the intersection. The posted speed limit on both Wisconsin Avenue and Jenifer Street is 25 mph.

This signalized intersection includes pedestrian crosswalks across the top of each leg of each of the intersecting roadways. Jenifer Street intersects Wisconsin Avenue at a 112° angle. Signal support poles with traffic signal lights and pedestrian signal boxes for the crosswalks are mounted on the sidewalks on each of the 4 intersections' corners. The pedestrian crosswalks are defined by solid white lines, which are worn, faded and partially missing in some places, making them difficult to distinguish from the asphalt surface of the pavement and the other lane line markings on the roadway.

On the night of June 8, 2006, weather conditions were clear and dry. At 10:59 p.m. it was well after sunset but this intersection is well illuminated by street lights. The police report narrative describes the collision as follows:

> *On Thursday, June 8, 2006 at approximately 2259 hours, pedestrian #1 was walking eastbound across Wisconsin Avenue, N.W., in the south side crosswalk, when she was struck by vehicle #1 making a right turn from eastbound Jenifer Street to southbound*

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 5 of 11

This bus displayed the Date of Manufacture as March 1998 based on the Federal Motor Vehicle Safety Standard identification plate. The bus had a Manufacturers' Gross Vehicle Weight Rating of 34,750 pounds. The empty weight was found as 27,780 pounds. Front axle weight was 8,100 pounds and the rear axle weighed 19,680 pounds. This bus measured 32' 4" long, including the forward mounted bicycle rack. The front axle had an overall width of 7' 5" and the body measured 7'9" wide.



Ms. Ferguson was driving eastbound on Jenifer Street and making a right turn onto southbound Wisconsin Avenue with a green light. She was waiting for a pedestrian walking westbound in the south crosswalk across Wisconsin Avenue before proceeding, and stated she checked her mirrors, saying right-left-right-left. When the westbound pedestrian had cleared her path, she then continued her turn when she felt a bump and heard a lady's screams. At this point she stopped the bus and exited the door, viewing a lady underneath the left front tire. Ms. Ferguson indicated she never saw the pedestrian before she hit her.

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 6 of 11

**Pedestrian 1** – Emily Schrag Fenichel of 3922 Ingomar St. NW, Washington, DC was the pedestrian who was struck as she was traversing the crosswalk Wisconsin Avenue in an easterly direction in the south crosswalk. Ms. Fenichel was a 64 year old woman, 5 ft., 1 inch in height. She is believed to have come from the Friendship Heights Metro subway station walking to her home about 2 ½ blocks away. She was struck by the left front bumper of the bus and was knocked to the ground and then drug before being pinned under the left front tire. The bus came to rest predominantly in the center of the three southbound lanes of Wisconsin Avenue with the left front wheel entering the passing lane. Ms. Fenichel's bag was thrown 1 ½ lanes to the southeast coming to rest in the northbound left lane of Wisconsin Avenue. Ms. Fenichel remained conscious on the scene but later died at the hospital as a result of her injuries. A local NBC Channel 4 News crew who had been preparing for an unrelated news report on the northeast corner of the intersection documented the scene immediately after the collision had occurred, before rescue had arrived.

Police officers, Sandra Connor and William Belton, were driving in a marked police patrol car facing west on Jenifer Street and preparing to turn south on Wisconsin Avenue, when they witnessed the collision from their position, opposite of the turning bus. Officer Connor indicated that she saw pedestrians, a male walking westbound and a female, eastbound, in the south crosswalk. The female was waving her hands and yelling "Hey, hey," attempting to get the attention of the bus driver before she was run down. This officer indicated that the female had just stepped off the sidewalk and was about 5-7 feet inside the crosswalk when the bus struck her. The pedestrian countdown style crosswalk signal facing eastbound was showing a '4' and the "hand" signal at this time. Officer Connor indicated she observed the driver of the bus watching the westbound male pedestrian as he made his way across the crosswalk.

The male pedestrian was identified as Mr. Mathew Clark. He stated Ms. Fenichel passed him on his left walking east as he was crossing Wisconsin Avenue walking west as the WMATA bus was inching forward. Mr. Clark stated he had made about two steps on the curb when he heard Ms. Fenichel yell and then a thud. He stated there were 5 – 4 seconds left on the pedestrian crossing countdown after this happened.

Mr. Chris McGuire was standing at the bus stop just south of the intersection and also witnessed the collision. He was quoted as saying the lady did not seem very agile. He also heard Ms. Fenichel scream before she was run over by the left front tire of the WMATA bus.

Another witness, Mr. Luis Urbina was on the southeast corner. He confirmed the traffic light was green for Jenifer Street and red for Wisconsin Avenue. He also heard Ms. Fenichel call out and then a thump as the bus made a right turn and the saw her under the bus.

Photographs and video of the scene reveal a Chevrolet van with a ladder rack was parked in the right lane of Wisconsin Avenue and as a result the bus had to enter the center lane to make a right turn. Examination of the scene and the photographs find each lane of Wisconsin Avenue is

approximately 10 feet wide. Ms. Fenichel was struck and dragged under the left front of the bus; therefore she was approximately 21 feet into the intersection, more the half way across the southbound lanes of Wisconsin Avenue, when she was struck.

## Washington Metropolitan Area Transit Authority

**Washington Metropolitan Area Transit Authority (WMATA),** U.S. DOT No. 36845, is domiciled at 600 Fifth Street, NW, Washington, DC 20001, (202) 962-1814. An intrastate, non haz-mat carrying, motor carrier of passengers, WMATA has 1,864 buses and 2,581 drivers. The U.S. DOT database known as the 'Safer Web' shows WMATA had only 2 fatal accidents in the 24 months preceding 7/24/07. We know that this is inaccurate and is probably a case of the data not having been updated because there were at least 4 fatal pedestrian accidents, one in January 2006, this one in June of 2006, and 2 in February of 2007.

WMATA is a bus and rail transit operation serving Washington, DC, Maryland and Virginia commuters and other passengers. The bus operations are the fifth largest network in the country, operating 335 routes on 176 lines. Its bus operators, are subject to Federal Motor Carrier Safety Regulations (FMCSR) and Commercial Driver's License regulations pursuant to 49 CFR Part 383. U.S. DOT has also issued interpretations of the Commercial Driver's License Standards holding such drivers to a higher standard of conduct than other motorists. This makes compliance with safety rules and practices all the more vital for both the operators and the motor carrier.

## Driver Qualification and Training

Our research has shown that at the time of this collision in 2006 WMATA provided an 8-week training course for newly hired drivers, wherein Metro's policies and procedures for bus operators were reviewed, and technical bus driver training was administered which included hands-on behind the wheel instruction. All operators then were required to receive regular 'refresher' classes on dealing with customers in addition to accident prevention procedures.

Effective safety management controls are vital for any motor carrier of passengers and the Federal Transit Administration, through its Transit Cooperative Research Program has prepared guidelines in this regard in its TCRP Report No. 66, "Effective Practices to Reduce Bus Accidents." In this report, the authors identified and evaluated five transit agencies that exhibited exemplary safety records and then examined the mechanisms they utilized for accident prevention (WMATA was not among those selected for this study). These mechanisms included specific driver selection and hiring and training practices, as well as vehicle inspections, safety audits and accident reviews. Improving bus technology was also important and this included driver vision concerns and improved mirror configurations. These mechanisms are all important and effective safety management controls.

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page **8** of 11

In addition, the Federal Transit Administration, in partnership with American Association of State Highway and Transportation Officials (AASHTO), the American Public Transit Association, (APTA), and the Community Transportation Association of America (CTAA), has developed a Model Transit Bus Safety and Security Program which offers safety program elements that all transit providers are urged to implement. The recommendations offered by this partnership are voluntary. Elements include procedures directed toward driver and employee safety issues, as well as the safety issues peculiar to the transit industry. The driver training element is described as:

> **Driver/Employee Training:** Once qualified candidates are identified and hired, initial and on-going training is critical to insure proper operations and adherence to the transit providers' rules and regulations. Proper qualification of operating and maintenance personnel is a vital part of a safe transit environment. Driver training should address specific safety-related issues appropriate to the type of vehicle and driving assignment including fitness for duty.

It is not evident from the materials reviewed how Ms. Ferguson had been qualified for the safety sensitive function of operating a passenger bus nor whether she had undergone any driver training through WMATA. The post-crash investigation by the police department indicates that she had a valid Class B Commercial Driver's License with a passenger endorsement but that her required medical certification expired on 6/4/06. Ms. Ferguson stated that she had recently been reexamined by a physician and that WMATA did have a current copy of her medical qualification.

## Commercial Driver Standards

Ms. Ferguson possessed a District of Columbia Class B Commercial Driver's License permit with passenger endorsement, allowing her to operate a single, non-articulated vehicle carrying passengers that is rated in excess of 26,000 pounds. Various driving skills are addressed in the DC Commercial Drivers License Manual, including 'Seeing.' The skills and knowledge section of the manual applies to all commercial drivers, whether they operate trucks or buses. Drivers are instructed that safe driving practices include knowing what's going on all around your vehicle and the first directive is to look ahead, 12 to 15 seconds ahead, or what would be equivalent to the distance of a city block. This issue is of utmost importance to the commercial driver who drives at night in an urban area where there is significant potential for conflict with vehicles and pedestrians crossing the roadway at intersections. Looking ahead and to all sides is a critical practice for bus drivers, especially in areas of high pedestrian traffic and crossing at intersections.

The Commercial Driver's Manual also contains a section devoted specifically to bus operators and a subsection therein instructs drivers on 'Avoiding Crashes.' Drivers are urged to 'Use caution at intersections, even if a signal or stop sign controls the intersection. Bus crashes often happen at intersections.'

Scott Perry, Esquire
RE:  Fenichel v. WMATA
February 29, 2008
Page **9** of **11**

### WMATA Bus #3916

Inspection was conducted September 4, 2007 at the WMATA bus barn 5230 Wisconsin Ave. Washington, DC on a level concrete parking lot one block from the fatal crash site.  The inspection of the bus revealed it was manufactured by Orion Bus of Oriskany, NY.  The bus displayed a certificate of manufacture indicating the vehicle conformed to all Federal Motor Vehicle Safety Standards on the date of manufacture which was shown as March 1998.  The manufacturer's Gross Vehicle Weight Rating (GVWR) displayed was 34,750 pounds.  This bus displayed a label indicating "Rehabilitated Bus 940 Proudly & Professionally Refurbished by Metro".

Numerous measurements were made to include but not limited to:

- Overall length 32'4" including the front bicycle rack
- Overall width 7'9" at front bumper
- The front axle 7'7", behind the leading edge of the bus
- Rear axle 9'10", from the rear of the bus
- Driver seat back 6'7" to 6'10" above ground level (AGL) depending on seat air ride adjustment
- The driver seat backrest rises 24" above the seat
- Windshield measured 5'½" to 8'1½"AGL
- Right rearview mirror 6'8 ¼" to 7'8" AGL
- Left rearview mirror 5'1 ½" to 6'1" AGL
- Front axle weighed 8,100 pounds
- Rear axle weighed 19,680 pounds
- Weight of bus with driver 27,780 pounds
- Front bumper measured 1'3" to 2'1/2" AGL
- Left front chassis skid plate 11" to 10" AGL
- Jagged steel bracket found 8 1/2" AGL, 5' from the right edge of the bus and 5'4" from front of bus
- Front tire track width 7'5 ½" outside to outside ground contact
- Front tire ground contact width 8"

Examination of the bus revealed no unusual visual impairments which would have prevented the driver, using proper scanning techniques, from observing pedestrians as the bus traversed an intersection.  Commercial bus driver's are taught and Ms. Ferguson testified that she was able to adjust her position as she scanned for vehicles and pedestrians so as to insure a potential conflict (person or vehicle) was not briefly obscured by the window frame structure ("A frame") or other mounted equipment on the bus.  The right rearview mirror is mounted 6'8 ¼" to 7'8" above ground level (AGL) so as to prevent visual obstructions to the right front and side of vehicles and pedestrians.  The bottom of the windshield measured 5'1" AGL.  The driver's seat back was found to be 4'2" to 4'4" behind the windshield.  The driver's seat back was 6'7" to 6'10" above

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page 10 of 11

ground level (AGL) depending on seat air ride adjustment. Considering these measurements as well as my own observation from the driver's seat of these items and other mounted equipment, an object or pedestrian 5'0" high would be within the driver's field of view 4' or greater forward of the bus. The driver would have direct view of a pedestrian to the right of the bus through the glass mounted the entire height of the entrance door, with the exception of frame members. The frame members of the door are not of sufficient size to obstruct the field of view to the immediate right of the coach.

Ms. Ferguson testified she was operating 2 – 3 mph when she heard the impact. At that speed the bus would travel 4 feet in 0.90 to 1.36 seconds. Mr. McGuire, an independent witness, testified Mrs. Fenichel was in the crosswalk when the bus began to accelerate approximately 2-3 seconds before impact and was operating 10 – 12 mph at impact. At 10 mph the bus would cover 14.6 feet per second.

## Analysis

The bus was operating eastbound on Jenifer Street turning right on Wisconsin Avenue. The pedestrian crosswalk for Wisconsin Avenue receives a 27 second crossing countdown. At the same time the traffic signal for eastbound Jenifer Street turns green. Traffic eastbound on Jenifer Street turning south on Wisconsin Avenue must yield to pedestrians in the crosswalk.

Ms. Ferguson, the driver of bus 3916 was oerating empty and is reported to have initially stopped the bus to allow pedestrians to cross Wisconsin Avenue. All the evidence shows Ms. Fenichel was in the crosswalk as the bus was "inching forward". The AASHTO walking speeds for pedestrians is a range of 2.5 to 6.0 feet per second and uses an average of 4 feet per second for highway design. The AASHTO manual states, "Older people will generally walk at speeds in the lower end of this range." Considering Ms. Fenichel was 64 years of age and had both knees replaced in the last year as well as the observation of Mr. McGuire that she was not very agile the application of the lower end of the range is appropriate for this case. Using 2.5 feet per second to 4 feet per second, Ms. Fenichel was most likely in the crosswalk 5.25 to 8.4 seconds. Considering the field of view from the driver's seat would have allowed direct observation of a pedestrian 4 feet or more forward of the bus and the time Mrs. Fenichel must have been well into the crosswalk to the point of impact where she was run over by the left front wheel of the bus. Ms. Ferguson had the opportunity as well as duty to use extreme care when making a right turn through a crosswalk especially in a high volume pedestrian area and could have seen Mrs. Fenichel and avoided running her down.

Scott Perry, Esquire
RE: Fenichel v. WMATA
February 29, 2008
Page **11** of **11**

## Summary

This was a preventable accident but for the actions of this driver failing to pay proper attention to the task at hand, failing to scan forward as well as to the sides before crossing the crosswalk. Ms. Ferguson testified she never saw and was unaware of Ms. Fenichel's presence and only heard a thump. Ms. Ferguson was not keeping a proper lookout before she entered the intersection to make her right turn. Ms. Ferguson should have been aware of Ms. Fenichel before she began to turn right and then should have checked to make sure she was clear before continuing the right turn.

Operation of CMV's is defined as a "Safety Sensitive Function" (49 CFR 382.107) placing additional responsibilities and duties on the drivers and motor carriers that assign drivers to operate CMV's in interstate and intrastate commerce, including substance abuse testing (49 CFR §382).

The Federal Highway Administration, Office of Motor Carrier Standards published in the February 8, 1991 Interpretations of 49 CFR Part 383 which stated:

> ***"Because of the greater potential for loss of life, serious injury, and significant property damage in accident involving CMV's, the FHWA's regulations (in 49 CFR Part 383) hold drivers of these vehicles to a higher standard of conduct than other highway users."***

Preventable accident is defined pursuant to the FMCSR's as:

> ***49 CFR §385.3:***
>
> ***Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver.***

It is critical the bus driver is trained in preventing pedestrian conflicts. WMATA had a rash of pedestrian collisions in 2006 and 2007 that were directly attributable to a lack of effective safety management controls. WMATA had a duty to develop and administer Safety Management Controls and there was certainly ample information and guidance available to help them improve their driver training programs well in advance of this fatal pedestrian collision.

I reserve the right to edit, supplement and amend these opinions in the event additional information is brought forth for my review.

Sincerely,

David A. Stopper,
Director



Financial and Economic Consulting

Richard J. Lurito, Ph.D.
*President*

January 16, 2007

Scott M. Perry, Esq.
Bruce J. Klores & Associates
1735 20th Street, N.W.
Washington, D.C. 20009

Re: Emily S. Fenichel Case

Dear Mr. Perry:

The purpose of this report is to set out the economic loss suffered by the family of Ms. Emily S. Fenichel as a result of her death on July 8, 2006, when she was struck and killed by a Metro bus. At the time she died, Ms. Fenichel was 64.17 years old, having been born on May 5, 1942. According to the 2003 <u>Life Tables</u>, published by the U.S. Department of Health and Human Services, a white female, age 64, has 20.6 years of remaining life expectancy. I am advised that Ms. Fenichel intended to work until age 70, or 5.83 years beyond her death.

Ms. Fenichel was a licensed social worker and was employed as the Editor of the scholarly press at Zero To Three: The National Center For Infants, Toddlers and Families. She started work there on October 1, 1979 and was earning $118,667 a year at the time of her death. For purposes of this study, it is conservatively assumed that absent death Ms. Fenichel's salary would have risen at 3% a year, which is the likely future rate of inflation in our economy. Based on this, Table 1, Column 2, shows that had she not died Ms. Fenichel could have expected to earn $744,263 in total dollars over the 5.83 years of working life she had remaining when she died.

Given this projected lost income stream for Ms. Fenichel, we must now determine the economic value today of these earnings. To do this, we must find a lump-sum which, if given today, would be equivalent in value to her income stream, absent death. It will be recalled that Ms. Fenichel would likely have earned $744,263 in total dollars from the time she died through the end of her expected working life.

1491 Chain Bridge Road, Suite 300
McLean, VA 22101

Telephone: 703/442-4528
Telecopier: 703/893-1674

However, it would be inappropriate to give her family such a sum today to compensate it for the income she could have earned, absent death. This is the case because this money could be used to earn interest itself. The question then is, "how much less should this sum be in order to be equal to the value of the income Ms. Fenichel would likely have earned, absent death?"

The answer depends on (1) how the income stream is spread over time, and (2) what sort of interest the lump-sum could earn if invested. The final answer, called the present value of the future income stream, is obtained by the technique of discounting each year of the future stream at whatever interest rate is deemed appropriate for investing funds and then summing across all years.

The choice of an appropriate discount rate (interest rate) is to some extent a matter of opinion. One can invest funds in assets yielding various interest rates, and the differences in rates among such assets is usually related to the degree of risk associated with holding them. U.S. Government securities, for example, are generally considered to have as little risk as any interest-bearing asset can have. Over the 1970-2005 period, long-term, taxable U.S. government bonds have yielded, on the average, 7.69% per year (see Table 2, Column 3). On the other hand, Aaa corporate bonds, being somewhat riskier, have yielded 8.63% per year over this same period. Other types of assets such as common stocks or lower grade bonds have still higher yields owing to the greater level of risk associated with holding them. In view of these differences in interest rates, which rate is appropriate?

One way to put the question of interest rate choice is to ask, "what sort of rate would be earned on the kind of asset a prudent person would choose if he/she were trustee of a sum of money for someone else?" Because there is no universally accepted rate for this purpose, calculations of the present value of Ms. Fenichel's lost income have been made on the basis of a 4.0% after-tax discount (interest) rate. This constitutes a rate of return that a prudent trustee might aim for in current financial markets. Higher rates would require that higher levels of risk be taken and would seem to go beyond risk levels a prudent trustee might want to accept.

Hence, to determine the amount of money Ms. Fenichel's family would have to be given today to compensate it for the income she could have earned absent death, the figures in Table 1, Column 2, were discounted at 4.0% per year – the rate of interest found appropriate for this purpose. The total of Column 3 of Table 1 shows that a lump-sum payment of $675,939 would be necessary for this purpose. Hence, in my opinion, Ms. Fenichel could have expected to earn at least $675,939 in present value terms over her working life had she not died.

Had Ms. Fenichel earned the income set out in Column 2 of Table 1 she would have had to pay federal and District of Columbia income taxes on it. The first step in the process of determining her total tax liability is to establish her average yearly income in 2006 dollars over her working life. Had Ms. Fenichel been able to enjoy the earnings set out on Table 1, Column 2, her average yearly income over her working life in 2006 dollars would have been $118,677.[1] A married person, filing a separate tax return, taking a 19% itemized deduction and one exemption and earning $118,677 per year would pay $20,962 in federal income taxes.[2] A District of Columbia resident would pay $8,022 in taxes on such an income.[3] Thus, had Ms. Fenichel had the earnings set out on Table 1, Column 2, her total tax liability would likely have been 24.4% of her gross income [($20,962 + $8,022)/$118,677].

---

[1] The figures in Column 2 of Table 1 are deescalated by 3.0% per year and summed. This is $691,887. This figure is then divided by 5.83 working years.

[2] ($118,677)(1 - .19) - $3,200 is a taxable income of $92,928. The federal tax on such a taxable income is $20,962.

[3] Based on a $94,758 taxable income; tax is $2,000 + 9.3% over $30,000.

It will be recalled that absent death Ms. Fenichel would likely have earned $675,939 in present value terms over her working life. Had she spent 24.4% of this amount for income taxes, $511,010 would have remained after taxes ($675,939 x (1 - .244)).

Had Ms. Fenichel earned the income shown in Table 1, Column 2, she would also have spent a portion of it for her own personal maintenance. To determine how much she likely would have spent, it is first necessary to compute her average yearly income over her working life in 2006 dollars. This was already seen to be $118,677. This income figure is $107,888 in 2002-2003 dollars.[1] An analysis based on U.S. Department of Labor data revealed that Ms. Fenichel would likely have spent $136,269 in present value terms for her own personal maintenance over her working life.[2] Hence, the lost income to her family due to her death after income taxes and personal maintenance expenses are deducted is $374,741 ($511,010 - $136,269).

In addition to suffering an income loss, Ms. Fenichel's family has also lost the contributions her employer would likely have made to her 403(b) defined contribution retirement benefit plan. According to the terms of that plan, Zero To Three would have contributed 7% of Ms. Fenichel's gross earnings into her pension plan. Based on a 7% per year rate of return on investment and a 4% after-tax discount rate, the present value of Ms. Fenichel's lost pension benefits was determined to be $51,002.

It should be noted that Ms. Fenichel's husband has also lost the household services his wife would likely have provided to him had she not died. Mr. Fenichel advised me that his wife spent some 16 hours a week providing a host of household services to him prior to her death. These services included, inter alia, cooking, shopping, cleaning, laundry, errands, etc. I have been asked to assume that it would cost $30.00 per hour to replace Ms. Fenichel's lost services; hence, it would cost $24,000 a year to accomplish this task ($30.00 x 16 x 50). Based on the use of a 4.0% annual cost escalation factor, Table 3, Column 2 shows that it will cost Mr. Fenichel $596,790 in total dollars over the 17.6 years from the time his wife was killed to the end of his expected life to replace the services she would have provided to him had she not died.[3] The present value of this cost is $422,400, at the 4.0% after-tax discount rate already found appropriate for this purpose, as Column 3 of Table 3 shows.

Finally, I am advised that Ms. Fenichel provided four to five hours a week of child care services to her grandson, Leonard, who was born on September 13, 2005. Ms. Fenichel would likely have provided these services for 4.18 more years until Leonard reached age 5. At a current replacement cost of $10.00 an hour, it would cost $2,000 to $2,500 a year to replace Ms. Fenichel's lost services ($10.00 x 4 or 5 hours x 50 weeks). Based on a 4% per year cost escalation factor and a 4% after-tax discount rate, the present value cost to replace Ms. Fenichel's lost child care services is $8,360 to $10,450 over the 4.18-year period she would likely have provided them.

In sum, the family has suffered at least four types of economic loss due to Ms. Fenichel's death. They are as follows:

---

[1] The $118,677 figure is divided by 1.10 which is the increase in the Consumer Price Index between 2002-2003 and today.

[2] "Consumer Expenditure Interview Survey, 2002-2003", U.S. Department of Labor, Bureau of Labor Statistics, Table 35.

[3] Ms. Fenichel's husband, Robert, was 64 years old when she died. He was born on November 1, 1941. According to the 2003 Life Tables referred to earlier in this report, the life expectancy of a typical white male, age 64, is 17.6 more years.

| Aspect Of Loss | Pecuniary Loss |
|---|---|
| 1. Lost Net Income | $ 374,741 |
| 2. Lost Pension Benefits | 51,002 |
| 3. Lost Household Services | 422,400 |
| 4. Lost Child Care Services | 8,360-10,450 |
| 4. Total | $856,503-$858,593 |

Hence, in my opinion, a lump-sum payment of at least $856,503 to $858,593 needs to be made to the family today to compensate it for the pecuniary loss it has suffered due to Ms. Fenichel's death on July 8, 2006.

Very truly yours,

*Richard J. Lurito*

Richard J. Lurito, Ph.D.

TABLE 1

Lost Future Earnings Of Ms. Emily S. Fenichel

Over Her Working Life

And The Present Value Of That Loss

| Year Of Remaining Work Life Expectancy a/ (1) | Lost Future Earnings (2) | Present Value Of Lost Future Earnings d/ (3) |
|---|---|---|
| 1 | $ 118,677 b/ | $ 118,677 |
| 2 | 122,237 | 117,536 |
| 3 | 125,904 | 116,406 |
| 4 | 129,682 | 115,286 |
| 5 | 133,572 | 114,178 |
| 6 | 114,191 c/ | 93,856 |
| Total: | $ 744,263 | $ 675,939 |

a/ At the time her economic loss began, Ms. Fenichel had an expected working life of 5.83 more years.
b/ From 7/9/2006 to 7/8/2007 Ms. Fenichel would likely have earned $118,677 (per text).  This $118,677 figure is escalated at 3% per year into the future.
c/ 83% of $137,579.
d/ The figures in Column 2 discounted at 4% per year.

TABLE 2

Basic Economic Data

1970 - 2005

| Year (1) | Moody's Aaa Corporate Bonds (Percent Yield) (2) | U.S. Government Bonds Percent Yield) * (3) |
|---|---|---|
| 1970 | 8.04 | 7.35 |
| 1971 | 7.39 | 6.16 |
| 1972 | 7.21 | 6.21 |
| 1973 | 7.44 | 6.84 |
| 1974 | 8.57 | 7.56 |
| 1975 | 8.83 | 7.99 |
| 1976 | 8.43 | 7.61 |
| 1977 | 8.02 | 7.42 |
| 1978 | 8.73 | 8.41 |
| 1979 | 9.63 | 9.44 |
| 1980 | 11.94 | 11.46 |
| 1981 | 14.17 | 13.91 |
| 1982 | 13.79 | 13.00 |
| 1983 | 12.04 | 11.10 |
| 1984 | 12.71 | 12.44 |
| 1985 | 11.37 | 10.62 |
| 1986 | 9.02 | 7.68 |
| 1987 | 9.38 | 8.39 |
| 1988 | 9.71 | 8.85 |
| 1989 | 9.26 | 8.49 |
| 1990 | 9.32 | 8.55 |
| 1991 | 8.77 | 7.86 |
| 1992 | 8.14 | 7.01 |
| 1993 | 7.22 | 5.87 |
| 1994 | 7.96 | 7.09 |
| 1995 | 7.59 | 6.57 |
| 1996 | 7.37 | 6.44 |
| 1997 | 7.26 | 6.35 |
| 1998 | 6.53 | 5.26 |
| 1999 | 7.04 | 5.65 |
| 2000 | 7.62 | 6.03 |
| 2001 | 7.08 | 5.02 |
| 2002 | 6.49 | 4.61 |
| 2003 | 5.67 | 4.01 |
| 2004 | 5.63 | 4.27 |
| 2005 | 5.24 | 4.29 |
| Average | 8.63% | 7.69% |

* U.S. Treasury securities of 10-year maturities.

SOURCE: Economic Report of the President, 2006. Washington,
        D.C.:  U.S. Government Printing Office, 2006.

TABLE 3

Lost Household Services Of Ms. Emily S. Fenichel

Over Her Husband's Expected Life

And The Present Value Of That Loss

| Year Of Remaining Life Expectancy a/ (1) | Lost Household Services (2) | Present Value Of Lost Services d/ (3) |
|---|---|---|
| 1 | $ 24,000 b/ | $ 24,960 |
| 2 | 24,960 | 24,960 |
| 3 | 25,958 | 24,960 |
| 4 | 26,997 | 24,960 |
| 5 | 28,077 | 24,960 |
| 6 | 29,200 | 24,960 |
| 7 | 30,368 | 24,960 |
| 8 | 31,582 | 24,960 |
| 9 | 32,846 | 24,960 |
| 10 | 34,159 | 24,960 |
| 11 | 35,526 | 24,960 |
| 12 | 36,947 | 24,960 |
| 13 | 38,425 | 24,960 |
| 14 | 39,962 | 24,960 |
| 15 | 41,560 | 24,960 |
| 16 | 43,223 | 24,960 |
| 17 | 44,952 | 24,960 |
| 18 | 28,050 c/ | 14,976 |
| Total: | $ 596,790 | $ 439,296 |
| Adjusted Total: | | $ 422,400 e/ |

---

a/ At the time his economic loss began, Ms. Fenichel's husband had an expected life of 17.6 more years.
b/ From 7/9/2006 to 7/8/2007 Ms. Fenichel would likely have provided $24,000 worth of household services (per text).  This $24,000 figure is escalated at 4% per year into the future.
c/ 60% of $46,750.
d/ The figures in Column 2 discounted at 4% per year.
e/ $439,296/1.04.