## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT R. FENICHEL, M.D.** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Case No.: 1:07-cv-00768-JR** |
| : | |
| **WASHINGTON METROPOLITAN** : | |
| **AREA TRANSIT AUTHORITY** : | |
| : | |
| **Defendant.** : | |
| : | |

### DEFENDANT WMATA'S 26(a)(2) STATEMENT

Pursuant to Rule 26(a)(2), Defendant WMATA respectfully submits its list of expert witnesses, including areas of expertise, proposed testimony and the bases therefor:

1)      David Plant, PE, D.P. Plant & Associates, 1722 V Street, N.W., Washington, D.C. 20009, (202) 232-8929.

David Plant is a licensed mechanical engineer and an accident reconstructionist and is ACTAR certified.  Based on his own investigation and analysis of this accident, which includes but is not limited to his examination of the WMATA bus, the accident site and surrounding areas; his review of the investigation and analysis of Detective Michael Miller; his review of documents obtained from the FOIA request to the Metropolitan Police Department's Major Crash Unit ("MCU") as well as those documents which were subpoenaed from the MCU; and all discovery answers and responses, including deposition testimony of all fact witnesses, as well any other information referenced in his report, including his background, training and experience, Mr. Plant will testify to a reasonable degree of scientific certainty in accordance with his written

report attached hereto, and summarized as the following:

Mr. Plant will testify as to issues of timing and distance in this matter, including that Emily Fenichel's travel distance from the curb until the point of impact, the location of point of impact. He will opine that Emily Fenichel stepped off the west curb at Wisconsin Avenue to cross eastbound with only 4 seconds remaining on the pedestrian signal. The pedestrian light had already changed to amber upraised hand of "DON'T WALK," based on witness testimony. Mr. Plant will additionally testify, even assuming that the 4 seconds of the videotaped testimony refers to the time of impact, as Detective Michael Miller assumed, that Emily Fenichel would have still have stepped off the curb when the light would still have been the amber upraised hand of "DON"T WALK." Mr. Plant will discuss the timing of the walk signal, at what point that it changes from the white person, symbolizing "WALK," to the amber upraised hand of "DON'T WALK." Mr. Plant will also discuss walking speeds for pedestrians, and the results of his own study of pedestrian walking speeds, and the role of Mrs. Fenichel's walking speed in this incident. Mr. Plant will also discuss his opinions regarding speed of the bus, perception times and braking distances, acceleration rates and crossing times, and how that information interacts in this matter, and how that information is shown visually on his crash simulator computer program.

Mr. Plant will opine that witness Chris McGuire could not have seen the color of the pedestrian walk sign controlling the intersection for Emily Fenichel, as his view of the pedestrian light would be blocked from where he was positioned at the bus stop. Additionally, Mr. Plant will opine that Mr. McGuire's view was additionally blocked by cars parked in the curb lane just north of the bus stop where Mr. McGuire was waiting. Mr. Plant will opine that the testimony of Matthew Clark corroborates his finding that the Plaintiff stepped off the curb during the amber

upraised hand of the "DON'T WALK" signal.

Mr. Plant will also opine that Detective Miller conducted an investigation according to sound scientific bases and that there is sound scientific evidence to show that there are blind spots for a WMATA's bus operator with regard to a pedestrian of Emily Fenichel's stature, while the bus operator was making a right turn from Jenifer Street onto Wisconsin Avenue.

David Plant charges $180/hour.  He has spent approximately 71.25 hours on this matter at this time. Exhibit 1 is attached hereto, containing his Report, Curriculum Vitae, and last four years of court testimony  pursuant to the Rules of this Court.

2.   Thomas Borzilleri, Ph.D, 6701 Democracy Boulevard, Suite 300, Bethesda, Maryland 20817, (202) 862-3630.

Dr. Borzilleri is a forensic economic expert.  His 2007 reports and June 3, 2008 supplement, attached hereto as Exhibits 2  state his opinions and the bases and reasons for those opinions.   His report analyzes Emily Fenichel's financial information, including salary, W-2s and tax returns, household expenses she shared with her husband, Robert Fenichel, M.D, as well as other information, including that obtained from depositions.   He opines as to the economic value of the loss which the estate of Mrs. Fenichel incurred, as well as the household services losses incurred by family members, assuming *arguendo* that the factual premises alleged by Plaintiff for lost income and services are proven.  His *curriculum vitae* is attached hereto as Exhibit 3. Dr. Borzilleri's list of other cases he has testified within the last four years is attached as Exhibit 4.  Dr. Borzilleri charges $350.00 per hour for all his expert services.

3.  Detective Michael Miller; Metropolitan Police Department, 501 New York Avenue, N.W., Washington, D.C. 20001, (202) 698-7002.

Detective Miller is a non-retained expert in accident reconstruction and is ACTAR certified.  He is a police detective with the Washington, D.C. Metropolitan Police Department and has been assigned to the Major Crash Investigations Unit since 1997.  Detective Miller was assigned to investigate the circumstances of this accident involving Emily Fenichel.   His CV is attached hereto as Exhibit 5.   His  report, attached hereto as Exhibit 6, was produced within the course of his official investigation of this accident and contains his opinions regarding his accident reconstruction and the bases and reasons therefore.  Primary among his findings is that WMATA's bus operator, Michelle Ferguson, while turning her head for observations, could have entered into several of the blind spots the exist on the bus due to the nomenclature of the bus, and that Emily Fenichel stepped off the curb when the amber upraised hand of the DON'T WALK signal was flashing.  Detective Miller is expected to testify regarding the bases of his opinions, the information he relied on, including, but not limited to, the investigative file provided at his deposition, his actual accident reconstruction in this matter and the methods and criteria he used in doing his reconstruction, his interview with witnesses and his evaluation of their statements.  Detective Miller's opinions are further discussed in his deposition taken in this case.

4.  Aysha Farooqi, M.D., Virginia Hospital Center;  George Mason Drive, Arlington, VA.

WMATA reserves the right to qualify Dr. Ayasha Farooqi as an expert witness in medicine/trauma.   Dr. Farooqi, a medical doctor, was driving on Wisconsin Avenue near the accident scene and at the time of the accident.  If called at trial, Dr. Farooqi, a non-retained expert, would be expected to  testify that Mrs. Fenichel exhibited symptoms of shock when Dr. Farooqi was with her at the accident scene.  Based on her medical training, background and

experience, and in particular her emergency room experience, Dr. Farooqi would opine that

shock can blunt pain perception.  <u>See</u> pages 24 and 34 of Dr. Farooqi's January 28, 2008

deposition.

Respectfully submitted,

WASHINGTON METROPOLITAN AREA
  TRANSIT AUTHORITY

__/s/ _____
Gerard J. Stief #925933
Janice L. Cole  #440351
Associates General Counsel-WMATA
600 Fifth Street, N.W.
Washington, D.C.  20001
(202) 962-2543

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing <u>**Defendant WMATA's 26(a)(2)**</u>  was sent via electronic court service this 3rd of June 2008  to:

Bruce J. Klores #358548
Scott M. Perry #459841
Bruce J. Klores & Associates
1735 20th Street, NW
Washington, DC 20009
202-628-8100
Attorneys for Plaintiffs

_____/s/_____
Janice L. Cole

D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

May 13, 2008

Janice L. Cole, Esquire
Associate General Counsel
Office of General Counsel - WMATA
600 Fifth Street, NW
Washington, DC 20001

jlcole@wmata.com

VIA EMAIL & US MAIL

Re:  Robert R. Fenichel, M.D. v. WMATA

Dear Ms. Cole:

I am investigating the fatal pedestrian accident that occurred on the night of June 8, 2006. Based upon the information available at this time and my accident reconstruction work, I am presenting my opinions via this report. I have reviewed the following information and performed the work listed below:

1.    Various documents, reports, and photographs prepared by or taken by the Metropolitan Police Department (MPD) of Washington, D.C. This includes Det. Miller's file and drawings and the Autopsy Report.

2.    Various documents, reports, and photographs prepared by or taken by WMATA personnel.

3.    Video taped interviews of Michelle Ferguson, Officer Sandra Connor, and Officer William Belton.

4.    Reviewed transcripts of the depositions of:
        Officer Sandra Connor taken March 13, 2008
        Officer William Belton, III taken March 13, 2008
        Michelle Ferguson taken February 13, 2008
        Matthew Clark taken January 4, 2008
        Luis Urbina taken September 27, 2007
        Chris McGuire taken January 30, 2008
        Aysha Farooqi, M.D. taken , 2008
        Robert Fenichel, M.D. taken November 20, 2007
        Norman Williams taken December 7, 2007
        Robert Ballard taken February 8, 2008

5.   Video taken by News Channel 4 and 7.

6.   The Complaint and First Amended Complaint.

7.   Inspected the WMATA bus.

8.   Inspected the accident scene.

9.   Obtained a high-resolution aerial photograph of the accident scene that was taken October 29, 2000.

10.  Reviewed the February 29, 2008 report of David A. Stopper.

11.  Reviewed the March 10, 2008 report of Scott D. Batterman, Ph.D., P.E. Reviewed photographs and video from Scott D. Batterman, Ph.D., P.E.

12.  Reviewed the February 25, 2008 report of Kris Sperry, M.D.

## Police Report

According to the police report (Form PD 10), this accident occurred on Thursday, June 8, 2006 at 10:59 p.m. at the intersection of Wisconsin Avenue and Jenifer Street in Northwest, Washington, D.C.  The police report listed Michelle N. Ferguson as the driver of the 1997 Orion Metrobus, VIN 1VH519P7XV6033736, and Emily Schrag Fenichel as the pedestrian.

The police report stated "…pedestrian #1 was walking eastbound across Wisconsin Avenue N.W., in the south side crosswalk, when she was struck by vehicle #1 making a right turn from eastbound Jenifer Street to southbound Wisconsin Avenue.  After the initial impact, pedestrian #1 was the "run over" by the left front tire of the bus."

## WMATA Metrobus Inspection

I inspected the WMATA Metrobus on April 23, 2008.  During this inspection, I took measurements and photographs of the subject metrobus.  The metrobus is a 1997 Orion V transit bus, is numbered by WMATA as metrobus number 3916 and has a GVWR (gross vehicle weight rating) of 34,750 lbs.  The length of the metrobus measured 32 feet 5 inches (bumper to bumper), the width was 8 feet, the front overhang was 7 feet 7 inches, and the wheelbase was 15 feet. Using my measurements, I have prepared a scale drawing of the subject metrobus.

During my inspection, I conducted braking tests with the metrobus to determine the response time of the braking system.  For this report, I have defined the response time of the braking system as the time from when the brake pedal is depressed to when the vehicle's speed starts to noticeably decrease.  I equipped the metrobus was with a Vericom VC3000DAQ, which measured the deceleration rate of the metrobus from the application of the brake pedal until the metrobus came to a stop.  From this testing, I determined that the braking response time to be no less than 0.30 seconds.

## Accident Scene Inspections

I inspected the accident scene on April 16, 2008, April 23, 2008, and May 7, 2008. During these inspections, I took measurements and photographs of the accident scene.

I obtained from Det. Michael Miller (from the Major Crash Unit for MPD and who investigated this accident) his scale drawings of the accident scene. These drawings included the locations of the physical evidence, such as the rest positions of the metrobus and Mrs. Fenichel. These drawings did not include the sign for the Friendship Heights metro station, the cover and sign for the WMATA bus stop on the west side of Wisconsin Avenue that is south of the subject intersection (i.e., where witness Chris McGuire was located at the time of the accident), nor the trashcan at the southwest corner of the intersection. Using my measurements, I have included the sign for the Friendship Heights metro station, the cover and sign for the WMATA bus stop, and the trashcan on Det. Miller's scale drawing of the accident. This scale drawing of the accident scene is attached to this report as Exhibit 1. The sign for the metrobus stop, shown on Exhibit 1, is approximately 180 feet south of Jenifer Street. The sign for the Friendship Heights Metro Station, shown on Exhibit 1, is approximately 156 feet south of Jenifer Street

Witness Chris McGuire stated in his deposition that at the time of the accident he was standing at the Metro Bus Stop that is on the west side of Wisconsin Avenue and south of Jenifer Street. Mr. McGuire also stated that he observed that the "little white walk guy" was the condition of the walk/don't walk signal at the southeast corner of the intersection (i.e., the pedestrian signal for pedestrians crossing Wisconsin Avenue on the south side of the intersection) when "Ms. Fenichel stepped into the crosswalk." Below are photographs that I took on April 16, 2008 and May 7, 2008 from the Metro Bus Stop (i.e., the area where Mr. McGuire was standing) and looking toward the pedestrian signal at the southeast corner for pedestrians crossing Wisconsin Avenue on the south side of the intersection.



Taken April 16, 2008



Taken May 7, 2008

As shown in the above two photographs, while standing at the Metro Bus Stop, the pedestrian signal at the southeast corner for pedestrians crossing Wisconsin Avenue on the south side of the intersection is behind a utility pole and CANNOT be seen. It is my opinion, to a reasonable degree of scientific certainty, that Mr. McGuire could NOT have observed the condition of the walk/don't walk signal at the southeast corner of the intersection from the Metro Bus Stop on the night of the accident.



Frame from NBC4 video from night of the accident.

Using photographs and video (such as the frame shown above and taken from the NBC4 video) taken on the night of the accident or shortly thereafter, I have confirmed that the position of the pedestrian signal at the southeast corner of the intersection has not changed.

## Pedestrian Crossing Times

A pedestrian crossing study performed in 1970 by Bruce Herms showed that pedestrians of age 65 year-old and older, cross a street at a speed of 3.5 feet per second (15th percentile), 4.2 feet per second (50th percentile), and 4.8 feet per second (85th percentile).[1] This study also showed that all of the 543 pedestrians in the study, had crossing speeds of 4.3 feet per second (15th percentile), 5.0 feet per second (50th percentile), and 6.1 feet per second (85th percentile).

I performed a pedestrian crossing study at the subject intersection to determine the time pedestrians take to cross Wisconsin Avenue using the crosswalk on the south side of the intersection. Video was taken on April 16, April 23, May 1, and May 5, 2008 of pedestrians crossing Wisconsin Avenue. The video was taken from the parking garage at the southwest corner of the intersection. A total of 556 pedestrians were captured on video. Almost all of the pedestrians were adults of various ages. Of the total of 556 pedestrians, 438 pedestrians remained within the crosswalk as they crossed Wisconsin Avenue (the other 118 pedestrians "cut" the corner and walked substantially out of the crosswalk while crossing Wisconsin Avenue. Of the 438 pedestrians, 388 pedestrians started to cross when the pedestrian signal was in the "walk" condition and 50 pedestrians started to cross when the pedestrian signal was in the "don't walk" or "amber hand" condition. The results of the pedestrian crossing study are shown in the table below:

|  | All 438 Pedestrians | 388 Pedestrians that started to cross on "Walk" | 50 Pedestrians that started to cross on "Don't Walk" |
|---|---|---|---|
| Average Time to Cross Wisconsin Ave. | 14.4 seconds | 14.6 seconds | 12.9 seconds |
| Standard Deviation | 2.23 seconds | 2.11 seconds | 2.55 seconds |
| 68.3% Probability Range for Crossing Times (i.e., ± one standard deviation) | 12.2 to 16.6 seconds | 12.5 to 16.7 seconds | 10.4 to 15.5 seconds |
| Minimum Crossing Time | 6.5 seconds | 10.0 seconds | 6.5 seconds |
| Maximum Crossing Time | 22.8 seconds | 22.8 seconds | 19.9 seconds |

Using an average crossing distance of 66 feet, the average crossing speed for all 438 pedestrians was 4.6 feet per second (approximate 15th and 85th percentile speeds are 4.0 and 5.4

---

[1] Eubanks, J.J. and Hill, P.F., Pedestrian Accident Reconstruction and Litigation, 2nd Edition, Lawyers & Judges Publishing Company, 1998.

feet per second respectively) and the average crossing speed for the 50 pedestrians that started to cross on the "Don't Walk" signal was 5.1 feet per second (approximate 15th and 85th percentile speeds are 4.3 and 6.3 feet per second respectively). Analysis of pedestrians that started to cross when the "Don't Walk" signal was illuminated showed that they crossed the street faster than those pedestrians who started on the "Walk" signal. Also, almost all of the pedestrians that started to cross when the "Don't Walk" signal was illuminated had a faster crossing rate for the first part of crossing and then slowed down as they continued to cross the street. Of all of the 438 pedestrians, the fastest crossing speed was approximately 10.2 feet per second and the slowest crossing speed was approximately 2.9 feet per second.

## Analysis

I have used simulation software to analyze the path of travel of the WMATA bus as it makes a right turn from Jenifer Street onto southbound Wisconsin Avenue. Shown below, is such a path and this path results with the WMATA bus coming to a stop where it came to rest on this night of the accident. The simulation shows that as the WMATA bus is tuning right and traveling across the crosswalk (going across Wisconsin Ave.), the front of the WMATA bus is continuously changing directions. I have performed other simulations, where I have the bus starting further south on Jenifer Street (i.e. closer to the south curb for Jenifer Street). These simulations also show that as the bus is turning right, the front of the WMATA bus is continuously changing directions.



Crash Simulation

In this accident Ms. Fenichel was struck by the front of the WMATA bus and as the bus continued forward, Ms. Fenichel ended up being struck and dragged by the left front wheel of the bus. Based on how the WMATA bus turns to the right from Jenifer Street onto southbound Wisconsin Avenue, based on the tracking of the left front wheel of the WMATA bus as the bus makes its turn, based on the area of impact found by Det. Miller, and based on Ms. Fenichel becoming lodged under the left front wheel of the WMATA bus, it is my opinion, to a reasonable degree of scientific certainty, that it is more probable that Ms. Fenichel was struck by the right front (i.e., from the center of the front of the bus to the right front corner) of the bus rather than the left front (i.e., from the center of the front of the bus to the left [or driver's side] front corner).

The area of impact between the WMATA bus and Ms. Fenichel was determined by Det. Miller. Witnesses have stated that Ms. Fenichel was in the crosswalk at the time of the accident. For this report, I have assumed that Ms. Fenichel was in the crosswalk at the time when she was struck by the WMATA bus. Det. Miller performed a re-enactment of the accident with the subject WMATA bus and a pedestrian of the approximate height of Ms. Fenichel and had Officer Connor present during this re-enactment. Det. Miller testified at his deposition that Officer Connor assisted locating the path of travel of Ms. Fenichel as she crossed the Wisconsin Avenue. Based on this area of impact, Based on how the WMATA bus turns to the right from Jenifer Street onto southbound Wisconsin Avenue, based on the tracking of the left front wheel of the WMATA bus as the bus makes its turn, and based on Ms. Fenichel becoming lodged under the left front wheel of the WMATA bus, it is my opinion, to a reasonable degree of scientific certainty, that Ms. Fenichel would have traveled between 16 and 21 feet from the curb to where she was struck by the WMATA bus. From this area of impact, the WMATA bus traveled another 22 to 26 feet to where it came to a stop. Shown below are the images from the simulations that show the WMATA bus at 22 to 26 feet from where it came to rest.



Crash Simulation – WMATA Bus 22 feet from where it came to rest



Crash Simulation – WMATA Bus 26 feet from where it came to rest

Ms. Ferguson, the bus operator, stated that she felt a bump, which was the collision between the bus and Ms. Fenichel, and she reacted to this bump by applying her brakes to stop the bus. Using a perception-response time of 0.75 to 1.50 seconds for Ms. Ferguson to perceive and respond to feeling the bump, using brake response time of between 0.30 to 0.60 seconds for the bus, using a drag factor of between 0.20 to 0.60 for the bus deceleration rate as it stopped, and using a travel distance of between 22 and 26 feet, I have determined the probable speed the WMATA bus was traveling at the time of impact. The speed of the WMATA bus at the time of impact with Ms. Fenichel was more than likely between 7 and 9 miles per hour (mph). Based on acceleration rate of 0.05 to 0.15g (a typical acceleration rate range for this type of vehicle), it is more than likely that the WMATA bus would need a distance of 14 to 34 feet to accelerate from a stop to a speed of between 7 and 9 mph. These positions are shown below.



Crash Simulation – WMATA Bus 14 feet from 22 feet Area of Impact Position.



Crash Simulation – WMATA Bus 34 feet from 26 feet Area of Impact Position

The WMATA bus would have started to accelerate at a minimum distance of the 14 to 34 feet distances discussed and shown above. There is no physical evidence to show where the WMATA bus started to accelerate before the accident. Also, there is no physical evidence to indicate at what rate the bus accelerated at. Therefore, it would be impossible to get the exact time-distance positioning of the WMATA bus as it accelerated and made its right turn before the accident.

As I mention above, it is my opinion, to a reasonable degree of scientific certainty, that Ms. Fenichel would have traveled between 16 and 21 feet from the curb to where she was struck by the WMATA bus. At a crossing speed of 2.9 feet per seconds (i.e. slowest crossing speed of the 438 pedestrians from my study), a pedestrian will take 5.5 to 7.2 seconds to travel 16 to 21 feet. At a crossing speed of 3.5 feet per seconds (i.e. 15th percentile crossing speed from Herms study for 65+ year olds), a pedestrian will take 4.6 to 6.0 seconds to travel 16 to 21 feet. At a crossing speed of 4.3 feet per seconds (i.e. 15th percentile crossing speed for pedestrians from my study that started to cross on the "Don't Walk" signal), a pedestrian will take 3.7 to 4.9 seconds to travel 16 to 21 feet. At a crossing speed of 5.1 feet per seconds (i.e. 50th percentile crossing speed for pedestrians from my study that started to cross on the "Don't Walk" signal), a pedestrian will take 3.1 to 4.1 seconds to travel 16 to 21 feet. At a crossing speed of 5.1 feet per seconds (i.e. 85th percentile crossing speed for pedestrians from my study that started to cross on the "Don't Walk" signal), a pedestrian will take 2.5 to 3.3 seconds to travel 16 to 21 feet.

The pedestrian signal at the southeast corner for pedestrians crossing eastbound across Wisconsin Avenue (i.e. the direction that Ms. Fenichel was crossing) consists of a white-

illuminated symbol of a WALKING PERSON (symbolizing "WALK") and amber-illuminated UPRAISED HAND (symbolizing "DONT WALK"). This signal also included a count-down timer, which started at 27 seconds (white-illuminated WALKING PERSON displayed) then at 15 seconds the signal changed to a flashing amber-illuminated UPRAISED HAND. At 0 seconds on the count-down timer the signal changed to a solid amber-illuminated UPRAISED HAND.

As I discussed previously, although witness Chris McGuire stated in his deposition that he observed that the "little white walk guy" was the condition of the walk/don't walk signal at the southeast corner of the intersection (i.e., the pedestrian signal for pedestrians crossing Wisconsin Avenue on the south side of the intersection) when "Ms. Fenichel stepped into the crosswalk," the pedestrian signal is behind a utility pole and could not be seen by Mr. McGuire. Mr. McGuire also stated that "I don't remember seeing her until it was essentially almost the collision point. So I'm not sure if there was something that actually blocked my view or if I didn't notice her in the crosswalk." There was a parked van (which is shown on Exhibit 1) that would have blocked Mr. McGuire's view of pedestrians in the crosswalk that were in the area behind the parked van. Also, there was a white vehicle that is parked in the west curb lane of Wisconsin Avenue and that was further south than the parked van. The image below was a frame taken from the NBC4 video that was taken immediately after the accident and this image shows the parked white vehicle. These vehicles (the parked white vehicle and van) would have limited Mr. McGuire's visibility of pedestrians in the western part of the crosswalk. This would have blocked Mr. McGuire's visibility of pedestrians in the crosswalk who were crossing the curb lane and also potentially the western part of the center lane of southbound Wisconsin Avenue. Therefore, Mr. McGuire would have only started to see Ms. Fenichel when she emerged from behind the parked vehicles.



Frame from NBC4 video from night of the accident.

Witness Matthew Clark, who had crossed Wisconsin Avenue in the westbound direction and passed Ms. Fenichel who was going eastbound when he reached the west curb of Wisconsin Avenue, stated that "what I thought the count was probably at based on my experience of walking that street so many times. I mean, considering I had walked it often enough to know that once I—every time I had reached the end of the corner I usually would have four or five seconds left on the countdown." Mr. Clark also stated that he started to cross Wisconsin Ave. as soon as the walk signal allowed him to proceed (this will take between 12.5 and 16.7 seconds for 68% of the pedestrians from my study who started to cross on the "WALK" signal). Mr. Clark also stated "As I reached the curb a woman, Miss Fenichel, passed me on my left and seemingly in a hurry. I took one of two steps onto the curb and heard the impact."

Officer Connor who witnessed the accident was interviewed by Det. Wheeler approximately 4 hours after the accident. During this interview, Officer Connor stated that "I actually looked at the light because when the pedestrian (Ms. Fenichel) was crossing the street I looked up it actually had 4 seconds left of that light…for pedestrians to walk." Officer Connor also stated during the interview that "But like I said at the 4 seconds the hand was up not to walk across the street." It is fairly clear from this video taped interview that Officer Connor is stating that Ms. Fenichel stepped into the street from the curb when the pedestrian signal was showing a flashing amber-illuminated UPRAISED HAND.

Det. Miller assumed Officer Connor statement about the 4 seconds on the countdown timer to mean that this occurred at the time of impact. If I assume that the countdown timer showed 4 seconds at the time of impact, then even assuming the slowest walking speed (of 2.9 feet per second), Ms. Fenichel would have started to cross the street when the pedestrian signal displayed the flashing amber-illuminated UPRAISED HAND (symbolizing "DONT WALK"). Assuming the countdown timer showed 4 seconds at the time of impact, the countdown timer would have displayed between 6 seconds and 12 seconds when Ms. Fenichel entered the street (i.e., Ms. Fenichel would have started to cross the street when the pedestrian signal displayed the flashing amber-illuminated UPRAISED HAND).

As I discussed previously, there is no physical evidence to show where the WMATA bus started to accelerate before the accident. The path of the WMATA bus can vary slightly but is fairly well established. Also, there is no physical evidence to indicate what rate the bus accelerated at. Therefore, it would be impossible to determine the time-distance positioning of the WMATA bus as it accelerated and made its right turn before the accident. It would also be impossible to determine the time-distance positioning of Ms. Fenichel as she crossed the street before the accident. Therefore the relative time-distance positions between the WMATA bus and Ms. Fenichel are unknown before this accident. Det. Miller did perform a re-enactment of the accident. This re-enactment was scientifically sound and is a reasonable scientific basis to show that there are blind spots for the bus operator where the bus operator would not be able to see a pedestrian of Ms. Fenichel's stature while the WMATA bus is making a right turn onto Wisconsin Avenue from Jenifer Street.

All of the opinions I have presented above are to a reasonable degree of scientific certainty. In addition, not all of the fact witnesses have testified and I will reserve the right to supplement and/or amend my opinions upon receipt of this testimony. If additional information becomes available or other opinions are presented, I will provide additional analysis and conclusions if requested.

Report by:

David P. Plant, P.E., ACTAR



Exhibit 1

D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

May 22, 2008

Janice L. Cole, Esquire
Associate General Counsel
Office of General Counsel - WMATA
600 Fifth Street, NW
Washington, DC 20001

jlcole@wmata.com

VIA EMAIL & US MAIL

Re:  Robert R. Fenichel, M.D. v. WMATA

Dear Ms. Cole:

On page 12 of my report (dated May 13, 2008), I inadvertently had in my report the following line: "In addition, not all of the fact witnesses have testified and I will reserve the right to supplement and/or amend my opinions upon receipt of this testimony."  This line should not have been included in my report.

Also, in discussing pedestrian crossing times in my report (of May 13, 2008), I included data from a pedestrian crossing study performed in 1970 by Bruce Herms.[1]  I would like to add to my report the data from this study that pertained to Ms. Fenichel's age (Ms. Fenichel turned 64 years old about one month before the accident).  The data from the Herms study showed that pedestrians aged 55 to 64 years old cross a street at a speed of 4.2 feet per second (15th percentile), 4.8 feet per second (50th percentile), and 5.5 feet per second (85th percentile).

If you have any questions or require further information, please feel free to contact me.

Sincerely,

David P. Plant, P.E., ACTAR

---

[1] Eubanks, J.J. and Hill, P.F., Pedestrian Accident Reconstruction and Litigation, 2nd Edition, Lawyers & Judges Publishing Company, 1998.

# David P. Plant's Deposition and/or Trial Testimony List
## May 2004 to Present

| DATE | CASE NAME | VENUE |
|---|---|---|
| 7/14/04 | Stanley Bishop v. Elisabeth McCarthy and Wayne Carter | In the United States District Court for the District of Maryland – Case No. AW03CV2134 |
| 8/20/04 | Decorah R. Arem v. Frederick T. Wolpert v. Judith Leah Meiselman | In the Circuit Court for Montgomery County, Maryland – Case No. 247830V |
| 9/10/04 | Carol A. Tyson v. Washington Metropolitan Area Transit Authority | In the United States District Court for the District of Columbia – CA No. 03-1261 |
| 11/22/04 | Elizabeth Grieco, et al. v. Enterprise Leasing Co., et al. | In the United States District Court for the District of Maryland – Case No. 03-cv-2492 |
| 12/22/04 | Estate of Robert Brown, Cecilia Todd, Personal Representative v. Washington Metropolitan Area Transit Authority | In the United States District Court for the District of Maryland Southern Division – Case No. RWT-03-3040 |
| 1/6/05 | State of Maryland vs. Ernest L. Barber | In the District Court for Montgomery County, Maryland – Case No. B401804-06 |
| 2/9/05 | Donald Miller, et al. v. Western Express, Inc., et al. | In the United States District Court for the District of Maryland – Case No. AMD 04-CV-1602 |
| 2/16/05 | Dean Kevin Lurie v. Orlando Mancilla Bellemir, et al. | In the Superior Court for the District of Columbia – Case No. 030002564 |
| 3/3/05 | Jonathan R. Eber, Individually and as Parent and next friend of David B. Eber, a minor, et al. v. Unted Parcel Services, Inc., et al. | In the Circuit Court for Baltimore County, Maryalnd – Case No. 03-C-04-004598 |
| 3/15/05 | Savino Amaya, et al. v. Roger LaPerle and High Ridge Excavating, Inc. | In the Circuit Court for Prince George's County, Maryland – Case No. CAL 04-10609 |
| 3/18/05 | Peggy Davenport v. Geraldine Kay Myers, et al. | In the Circuit Court for Wicomico County, Maryland – Case No. 22-C-03-001474 MT |
| 4/21/05 | Wayne F. Stancil, et al. v. National Center for Children and Families, Inc., et al. | In the Circuit Court for Montgomery County, Maryland – Case No. 250212-V |

**D. Plant's Testimony List**  **Page 2**

| 5/9/05 | Crystal Benton v. John Craven | In the Circuit Court for Prince George's County, Maryland – Case No. CAL 04-6176 |
|---|---|---|
| 6/29/05 | Ricardo Antonio Acevedo a/k/a Jose Miranda v. Robert Ulies Manago, Jr. et al. | In the Superior Court for the District of Columbia – Case No. 03ca007066 |
| 8/22/05 | Anne Thomas Paxson v. Bobby J. Shannon, Jr. and Fort Meyer Construction Corp. | In the United States District Court for the District of Columbia – Case No. 104CV00004 |
| 9/23/05 | Diane P. Brown, et al. v. Randall Lynn Card, et al. | In the United States District Court for the District of Maryland, Northern Division – Case No. 03CV03602 |
| 10/20/05 | Carolyn Bradford, Administratrix of the Estate of Brandeis D. Wilson v. Sun Aire Transport Corp., Karl Edmond Nehr, et al. | In the Circuit Court of Frederick County, Virginia – Law No. L03-237 |
| 12/6/05 | Joseph Taylor, Sr., et ux. v. Adam J. Malinski, et al. | In the Circuit Court of Maryland for Baltimore City – Case No. 24-C-04-007427 |
| 1/4/06 | Al-Jerod Robinson, et al. v. United States of America | In the United States District Court for the District of Columbia – Case No. 05-116 |
| 1/19/06 | Yvonne S. Walker, Personal Representative of Estate of James Glenn Walker v. Garland Dean Wilson and Charles W. Brinegar Enterprise, Inc. | In the United States District Court for the Western District of Virginia, Danville Division – Civil Action No.: 4:05CV00035 |
| 1/27/06 | Sabrina Miller-Chisley, et al. v. Bradway Trucking, Inc. | In the United States District Court for the District of Maryland – Case No. RTM 05 CV 250 |
| 4/7/06 | Brenda S. Lucabaugh v. Roger L. Matthews, Sr., et al. | In the Circuit Court of Maryland for Baltimore City – Case No. 24-C-04-006305 |
| 5/9/06 | The Estate of Clara Guerra, et al. v. Raymond Robert Oswald, et al. | In the Circuit Court for Montgomery County, Maryland – Case No. 260430-V |
| 7/13/06 | Kendra Miller v. Sun-Aire Transport Corporation, Karl Nehr, and John Doe | In the Circuit Court of Frederick County, Virginia – Law No. L04-199 |
| 8/23/06 | Emerson Sutton v. Washington Metropolitan Area Transit Authority | In the Superior Court for the District of Columbia – Case No. 05-CV-3034 |
| 9/18/06 | Ruth M Schipper vs. Linda D. | In the Circuit Court for Frederick County, |

**D. Plant's Testimony List**                                                    **Page 3**

| | Studebaker | Maryland – Case No. 10-C-05-001930 |
|---|---|---|
| 1/4/07 | Sysco Food Services of Baltimore, LLC, et al. v. Constance J. Newton | In the Circuit Court of Maryland for Baltimore County – Case No. 03-C-06-2928 |
| 1/5/07 | Bunthoeun Chhean v. Marco Antonio Herrada | In the Circuit Court for Montgomery County, Maryland – Case No. 270059-V |
| 4/10/07 | Margaret L. Griggs and William E. Griggs, Sr., Individually and as Co-Personal Representatives of the Estate of William E. Griggs, Jr. v. Jennifer K. Mills, et al. | In the Circuit Court for Carroll County, Maryland – Case No. 06-C-06-044834 |
| 4/26/07 | Darl Ann Shird and Sir Charles Shird v. Douglas W. Cox and Roadway Express, Inc. | In the Circuit Court of Common Pleas of Westmoreland County, Pennsylvania – Case No. 3287 of 2004 Consolidated with No. 2972 of 2004 and 3347 of 2004 |
| 6/21/07 | Thomas L. Dickerson, Sr., et al. v. Tammy Lee Bollinger, et al. | In the Circuit Court for Wicomico County, Maryland – Case No. 22C-06-001307 MT |
| 9/12/07 | Derrick Corbin, as Father and Next Friend of Dimitri Corbin, a minor v. Jerry's Towing Service, et al. | In the Superior Court for the District of Columbia – Case No. 2006-CA-002321 B |
| 10/3/07 | Jose L. Henriquez-Alvarenga, Personal Representative of the Estate of Jose Santos Montoya Henriquez v. Stuart M. Wampler and McCormick Insulation Supply, Inc. | In the Circuit Court for Loudon County, Virginia – Case No. CL00041480-00 |
| 11/20/07 | Olukayode Laniyonu v. Anthony Gazo | In the Circuit Court of Maryland for Prince George's County, Maryland – Case No. CAL 06-16563 |
| 12/14/07 | Gladys Claudette Sutton, Individually and as Personal Representative of the Estate and Next of Kin of Angel Claudette Walters, Deceased v. Washington Metropolitan Area Transit Authority | In the United States District Court for the District of Columbia – Case No. 07-01197 |
| 1/10/08 | Carolyn Gaddy-Perry, Individually and in her Capacity as Personal Representative of the Estate of the Deceased, Keymarthanese Rahim Rashad-Ali, et al. v. James H. Carter, Jr., et al. | In the United States District Court for the District of Maryland – Case No. 8:07-CV-929 |

**D. Plant's Testimony List**                                                                    **Page 4**

| 4/1/08 | Loretta B. Thomas, Individually and as Personal Representative of the Estate of Shawn B. Thomas v. Kenya Latrina J. Stewart, et al. | In the Circuit Court for Montgomery County, Maryland – Case No. 275965-V |
|--------|---|---|
| 4/10/08 | Linda Lee Moxley, et al. v. James Anthony Pellegrini, Jr., et al. | In the Circuit Court for Baltimore County, Maryland – Case No. 03-C-06-11488 |

# D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

May 2007

# David P. Plant, P.E.
Mechanical Engineer & Accident Reconstructionist

**EMPLOYMENT:**

D. P. Plant & Associates
1722 V Street, NW
Washington, DC 20009
January 2000 to Present
Position: Owner, Mechanical Engineer & Accident Reconstructionist

F.A.R.E. (Forensic and Research Engineers), Inc.
4321 Hartwick Road, Suite 116
College Park, Maryland 20740
January 1989 to January 2000
Position: Mechanical Engineer & Accident Reconstructionist

J. A. Kirk & Associates
7210 Windsor Lane
Hyattsville, MD 20782
October 1987 to December 1988
Position: Accident Reconstruction Consultant

University of Maryland – Department of Mechanical Engineering
College Park, Maryland 20742
September 1986 to December 1988
Position: Research Assistant

**EDUCATION:**

Bachelor of Science in Mechanical Engineering - University of Maryland - May 1986
Graduated with Honors - *Magna Cum Laude*

Master of Science in Mechanical Engineering - University of Maryland - December 1988

**HONORS AND PROFESSIONAL SOCIETIES:**

Full Accreditation as a Traffic Accident Reconstructionist by the Accreditation Commission for Traffic Accident Reconstruction (ACTAR), September 1997, registration number: 857
Full Re-Accreditation March 2002, Full Re-Accreditation January 2007

Registered Professional Engineer in the state of Maryland, 1995, registration number: 21447

Guest Lecturer, University of Maryland, Department of Mechanical Engineering, Accident Reconstruction Course.

Member, National Association of Professional Accident Reconstruction Specialists (N.A.P.A.R.S.).

Member, Maryland Association of Traffic Accident Investigators

Member, National Society of Professional Engineers (NSPE)

Member, Society of Automotive Engineers (SAE)

Member, American Society of Mechanical Engineers (ASME)

Member of Tau Beta Pi, the National Engineering Honor Society

Member of Pi Tau Sigma, the National Mechanical Engineering Honor Fraternity

Awarded the Pi Tau Sigma Memorial Award, Feb. 1986, for outstanding contributions to the Department of Mechanical Engineering

Awarded an Undergraduate Apprenticeship in Research and Scholarship for the spring 1986 semester

## PUBLICATIONS:

### BOOKS:

1. Barzelay, M.E., "Scientific Automobile Accident Reconstruction," Matthew Bender, 1992. 5 Volumes. Chapter 37 written by Plant, D.P., et al., "Calculation and Computer Tools for Accident Reconstruction." (1992 Edition Only)

2. Kirk, J.A., Plant, D.P., Ries, D.M., "Engineering Principles in Accident Reconstruction," January 1993. Textbook utilized by the Mechanical Engineering Department of the University of Maryland for a course in Accident Reconstruction.

### PAPERS:

1. Plant, D.P., Jayaraman, C.P., Frommer, D.A., Anand, D.K., Kirk, J.A., "Prototype Testing of Magnetic Bearings," Proceedings of the 22nd Intersociety Energy Conversion Engineering Conference, August 10-14, 1987, Philadelphia, Pennsylvania.

2. Plant, D.P., Anand, D.K., Kirk, J.A., Calomeris, A.J., Romero, R.L., "Improvements in Magnetic Bearings for Flywheel Energy Storage," Proceedings of the 23rd Intersociety Energy Conversion Engineering Conference, July 31-August 5, 1988, Denver, Colorado.

3. Plant, D.P., Anand, D.K., Kirk, J.A., "Prototype of a Magnetically Suspended Flywheel Energy Storage System," Proceedings of the 24th Intersociety Energy Conversion Engineering Conference, August 6-11, 1989, Washington, D.C.

David P. Plant, P.E.                                                                 Page 3

4.      Plant, D.P., "Prototype of a Flywheel Energy Storage System," Master of
        Science Thesis, University of Maryland, 1988.

5.      Higgins, M., Kirk, J., Plant, D., Ries, D., Weiss, K., "Determination of
        Maximum Vehicle Speed in Pedestrian Accidents," Accident Reconstruction
        Journal, Volume 2, No.4, pg. 18-19, July/August, 1990.

6.      Plant, D.P., Zmood, R.B., Kirk, J.A., "Development of a Suitable Inductive
        Transducer for Magnetic Bearings," Proceedings of the Aerospace Applications
        of Magnetic Suspension Technology Conference, September 25-27, 1990,
        NASA Langley Research Center, Hampton, VA.

7.      Higgins, M.A., Plant, D.P., D.M., Ries, Kirk, J.A., Anand, D.K., "Flywheel
        Energy Storage for Electric Utility Load Leveling," Proceedings of the 26th
        Intersociety Energy Conversion Engineering Conference, August 4-9, 1991,
        Boston, Massachusetts.

8.      Plant, D.P., "Flywheel Energy Storage," Proceedings of the Solar and Electric
        Vehicle Conference, October 9-10, 1992, Boston, Massachusetts.

9.      Ries, D.M., Kirk, J.A., Plant, D.P., "An Analytical Method to Determine
        Vehicle Impact Speeds into Energy Absorbing Barrier End Treatments," SAE
        930657, 1993.

## PROVIDED EXPERT TESTIMONY IN THE FOLLOWING COURTS:

The Superior Court for the District of Columbia

The United States District Court for the District of Columbia

The United States District Court for the District of Maryland

The United States District Court for the Eastern District of Virginia, Alexandria

The United States District Court for the Eastern District of Oklahoma

The Circuit Court of Fairfax County, Virginia

The Circuit Court of Frederick County, Virginia

The Circuit Court for Baltimore City, Maryland

The Circuit Court for Baltimore County, Maryland

The Circuit Court for Dorchester County, Maryland

The Circuit Court for Harford County, Maryland

The Circuit Court for Howard County, Maryland

David P. Plant, P.E.                                                                        Page 4

The Circuit Court for Montgomery County, Maryland

The Circuit Court for Prince George's County, Maryland

The Circuit Court for Talbot County, Maryland

The Circuit Court for Wicomico County, Maryland

The District Court of Maryland for Baltimore County

The District Court of Maryland for Montgomery County

D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

January 2008

# Fee Schedule
## for the Expert Services
## of David P. Plant, P.E.

- Rate for David P. Plant, P.E. is $180 per hour.

- Rates for Associates vary from $50 to $140 per hour.

- Hours are billed portal to portal.

- Automobile mileage is charged at $0.50 per mile.

- Digital photographs charged at $1.00 per photograph.

- In addition to D. P. Plant's expert services the client is responsible for the payment of expenses such as air fares, hotel, exhibit costs, delivery charges, duplication of case material, and other like charges. Expenses are billed at cost to the client.

**Please make payments payable to:  D. P. Plant & Associates
TIN: 52-2215241**

REPORT


THE ECONOMIC LOSSES OF
**ROBERT R. FENICHEL**

ARISING FROM THE DEATH OF

**EMILY A. FENICHEL**


Submitted to:

**GERALD STIEF**
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, DC 20001


Prepared By:

**THOMAS C. BORZILLERI, PH.D.**
Economic Consultant
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland, 20817


*Thomas C. Borzilleri*

May 3, 2007

## SUMMARY OF FINDINGS

I have calculated the current market cost to replace the cash economic contributions and financial support that Mrs. Emily Fenichel would have made available to her family had she not died. I place the present value of losses at **$241,775 to $269,191.**

The present value of after-tax cash losses is $200,459 to $223,190. The lower number is based on Mrs. Fenichel's work expectancy, age 69.6 while the higher estimate assumes work until age 70, the same assumption made by Dr. Lurito in his analysis of January 16, 2007. According to Dr. Lurito's report, Mrs. Fenichel also has a pension plan that added 7% of her earnings to a retirement account. I place the present value of those contributions at $41,316 to $46,001.

This estimate is the current market cost to purchase an annuity to replace losses. It is therefore an actuarially adjusted present value taking into account Mrs. Fenichel's year to year survival probability, Mrs. Fenichel's personal spending out of family income, income taxes and interest on any compensation her survivors might receive.

Annuity prices depend upon market interest rates and as these rates change over time, the cost of an annuity will change as well. Therefore, our analysis will be updated at the time of trial to take these changes into account. Should rates be higher in the future than they are today, annuity prices will be lower and estimated losses will be lower. Alternatively, should rates be lower, the cost of an annuity will be higher and our estimated losses will increase.

## INFORMATION PROVIDED BY PLAINTIFF'S COUNSEL

The information that follows has been provided by Plaintiff's Counsel and outlines the elements of the case I have been asked to value. As various additional facts become known or are stipulated to, our estimates may be revised to take these matters into account.

I have been provided with a report prepared by Richard Lurito, Ph.D. dated January 16, 2007. That report states that Mrs. Fenichel's date of birth was May 5, 1942 and that her date of death was July 8, 2006. Mr. Fenichel's date of birth is November 1, 1941. I was also provided with W-2s and Federal tax returns for 2005 and 2006.

According to the 2005 Federal income tax return, Mrs. Fenichel's W-2 earnings were $95,346. Her Medicare earnings, a combination of health insurance, retirement accounts and other fringe benefits, were $113,346. As stated above, Dr. Lurito states that the employer contributed 7% of her pay

1

into a retirement account. Typically that 7% is applied to cash earnings and I did that in this case. Since pension is explicitly accounted for, I prepared these loss estimates based on the $95,346 in W-2 earnings she earned in 2005, growing earnings over time as described below.

The 2005 tax return shows deductions equal to 15.2% of family income and I assumed a 15.2% of gross income itemized deduction for the remaining work years. Dr. Lurito prepared his calculations of loss assuming a 19% itemized deduction level and that the parties would have filed separately, but there is no obvious reason to use a filing separately assumption. In both 2005 and 2006 the parties filed jointly and I assumed future tax returns would be filed jointly as well.

Total family income in 2005 was $286,766 and in 2006, $259,920. Mrs. Fenichel's actual W-2 earnings for 2006 were $40,820.

## GENERAL METHODOLOGY

In general, there are two methods used to estimate future losses. One approach uses so-called "real" or after-inflation earnings growth rates and "real" interest rates to discount future losses. Typically, historical rates of real earnings growth, in the range of 1% to 3% per year, and real interest rates, also in the 1% to 3% per year range, are cited as a reasonable forecast of these rates for the future.

I favor the alternative approach, one in which nominal rates of growth and market interest rates are used. I use a growth forecast prepared each year by the Social Security Administration[1]. This forecast produces earnings growth forecasts in the 3.3% to 4.1% per year range, inflation in the 2.4% to 3.0% range, and real earnings growth in the 1% range in real or after-inflation terms, consistent with U.S. economic history, as is typically cited in the after-inflation approach.

I next deduct an amount for personal spending by the decedent, monies that could not have been used to benefit the survivors, based on an authoritative study of personal spending. The result is the dollar amount of support available to benefit the survivors if the decedent was alive to produce the earnings and the recipient was alive to benefit from them.

---

[1] Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2007 Annual Report of the Board*, Washington, D.C., April 23, 2007, Page 88, Table V.B1.

Life expectancy is then taken into account. The losses are reduced by the survival probability of the party, producing the expected cash flow into the household, and hence losses, actuarially adjusted for the probabilities of death in each year.

I use the current market price for the purchase of an annuity to "discount" these future losses. Using a market price to purchase a contract to replace this future income, rather than a forecast for assumed future investment returns, real or nominal returns, eliminates a significant source of forecast uncertainty. It also provides the recipient with a reasonably prudent and secure flow of replacement income.

## BASIS FOR FUTURE EARNINGS GROWTH ASSUMPTION

United States economic history demonstrates that both money income and real, or after-inflation earnings increase over time. First, over the past 50 years and measured in current dollars, average earnings have increased each year. Second, earnings tend to increase faster than prices; real earnings grow: the average annual rate of change in the average real wage in OASDI covered employment was 1.0% over the 40 years 1964-2003. Real earnings growth was 1.8%, in 1995, 1.1% in 1996, 3.4% in 1997, 4.8%, in 1998, 2.6% in 1999, 2.6% in 2000, -.8% in 2001, -1.0% in 2002, .4% in 2003 and 1.2% in 2004.

Real wage growth depends fundamentally upon productivity growth - and the best economic evidence available indicates that there is no negative trend in productivity. In fact, U.S. productivity growth has averaged approximately 1.6% per year from 1966 to 2000, not much different that productivity growth measured over a century. Increases in worker productivity result in a) higher profits, b) higher wages, c) lower prices or d) some combination of the three. The evidence further indicates that such performance is an appropriate expectation for the future.

## ECONOMIC ASSUMPTIONS OF THE SOCIAL SECURITY SYSTEM

I have incorporated the expectation of future increases into my analysis with the use of the Social Security economic assumption set prepared by the Social Security Administration for its annual report to the Congress of the United States. By law, the Social Security Administration must report annually to the Congress of the United States on the expected financial status of the system, both in the short term and over the next 75 years. As a consequence of this legal requirement, and because both the taxes taken in and benefits to be paid out depend crucially on earnings growth and inflation, the Social Security Administration develops year-by-year estimates of expected, future, average earnings growth and expected future inflation.

3

These forecasts result from an analysis of past economic history including productivity growth, earnings growth, international trade issues, changes in the labor force supply and demand, inflation, and for the first 10 years of the forecast period, short-term economic cycles as well. I use the so-called Intermediate Assumption Set, which represent the Social Security Administration's best estimate of the future, long run economic performance of the U. S. economy.

In my view, these estimates are consistent with U.S. economic history and current research, objective, and reasonably representative of the economic future. The growth rates I actually use are reproduced on my printouts and are taken from page 88 of the Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Disability Trust Funds, Transmitted to the Congress April 23, 2007.

## PERSONAL SPENDING BY THE DECEASED

In calculating economic damages, a reduction from expected past and future income must be made for the income that would have been used exclusively by the deceased. The most comprehensive and reliable data available concerning family expenditures is the Consumer Expenditure Survey (CES)[2], published by the U.S. Bureau of Labor Statistics. The CES provides the basic expenditure data used to establish a benchmark for the goods and services priced for the Consumer Price Index program. Households are surveyed to establish direct, out-of-pocket spending on thousands of items: food, housing, utilities, clothing, transportation, health care, entertainment goods and services, and various personal care expenditures.

By definition of the Bureau of Labor Statistics, "Spending" includes both Social Security taxes and contributions to 401-k and other retirement plans. The definition also does not include repayment of principal on debt so that only the interest payment is recorded as an "expense". For example, debt repayment such as the principal portion of a mortgage or on a car loan or on other debt, absorbs a significant percentage of family income, but is, in effect, "saving" rather than spending since debt repayment reduces indebtedness, adds to equity and therefore to family wealth.

---

[2] U.S. Department of Labor, Bureau of Labor Statistics, *Consumer Expenditure Survey, 1996-1997*, Washington, D.C.

| PERSONAL SPENDING BY ADULT FEMALES, 2000-2001 | | | | | |
|---|---|---|---|---|---|
| FAMILY INCOME | FAMILY SIZE | | | | |
| 2000=2001$ | ONE | TWO | THREE | FOUR | FIVE |
| $10,000 - $14,999 | 145.0%-127.0% | 63.8% | 51.9% | 52.7% | 36.7% |
| $15,000 - $19,499 | 116.2%-104.3% | 52.1% | 35.8% | 36.3% | 33.2% |
| $20,000 - $29,999 | 93.6%-82.2% | 39.5% | 31.2% | 27.78% | 27.9% |
| $30,000 - $39,999 | 78.5% -68.5% | 32.3% | 28.2% | 23.1% | 20.3% |
| $40,000 - $49,999 | 70.4% - 61.9% | 29.3% | 23.8% | 21.2% | 21.0% |
| $50,000 - $69,000 | 61.8%-53.9% | 23.8% | 19.8% | 17.1% | 17.5% |
| $70,000 Plus | 48.7%-42.8% | 16.2% | 13.5% | 12.3% | 12.1% |
| SOURCE: RUBLE, PATTON & NELSON, TABLE 2 | | | | | |

In 1991 economists Robert Patton and David Nelson published an analysis of
this CES data for use specifically in death cases, which provides estimates of
personal spending by family income before taxes, gender, and family size[3].
That work was updated in 1998, 2000 and most recently, 2002. The table
below is *illustrative* of their findings in their most recent update, but the
results have remained fairly stable over all four studies, even with the
revision in the most recent update.[4]

All of the Ruble, Patton, & Nelson results are similar to the results of
numerous other investigations of this topic, spanning many years, many
approaches to the problem, and many researchers. This study provides a
reasonable indication of expected personal spending by the deceased, given
changes in family size and family income level over time.

The Ruble, Patton and Nelson study also provides estimating equations that
permit estimation of personal spending percentages for specific income levels
in current dollars rather than the ranges in 2000-2001 dollars shown in the
table. Those Ruble, Patton and Nelson *equations* (rather than the above
table) combined with my estimates of future income, are used to derive the
spending percentages shown in the printouts attached to this report.

### THE PRESENT VALUE OF FUTURE LOSSES
Given an estimate of year by year, expected losses, these future losses must
be converted into a present dollar equivalent. While there are numerous
financial instruments that might be used to establish the present value of a

---

[3] Robert T. Patton and David M. Nelson, *Estimating Personal
Consumption Costs in Wrongful Death Cases*, Journal of Forensic
Economics, Spring/Summer 1991.
[4] Michael R. Ruble, Robert T. Patton and David M. Nelson, *Patton-Nelson
Personal Consumption Tables, 2000-2001 Updated and Revised*,
Journal of Forensic Economics, Volume 15, Number 3, Pages 295-301.

future loss, I perform my conversion using information on the current annuity market provided the United States Pension Benefit Guaranty Corporation (PBGC)[5]. These annuity prices are used to value all future losses. Note however, that while I estimate current market annuity prices for this analysis using the average prices reported by the PBGC methodology, any annuity from a solid company producing the same replacement income is an acceptable valuation alternative[6].

PBGC is a United States Government agency charged with the responsibility of insuring pension plans in the event of employer default under the Employee Retirement Income Security Act (ERISA). As a consequence of that responsibility, PBGC monitors the annuity market and collects price data each month from a national sample of insurance and annuity companies. The PBGC Methodology permits the analyst to approximate the current price of an annuity found in this survey, given only the party's age and gender.

The methodology is essentially a method to distribute and disseminate current annuity prices. The prices, as stated above, come from a survey of the market and are not forecasts. Each month, the PBGC provides "interest factors", based on its survey results that are to be combined with its specific life table, the GAM94 adjusted to the current year. Neither the specific life table nor the rates to be used, determine these annuity prices - which again, come from a survey.

These rates are not the yield on a specific financial instrument but rather rates, which when mathematically combined with the specific PBGC mortality tables, reproduces the findings of the PBGC annuity price survey for the age and gender of the party involved. As the PBGC explains:

*"These derived interest factors are not market interest rates. The factors stand in for all the many components used in annuity pricing that are not reflected in the given mortality table e.g., assumed yield on investment, margins for profit and contingencies, premium and income taxes, and marketing and sales expenses."*

---

[5] United States Government, *Code of Federal Regulations*, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005.

[6] I estimate current market annuity prices for this analysis using the PBGC methodology, but any quality annuity contract producing the same replacement income is an alternative for the establishment of present value.

The PBGC rates are applied to an actuarially reduced stream of income, reduced by year to year survival probabilities, and hence the implicit rates of return are higher than would be the case if the income stream was an unreduced flow certain, as in a typical discounting problem.

The PBGC price survey provides an accurate, cost-effective, and objective estimate of the actual, current market price required to purchase a future flow of income equal to the amount required to compensate the party for expected future losses. Implicitly, my compensation approach is to provide Mrs. Fenichel's survivors with a cash payment sufficient to cover past losses and a cash payment sufficient to purchase an annuity, a market-determined present value, to replace future losses.

I am not requiring that such an instrument actually be chosen for compensation purposes. I am using annuity prices as an indicator of the financial market's "tradeoff" between the value of future dollars and the value of present dollars, inclusive of available investments, the time period involved, cash requirements associated with compensation, and mortality considerations. PBGC price information is current, reflecting actual economic conditions in the money market in the month of the lost earnings analysis and in fact, is a function of the current yields on the professionally managed, investment portfolios of insurance or annuity companies that back these annuity contracts[7].

The use of an annuity price to establish the discounted present value of future losses provides a number of advantages over the more familiar approach in which an analyst explicitly specifies an expected yield on a particular financial instrument or investment portfolio, typically bonds. Most importantly, an annuity price is an actual, market price at this point in time, not a forecast of future yields.

In addition, PBGC prices are objective, provided by the U.S. Government, and not prepared for the purpose of the litigation at issue. The price is a market price, favoring neither plaintiff nor defense and such prices are public information that may be easily verified by all parties to the litigation. Finally, an annuity provides for periodic payments, a flow of compensating

---

[7] The PBGC Methodology involves 2 components: the financial flow required to pay the annuity to individuals, and for _groups_ of employees, an administrative cost component. Because I am dealing with an individual rather than a group of employees, I use only the financial flow. Administrative expenses are ignored and therefore my estimated annuity price may be somewhat below group annuity market prices.

income timed similarly to the losses that are expected to occur in the future. Regardless of the future course of interest rates, an annuity price provides the actual market cost today, to purchase the required future flow of compensating payments for future losses.

## VALUATION ADJUSTMENTS

The annuity prices that PBGC monitors however, are taxable annuities and therefore the compensating income I calculate using these prices will be less than the income Mrs. Fenichel would have provided to the family had she not died. Ideally, the compensating instrument would be tax-free, so that the flow of compensation after taxes would exactly equal the flow of income I seek to replace, without the complication of taxes. Tax-free municipal bonds represent one alternative financial instrument that could be used, but to do so gives up the advantage of using a current price and requires that a rate of return forecast be made for the damage period.

To approximate the price of a tax-free annuity, I calculate the approximate tax liability associated with the annuity payments to the survivors and increase each year's payment such that after taxes, survivors would receive the amount I estimate that has been and will be lost. This is similar to performing the analysis with tax-free municipal bonds but it maintains the advantages I believe exist when an annuity price is used for the future loss calculation. This adjustment increases the loss estimates by the present value of expected taxes on the compensation, just as the loss estimates would be increased if I used the lower yields associated with tax-free instruments.

This is the column labeled "Adjustment Required" on the attached printouts, Schedule 3. It should be noted however, that my analysis produces loss estimates both with and without this adjustment. The column labeled "Market Value @ PBGC" provides losses without the above tax adjustment. In the event that my adjustment is deemed inappropriate however, estimates are provided both with and without it.

## ESTIMATING RESULTS

Detailed printouts of my calculations are attached to this report. Three schedules are provided for each earnings scenario. Schedule 1 displays some of basic data used in the calculation and a summary of results while Schedules 2 and 3 provide the year-by-year details of my estimates.

**Schedule 2, Past & Expected Levels of Support:** Most of the Column headings are self explanatory. Column 3 displays earnings in terms of today's dollars and column 4 shows the real or after-inflation growth rates implicit in the Social Security Administration earnings growth rates. Those rates are shown in Column 5. Column 6 shows other family income over time, which is used to compute estimates for total family income in Column

8

9.  Column 10 displays the personal spending precentages from the Lierman, Patton and Nelson study described earlier while Column 11 shows the resultant personal spending amounts.  Column 12 shows year by year losses.

**Schedule 3, Lost Economic Contributions:**  Schedule 3 displays the conversion of these loss amounts into actuarially discounted present or market values.  Column 17 shows the PBGC rates for the current month, used to calculate annuity prices. Column 18 shows the discount factor to be applied to losses and column 19 displays either the individual's survival probability or the joint survival probability.  Joint Survival probability is the probability that the earner would have otherwise survived to produce the income and the probability that the primary recipent would be alive to benefit from it.

Column 20 shows the losses from Column 18, reduced for these joint survival probabilities.  Column 21 shows the current price, as reported by the U.S. PBGC to purchase an annuity paying the amounts lost.

As described above, the annuity (or any other financial instrument) would have tax consequences.  Column 22 is my estimate of the taxes that would result, column 23 the required payment sufficient to produce what the party has lost after taxes on the compensation and Column 24, the present value of annuity price of these augmented payments.  Column 25 shows losses for different retirement ages.

# References

Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2007 Annual Report of the Board*, Washington, D.C., April 23, 2007, Page 88, Table V.B1.
http://www.ssa.gov/OACT/TR/TR06/tr06.pdf

United States Government, *Code of Federal Regulations*, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005.
http://thefederalregister.com/d.p/2005-03-14-05-4950

Millimet, Daniel L., Nieswiadomy, Michael, Ryu, Hang, Slottje, Daniel, *Estimating Worklife Expectancy: an Econometric Approach*, *Journal of Econometrics*, *Volume 113, Issue 1, March 2003, Pages 83-11*, http://faculty.smu.edu/millimet/pdf/worklifekidspaper.pdf


*Marriage, Children and Worklife Expectancy,* Millimet, Daniel L., Nieswiadomy, Hang, Slottje, Daniel
http://www.econ. unt.edu/research/pdf/01-04NiesWorklife.pdf

Cieka, James, Donley, Thomas, and Goldman, Jerry, *A Markov Process Model of Worklife Expectancies by Educational Attainment Based on Labor Market Activity in 1997-98,* Journal of Legal Economics, Volume 10, Number 3, Winter, 2000-01.

Fenichel, Female Death, Earnings, Lurito, Steif

| DATE OF ANALYSIS: | 5/3/2007 | SCHEDULE 1: SUMMARY OF RESULTS | | | |
|---|---|---|---|---|---|
| NAME: | Fenichel | | | | |
| ATTORNEY'S NAME: | Steif | Losses Assuming Continuous Employment to Social Security Retirement Age: | | 70.0 | $223,190 |
| INCOME REPLACED: | After-Tax | Pension Contrib | 7.0% | $46,001 | $269,191 |
| Past Loss Adjustment: | Purchasing Power Only | Losses Assuming Continuous Employment to Work Expectancy: | | 69.6 | $200,459 |
| | | Pension Contrib | 7.0% | $41,316 | $241,775 |

| PAST LOSSES FROM: | 7/8/06 | to: | 5/3/2007 | | | $44,498 |
|---|---|---|---|---|---|---|

| CURRENT YEAR & FUTURE LOSSES FROM: | | 5/3/2007 | to | 5/4/2012 | | |
|---|---|---|---|---|---|---|
| | Expected Future Amounts Ignoring Survival Probability: | | | | $249,120 | |
| | Future Amounts Reduced to Present Value Using PBGC Taxable Annuity: | | | | $213,306 | |
| | Annuity Value of Approximate Tax on Compensation Adds: | | 5.34% | | $11,387 | |

| MARKET PRICE OF AN ANNUITY TO REPLACE FUTURE LOST EARNINGS, MONTH OF: | | May-07 | $224,693 |
|---|---|---|---|

| TOTAL LOSSES, PAST & FUTURE: | | 1/1/2006 | 5/4/2012 | | $269,191 |
|---|---|---|---|---|---|

| DATE OF BIRTH: | 5/5/1942 | | Losses Start: | 7/8/2006 | Age At Start: | 64.18 |
|---|---|---|---|---|---|---|
| EARNING of DECEDANT: | Earnings at Loss Start: | | | 7/8/2006 | | $99,086 |
| | Earnings as of Today, If Alive: | | | 5/3/2007 | | $103,920 |
| FAMILY INCOME: | Other Family Income In The Year Person Died: | | | 2006 | | $219,100 |
| TAXATION: | Deduction Level : | 15.18% | | | | |
| | Average Effective Tax Rate on Earned Income, Alive, State & Federal: | | | | | 36.89% |
| | Average Tax Rate Including Compensation, State & Federal: | | | | | 57.05% |
| FAMILY SIZE: | Number of Dependents @ Death, Including Worker: | | | | | 2 |
| | Assumed Support of Children Dependants Until Age: | | | | | #N/A |
| AVERAGE PERSONAL SPENDING OUT OF PERSONAL INCOME: (See Schedule 2 for Year by Year Spending) | | | | | | 26.99% |
| AVERAGE INFLATION RATE EXPECTED BY SOCIAL SECURITY ADMINISTRATION OVER THE PERIOD: | | | | | | 2.52% |
| | PBGC INSTRUCTION SET, RATE FOR FIRST | 20 Years | 5.28% | Rate for all Years Thereafter is: | | 4.89% |
| | Alternative Used for Analysis, Direct Discounting: | | | | | Not Used |
| | Annuity Price with Tax Adjustment Comparable To Calculation Using Tax-Free Bond Yield of: | | | | | -3.84% |
| AGE & LIFE EXP: | Exact Age Earnings Loss Start Date: | | | 7/8/06 | | 64.18 |
| | Age on 12/31 of the Earnings Loss Start Year: | | | 64.66 | | |
| | Decedent's Normal Life Expectancy, Age at Death , PBGC Life Tables, 94 GAM Adjusted By PBGC to 2007: | | | 22.17 | To Age: | 86.35 |
| | Reported Life Expectancy of Decedent @ Death: | | | | | #N/A |
| | Life Table Set Forward: | 0.00 | Years | | Survival Probabilities Used as if Party Was Age: | 64.18 |
| | Primary Survivor Age on Date of Analysis: | | | | | #N/A |
| | Primary Survivors Life Expectancy on Date of Analysis, PBGC Life Tables, 94GAM Adjusted By PBGC to 2007: | | | | | 18.11 |
| | Joint Life Expectancy, PBGC Life Tables, 94GAM Adjusted By PBGC to 2007: | | | | | 22.17 |

| *Worklife* Expectancy At Injury, 1997-1998 Experience, Ciecka, Donely, & Goldman, 2000 | | | | Female | In Labor Force | Bachelors | 4.75 |
|---|---|---|---|---|---|---|---|
| | | | | | | Age at Event Plus worklife at Event | 68.93 |
| | | | | | | GAM94 Probability of Survival to age | 96.1% |
| | | | | | | Adjusted Worklife Estimate before LX Reduction | 71.69 |

| *Work* Expectancy, 1992-2000 Experience, Millimet, Nieswiadomy, Ryu & Slottje, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Age | Sex | Marital | Family | Race | Education | Worklife | Implied |
| | 64.16 | Female | Married | No Children | White | College | 3.47 | 67.64 |
| | | | | | | GAM94 Probability of Survival to age | 67.64 | 97.2% |
| | | | | | | Adjusted Worklife Estimate before LX Reduction | | 69.56 |
| | | | | | | | Implied Date: | 11/26/11 |

Fenichel, Female Death, Earnings, Lurito, Staff

| Year (1) | Age (2) | Decedent Earnings 2007$ (3) | Decedent Earnings in Current $ (4) | Decedent Earnings Growth (5) | Other Survivor Income (6) | Federal & State Tax on Earnings (7) | Marginal Tax Rate on Decedent Earnings (8) | Total Family Income Current$ (9) | Spending As a % of Family Inc. (10) | Deceased's Personal Spending (11) | Lost Contrib (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 64.2 | $102,335 | $99,066 | #N/A | $219,100 | $37,259 | 37.61% | $316,168 | 9.44% | $30,050 | $31,757 |
| 2007 | 65.2 | $103,920 | $103,920 | 4.90% | $228,835 | $39,298 | 37.82% | $333,756 | 9.36% | $31,228 | $33,394 |
| 2008 | 66.2 | $106,573 | $106,700 | 4.60% | $240,408 | $41,477 | 38.15% | $349,108 | 9.21% | $32,147 | $35,076 |
| 2009 | 67.2 | $108,966 | $113,700 | 4.60% | $251,467 | $43,484 | 38.24% | $365,167 | 9.09% | $33,192 | $37,024 |
| 2010 | 68.2 | $110,663 | $118,589 | 4.30% | $262,280 | $45,354 | 38.24% | $380,970 | 9.00% | $34,294 | $38,941 |
| 2011 | 69.2 | $112,170 | $123,570 | 4.20% | $273,296 | $47,259 | 38.24% | $396,866 | 8.93% | $35,441 | $40,870 |
| 2012 | 70.2 | $38,755 | $43,889 | #N/A | $97,069 | $8,316 | 18.95% | $225,828 | 12.82% | $9,865 | $25,708 |
| 2013 | 71.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2014 | 72.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2015 | 73.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2016 | 74.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2017 | 75.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2018 | 76.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2019 | 77.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2020 | 78.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2021 | 79.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2022 | 80.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2023 | 81.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2024 | 82.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2025 | 83.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2026 | 84.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2027 | 85.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2028 | 86.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2029 | 87.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2030 | 88.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2031 | 89.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2032 | 90.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2033 | 91.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2034 | 92.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2035 | 93.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2036 | 94.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2037 | 95.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2038 | 96.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2039 | 97.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2040 | 98.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2041 | 99.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2042 | 100.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2043 | 101.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2044 | 102.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2045 | 103.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2046 | 104.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2047 | 105.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2048 | 106.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2049 | 107.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2050 | 108.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2051 | 109.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2052 | 110.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2053 | 111.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2054 | 112.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2055 | 113.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| 2056 | 114.2 | $0 | $0 | #N/A | $0 | $0 | 0.00% | $0 | 0.00% | $0 | $0 |
| | | | $711,435 | | | $262,447 | | | | $208,218 | |

Fenichel, Female Death, Earnings, Lurie, Steif

| | | | | SCHEDULE 3: LOST ECONOMIC CONTRIBUTIONS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age | Family Size | PBGC RATES | Losses Current$ | Discount Factor | Joint Survival Prob | Actuarial Reduction | Mkt. Value @ PBGC | Tax-Test Adjustment | Payment Required | Mkt. Value Tax Adjusted | Cumulative Losses |
| (13) | (14) | (15) | (16) | (17) | (18) | (19) | (20) | (21) | (22) | (23) | (24) | (25) |
| 2006 | 64.2 | 2 | 0.00% | $32,804 | 1.00000 | 1.00000 | $32,804 | $32,804 | $0 | $32,804 | $32,804 | $32,804 |
| 2007 | 65.2 | 2 | 5.20% | $33,394 | 1.00000 | 0.99173 | $33,118 | $33,118 | $1,787 | $35,181 | $34,890 | $67,694 |
| 2008 | 66.2 | 2 | 5.20% | $35,076 | 0.95057 | 0.98251 | $34,463 | $32,759 | $1,877 | $36,953 | $34,512 | $102,207 |
| 2009 | 67.2 | 2 | 5.20% | $37,024 | 0.90358 | 0.97238 | $36,001 | $32,530 | $1,981 | $39,005 | $34,271 | $136,477 |
| 2010 | 68.2 | 2 | 5.20% | $38,841 | 0.85892 | 0.96142 | $37,439 | $32,157 | $2,084 | $41,025 | $33,878 | $170,355 |
| 2011 | 69.2 | 2 | 5.20% | $40,870 | 0.81646 | 0.94971 | $38,615 | $31,691 | $2,084 | $41,025 | $33,878 | $170,355 |
| 2012 | 70.2 | 2 | 5.20% | $25,708 | 0.77611 | 0.93722 | $24,094 | $18,700 | $1,029 | $26,737 | $18,448 | $223,190 |
| 2013 | 71.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2014 | 72.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2015 | 73.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2016 | 74.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2017 | 75.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2018 | 76.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2019 | 77.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2020 | 78.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2021 | 79.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2022 | 80.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2023 | 81.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2024 | 82.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2025 | 83.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2026 | 84.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2027 | 85.2 | 2 | 5.20% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2028 | 86.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2029 | 87.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2030 | 88.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2031 | 89.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2032 | 90.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2033 | 91.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2034 | 92.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2035 | 93.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2036 | 94.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2037 | 95.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2038 | 96.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2039 | 97.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2040 | 98.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2041 | 99.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2042 | 100.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2043 | 101.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2044 | 102.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2045 | 103.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2046 | 104.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2047 | 105.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2048 | 106.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2049 | 107.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2050 | 108.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2051 | 109.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2052 | 110.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2053 | 111.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2054 | 112.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| 2055 | 113.2 | 2 | 4.89% | $0 | 0.00000 | 0.00000 | $0 | $0 | $0 | $0 | $0 | $223,190 |
| SUMS: | | | | $243,818 | | | $236,734 | $213,769 | $10,945 | $264,763 | $223,190 | |

Fenichel, Female Death, Earnings, Lurito, Steif

| Fringe Benefits | 7% | Pension Contribution | | SCHEDULE 4: LOST FRINGE BENEFITS | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year (27) | Age (28) | PBGC (29) | Earnings (30) | Fringes (31) | Discount (32) | Joint Survival (33) | Present Value (34) | Tax Adjusted (35) | Cumulative |
| 0 | 0 | 0 | $0 | | 0.000000 | 0.000000 | $0 | $0 | |
| 2006 | 64.1752 | 0 | $99,068 | $6,935 | 1.000000 | 1.000000 | $6,935 | $6,935 | $6,935 |
| 2007 | 65.1752 | 0.052 | $103,920 | $7,274 | 1.000000 | 0.991725 | $7,214 | $7,600 | $14,535 |
| 2008 | 66.1752 | 0.052 | $108,700 | $7,609 | 0.950570 | 0.982514 | $7,106 | $7,487 | $22,022 |
| 2009 | 67.1752 | 0.052 | $113,700 | $7,959 | 0.903584 | 0.972381 | $6,993 | $7,367 | $29,389 |
| 2010 | 68.1752 | 0.052 | $118,589 | $8,301 | 0.858920 | 0.961421 | $6,855 | $7,222 | $36,611 |
| 2011 | 69.1752 | 0.052 | $123,570 | $8,650 | 0.816464 | 0.949714 | $6,707 | $7,068 | $43,677 |
| 2012 | 70.1752 | 0.052 | $43,889 | $3,072 | 0.776106 | 0.937220 | $2,235 | $2,324 | $46,001 |
| 2013 | 71.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2014 | 72.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2015 | 73.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2016 | 74.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2017 | 75.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2018 | 76.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2019 | 77.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2020 | 78.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2021 | 79.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2022 | 80.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2023 | 81.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2024 | 82.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2025 | 83.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2026 | 84.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2027 | 85.1752 | 0.052 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2028 | 86.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2029 | 87.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2030 | 88.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2031 | 89.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2032 | 90.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2033 | 91.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2034 | 92.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2035 | 93.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2036 | 94.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2037 | 95.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2038 | 96.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2039 | 97.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2040 | 98.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2041 | 99.1752 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2042 | 100.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2043 | 101.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2044 | 102.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2045 | 103.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2046 | 104.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2047 | 105.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2048 | 106.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2049 | 107.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2050 | 108.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2051 | 109.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2052 | 110.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2053 | 111.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2054 | 112.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| 2055 | 113.175 | 0.0489 | $0 | $0 | 0.000000 | 0.000000 | $0 | $0 | $46,001 |
| | | | $711,435 | $49,800 | | | $44,046 | $46,001 | |
| | | | | | | | Worklife Adj. | $41,316 | |

# THE LOSS OF THE VALUE OF HOME SERVICES ARISING FROM THE DEATH OF

## EMILY FENICHEL

Submitted to:

## GERALD STIEF
WMATA
600 Fifth Street, NW

Washington, DC 20001

Submitted By:

## THOMAS C. BORZILLERI, PH.D.
Economic Consultant
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817

*Thomas C. Borzilleri*

April 26, 2007

## SUMMARY OF FINDINGS

I have estimated the approximate, current market cost to replace the home services Mrs. Emily Fenichel would have provided for the benefit of her family had she not died. Based on the 16 hours of home services used by Dr. Lurito, I estimate those losses at **$152,555** based on US average replacement costs and **$180,015** based on higher replacement costs in the District of Columbia.

Dr. Lurito's estimate of losses is $422,400. The primary reason for the difference between my estimate and his is that he was requested to use a $30.00 an hour replacement cost. Dr. Lurito does not typically use a replacement cost this high and there is no additional explanation contained in his report.

To provide an additional and liberal estimate of losses, I also performed a second loss estimate using a benchmark study of home services. That study indicates that Mrs. Fenichel performed fewer hours of home services than the average woman of her age, employment status, and marital status. Using that study and assuming average hours, I estimate those losses to be **$204,042** relying on U.S. average replacement costs and **$240,770** based on higher replacement costs in the District of Columbia.

My estimate is a current market cost, based on the current market price for an annuity to replace losses, and therefore, is an actuarially adjusted, present value, taking into account Mrs. Fenichel's life expectancy, Mr. Fenichel's life expectancy and interest. In other words, the calculation is performed over joint life expectancy, including any reductions for a less-than-normal life expectancy. Annuity prices depend upon market interest rates so while my analytical method will remain the same, the analysis will be updated at time of trial to reflect the market price for an annuity at that time, as well as any other adjustments made necessary by the passage of time. Should interest rates be higher than they are now, the resulting loss estimates will be lower. Alternatively, should rates be lower than they are now, resulting loss estimates will be higher.

## INFORMATION PROVIDED BY PLAINTIFF'S COUNSEL

The information that follows has been provided to me by Plaintiff's Counsel and outlines the basic elements of the case I have been asked to value. As various additional facts become known and/or stipulated to, my estimates may be revised to take those matters into account.

I have been provided with Mrs. Fenichel's date of birth, May 5, 1942 and her date of death, July 8, 2006. I have also been provided with the date of birth of her husband Robert, November 1, 1941.

I am advised that the testimony will show that Mrs. Fenichel performed approximately 16 hours a week of home services. Careful research undertaken by Expectancy Data, described in more detail below, indicates that the average female

1

of her age would provide approximately 21.4 hours of home services per week in the year she died, so her production of home services was approximately 25% below average. My lower estimate assumes that she would have typically provided 25% lower that average home services for the remainder of their joint life expectancies. My second estimate assumes the average level of home services.

## OVERVIEW OF METHOD

I use a study of hours spent in the production of services in the home titled "The Dollar Value of a Day" (DVOD), to estimate the hours of services the party would have produced over the remainder of the life had death not occurred[1]. The services valued in the DVOD study consist of ten general types of services: housework, cooking and cleaning, outdoor chores, home and auto maintenance, obtaining goods and services, child care, child guidance, playing with children, transporting children and providing care to others, adults and/or children.

The Expectancy Data study provides both the hours of services performed and the approximate market price for the replacement of these services in 1998 based on both national and local market average costs. I also prepare an estimate based on the stated level of home services provided by the party, if such an estimate is provided. Starting with the costs in 1998, I increase those costs using an inflation forecast prepared each year by the Social Security Administration[2]. The inflation rates run in the 2% to 3% range per year in nominal terms, consistent with U.S. economic history. I assume therefore, that replacement costs will remain fixed in terms of 2007 dollars. In place of an interest rate forecast for discounting, I use the current market price for the purchase of an annuity to "discount" these future losses, an annuity that takes into account the joint probability of survival of the producer of the services, and the recipient.

## HOURS OF SERVICES PROVIDED

Because individuals rarely have detailed time use information for even a single year let alone estimates concerning expected household production of services over a damage period extending over many years and life-cycle changes, primary reliance must be placed on recognized research on the subject to prepare estimates of loss. There have been a number of studies of this subject over the years[3].

---

[1] Expectancy Data, *The Dollar Value of a Day: 1998 Dollar Valuations*, Shawnee Mission, Kansas, 2000.

[2][2] Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2007 Annual Report of the Board*, Washington, D.C., April 23, 2007, Page 88, Table V.B1.

[3] See for example, Gauger, William H. and Walker, Kathryn E., *The Dollar Value of Household Work*, Cornell University, 1979, Bryant, W. Keith, John, Catherine, and Kim, Hyoshin, *The Dollar Value of Household Work, Revised Edition*, Cornell University, 1992, King, Elizabeth M. & Smith, James P., Computing *Economic Losses in Cases of Wrongful Injury*, Rand Institute for Civil Justice, 1988, Page 62, Table 6.2, Douglas, John B., Kenney, Genevieve M. & Miller, Ted R., *Which Estimates of Household Production Are Best*, Journal of Forensic Economics, Winter, 1990, and Peskin, Janice, *The Value of Household Work in the 1980's*, 1983 Proceedings of the Social Statistics Section, Washington, D.C., American Statistical Association, 1984.

The Expectancy Data study provides tables based on data collected by the Survey Research Center of the University of Maryland. A nationally representative sample of 9,386 persons was interviewed between September 1992 and October, 1994 and provided detailed, minute by minute, daily time records concerning 91 different activities taking place in 82 possible locations.

The study consolidated these activities into 23 categories and tabulated the responses. The 23 activities were further divided into 5 major categories of activity: household production, providing care, personal care, leisure and educational activities. I have used the data pertaining to the first two categories, household production and providing care and have ignored the remaining activities. The services contained in those two categories are housework, cooking and cleaning, outdoor chores, home and auto maintenance, obtaining goods and services, child care, child guidance, playing with children, and transporting children. In cases without children, these categories pertaining to children are not used, as described below.

There are tables provided in the DVOD study showing 44 different levels of home service provision corresponding to various demographic characters. For example, there are tables for single adults, by sex, by age, by employment status and by retirement status and for men and women in multiple adult households by employment status, number of children and various ages. Schedule 4 displays composite tables I prepared from the Expectancy Data report.

For the tables pertaining to adult households <u>without</u> children, no "providing care" services are included. While the providing care category does include care provided by one adult to the other, it also includes care provided to persons outside the family and to services that would more appropriately be termed consortium such as "affection between household members". In the interests of conservatism I have therefore ignored providing care services provided by one adult to another. I do include such services if they are provided to children however, but only in households with children.

The top age category in the study is for people "aged 75 and older". Starting at age 80, I gradually reduce household services by 6% per year to approximate the tapering off I would expect as people get older and less physically able to perform services in the home.

## REPLACEMENT COST
Expectancy Data also estimates the replacement cost of each day by attaching 1998 wages to each minute of activity. I used two categories of services, household production and providing care, to construct a weighted average wage rate for each

04/25/2007  23:03    2028623634    TCBORZILLER1    PAGE    05

family type.  The wage rates differ for the various tables because the kind and amount of services provided differ by family type, age, the presence or not of children, etc. The hourly wage associated with the various kinds of services produced in 1998 varied from a low of $9.16 an hour for the services provided by retired married females aged 75 and older to a high of $13.48 an hour for a full-time employed, married male with three children.

A recent study of the Washington D.C. labor market confirms wages in this general range for the types of work associated with home services[4].  Some of those wage figures are included in Schedule 5. Since household services are a mix of higher value and lower value work, local market wages indicate that the Expectancy Data wage estimates are in a plausible range.

## FUTURE COST GROWTH
The Bureau of Labor Statistics has maintained a Consumer Price Index for Domestic Services since 1997.  That index stood at 100 in December 1997 and as of December 2006 was 137.3, a rate of growth of 3.6% per year.  The other relevant CPI is that for Lawn Care, an index that started in November, 1998 and as of November 2006 was 138.5.  For this component, the rate of increase was 4.0% per year over this period.  In both cases, prices have increased faster than prices in general.  The Consumer Price Index increased at an annual rate of only 2.5% from December 1997 to December 2006.

Some components of home service production involve a significantly higher skill level than the items monitored in the CPI - for example quality child care, cooking, auto repair, financial management, home maintenance and repair - and therefore might be expected to change more in line with wages than prices.  To provide a conservative estimate however, I have assumed replacement cost changes over time only at the expected rate of general inflation.  Hence I fix replacement cost per hour at the year 2007 cost levels.

## THE ECONOMIC ASSUMPTIONS OF THE SOCIAL SECURITY SYSTEM
I have incorporated the expectation of future wage increases into my analysis with the use of the Social Security economic assumption set prepared by the Social Security Administration for its annual report to the Congress of the United States[5]. By law, the Social Security Administration must report annually to the Congress of the United States on the expected financial status of the system, both in the short term and over the next 75 years.  As a consequence of this legal requirement, and because both the Social Security taxes taken in and Social Security benefits to be paid out depend crucially on earnings growth and inflation, the Social Security

---

[4]  U.S. Department of Labor, *National Compensation Survey, Washington-Baltimore, DC-MD-VA-WV,* http://www.bls.gov/oes/2000/oes_8840.htm#b37-0000

[5]  *2007 Annual Report of the Board*, Washington, D.C., Page 88, Table V.B1.

Administration develops year-by-year estimates of expected, future, average earnings growth and expected future inflation.

These forecasts result from an analysis of past economic history including productivity growth, earnings growth, international trade issues, changes in the labor force supply and demand, inflation, and for the first 10 years of the forecast period, short-term economic cycles as well. I use the so-called Intermediate Assumption Set, which represent the Social Security Administration's best estimate of the future, long run economic performance of the U. S. economy.

## THE PRESENT VALUE OF FUTURE LOSSES

Given an estimate of year by year, expected losses, these future losses must be converted into a present dollar equivalent. There are numerous financial instruments that might be chosen for this present value calculation but I convert these future losses using current market annuity prices, rather than a hypothetical portfolio of assets. The cost to purchase an annuity to pay these future losses is estimated by using information on the current annuity market and a specific methodology to approximate annuity prices, both provided the United States Pension Benefit Guaranty Corporation (PBGC)[6].

The PBGC valuation methodology permits conversion of these survey results into an approximate, current market annuity price, given the party's age and gender. The PBGC provides a mortality table, so-called GAM83, and a set of "interest factors" for discounting future income flows. The factors are not the rates on any specific financial instrument, but rather factors chosen by PBGC which, when combined with PBGC's specific life table, reproduces the survey findings of annuity prices. As the PBGC explains:

*"These derived interest factors are not market interest rates. The factors stand in for all the many components used in annuity pricing that are not reflected in the given mortality table e.g., assumed yield on investment, margins for profit and contingencies, premium and income taxes, and marketing and sales expenses."*

The methodology and price survey provide an accurate, cost-effective, and objective estimate of the actual, current market price required to purchase a future flow of income equal to the losses estimated.

The PBGC Methodology requires the use of standard annuity mathematics to

---

[6]United States Government, *Code of Federal Regulations*, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005.

5

produce an actuarial present value[7]. Each future payment is reduced by the year to year, joint survival probability and those reduced payment are then brought to present value. This calculation takes account of the obvious fact that regardless of average life expectancy, some persons die within the current year while others live far beyond the average. The actuarial probability of dying before the average age and the actuarial probability of living beyond that average age are both taken into proper account.

The more familiar single number, "life expectancy", the average number of years a group of persons of a particular age and sex is expected to live, is not directly used in actuarial mathematics or the PBGC Methodology[8]. Since it is the survival probabilities that are summed to calculate average life expectancy, the PBGC calculation is in fact performed over average life expectancy even though actuarial discounts are applied to expected payments both before the average and after the average.

Implicitly, my compensation approach is to provide the survivors with a cash payment sufficient to purchase an annuity, a market-determined present value, to provide the income needed to replace future losses. While such an instrument could actually be chosen for compensation purposes, I am using annuity prices to illustrate the financial market's view of future rates of return and this market-determined "tradeoff" between the value of future dollars and the value of present dollars. The professionally managed investment portfolios that lie behind annuity products have been selected to combine yield, safety, and the requirement of frequent withdrawals. It is not a forecast but rather, a price today to insure future compensating payments.

It should be noted that the annuity prices that PBGC monitors are taxable annuities and therefore the compensating income I calculate *may* be less than the replacement cost of the services Mrs. Fenichel would have produced had she not died- if the annuity has tax consequences. Home services are tax-free and ideally, the compensating instrument would also be tax-free, so that the flow of compensation after tax would exactly equal the value I seek to replace, without the complication of taxes. There is however, no regular public source for tax-free annuities similar to the PBGC survey. Because my estimate ignores the taxability of the compensating annuity, it <u>understates</u> to some extent, the amount necessary to fully compensate the injured party.

## PAST LOSSES

I am *valuing* losses and the price level dictates the value of a dollar. Just as I calculate future losses as a present value, I calculate past losses as a present value,

---

[7] See 29 CFR, pages 50816 to 50820 for a full description of the formula for annuity computation.

[8] Treating each payment as though it will be paid with certainty over the average with no payments made beyond the average results in an overstatement of the amount needed for compensation. See attached tables.

increasing each past dollar lost by the percent change in the Consumer Price Index from that time to 2007. I return to the survivor the value, in 2007 dollars, of what was lost.

## ATTACHED SCHEDULES

Calculations are attached to this report. Schedule 1 summarizes the calculation and provides some of the basic data used in the calculation; Schedules 2 and 3 provide year by year detail and Schedule 4 displays the statistical tables used. Schedule 5 shows the wage data discussed above from a recent survey of Washington area wages. This information is provided only as a benchmark and it is not used in the calculation of losses.

My estimates of loss are shown on the upper right-hand section of Schedule 1. The estimate based on statistical evidence provided in the DVOD study described above is titled "1998 Statistical Estimate". The second line, "Stated Hours of Lost Services", shows my adjusted estimate of losses given a statement concerning how much work the party did prior to death, if such information was provided.

**Schedule 2, Past & Expected Cost of Home Services:** Most of the Column headings are self-explanatory. I display the year of analysis, the inflation rates used to escalate costs over time, the age of the party, the family size over time, number of children, age of the youngest child, the hourly rate for such services in 1998 dollars derived from the Expectancy Data study, the hourly rate in future dollars, the hours per week of expected services, the weekly replacement cost and the annual replacement cost.

**Schedule 3, Value of Lost Services:** Schedule 3 displays the conversion of these loss amounts into actuarially discounted present or market values. Column 14 shows the PBGC "interest factors" rates for the current month, Column 15 the replacement cost in current dollars and Column 16 the discount factor resulting from the PBGC rates. Column 17 provides the discounted value of these costs before account is taken of life expectancy. Column 17 simply sums these losses over the number of remaining years of joint life expectancy. While I show this "short-cut" calculation, for technical reasons it requires refinement and I do not rely upon it for my estimate of losses.

It can be shown that assuming a 100% survival probability for the number of years of remaining life expectancy produces an overstatement of losses. Regardless of the average life expectancy some people will not live one additional year while others will live well beyond the average. Column 19 implements the PBGC annuity mathematics and displays the year to year, joint survival probabilities - the probabilities that the deceased would have otherwise been alive to produce the services and the probability that the survivor would have been alive to receive the

7

services produced, including any reductions for a less-than-normal life expectancy.[9]

Replacement costs vary year to year. The actuarial present value of these replacement costs, the annuity cost, weights each expenditure level by the probability of its occurrence, the joint survival probability. Column 20 shows this annuity cost today to provide an annuity contract sufficient to make each payment over time. Columns 21 and 22 are useful for determining the approximate replacement cost if the deceased had a less than normal life expectancy, different from what was assumed when the calculations were prepared.

**Schedule 4, Expectancy Data Tables:** Schedule 4 displays various four composite tables drawn from the Expectancy Data report showing hours of services provided and the weighted average replacement cost per hour. Again, if the tables pertain to all-adult households, the levels and replacement costs of services do not include child-related services.

**Schedule 5, DC Area Wages:** Schedule 5 displays the average wages for various occupations in the Washington-Baltimore-West Virginia area as of 2003, discussed above. This information is provided only as a benchmark and is not used in the loss estimates.

**Schedule 6, Regional Adjustment Factors:** The authors of the Dollar Value of a Day study provide regional adjustment factors that I have displayed on Schedule 6. I use these factors to calculation both regional costs and national replacement costs.

---

[9] It is the sum of those probabilities of survival that yields the more familiar single life expectancy figure shown at the bottom of Column 18.

Fenichel, Female Death, Services, Stief

| SCHEDULE 1: SUMMARY, HOUSEHOLD SERVICE LOSSES | | | Hours Per Week | PV of Losses |
|---|---|---|---|---|
| DATE OF ANALYSIS: | 4/26/07 | Assumes Costs Grow at CPI Only | | |
| NAME: Fenichel | | 1996 Statistical Estimate, Average | Female | 21.4 | $204,042 |
| ATTORNEY: GERALD STIEF | | Stated Hours of Lost Service: | | 16.00 | $152,555 |

**PAST VALUE OF SERVICES** 7/8/06 4/26/2007 $10,390

**CURRENT YEAR & FUTURE VALUE:** From: 4/26/2007
 Annuity Cost,PBGC Taxable Annuity, As Of: Apr-07 $193,652
**TOTAL EXPECTED SERVICES VALUE, PAST & FUTURE:** $204,042

 Replacement Cost of Services $204,042

| DATE OF BIRTH: | 5/5/42 | FAMILY SIZE | | |
|---|---|---|---|---|
| LOSSES START: | 7/8/06 | Family Size At Death | 2 | |
| AGE AT DEATH: | 64.18 | Children Assumed to Leave Home at Age: | #N/A | |
| SEX: | Female | | | |
| MARITAL STATUS: | Married | | | |
| EMPLOYMENT STATUS: | Employed or Planned to be Employed Outside the Home At Death | | | |
| Age Party Leaves Labor Force, Retirement or Disability | | 66 | | |
| NUMBER OF CHILDREN: | 0 | | | |

**INFLATION, Assumed Rise in the General Price Level**
Average Expected Inflation Rate, General Price Level, Over Loss Period: 2.77%

**PBGC METHODOLOGY,** 4/26/07
PBGC RATE SET, RATE FOR 1ST 20 YRS.. TO DUPLICATE MARKET PRICES: 5.20%
PBGC RATE SET, RATE FOR ALL YEARS THEREAFTER: 4.87%

**AGE & LIFE EXPECTANCY**
Age at End of Death Year 64.00
Exact Age At Loss Start date 64.18
Normal Life Expectancy, 94GAM Adjusted by PBGC to Current Year, On Loss Start Date: 22.17
Age Plus Life Expectancy 86.17
Reported Life Expectancy: 22.17
 Life Table Set Forward 0.00 Survival Probabilities Used as if Age 64.00
Primary Adult Survivor's DOB: 11/1/41
Primary Adult Survivor's Age at Event 64.68
Primary Adult Survivor Age on Date of Analysis: 65.48
Primary Adult Survivor's Life Expectancy on Date of Analysis: Male 65.48 18.11

Joint Life Expectancy: **14.97**

Fenichel, Female Death, Services, Stief

### SCHEDULE 2: PAST & EXPECTED COST OF HOME SERVICES

| Year (1) | Cost Growth End of Rate (2) | Age End of Yr. (3) | Family Size (4) | Children 18 or Younger (5) | Hrly. Rate 1998$ DVOD (6) | Hrly. Rate Current Dollars (7) | Hours Per Week DVOD (8) | Weekly Repla. Current$ (9) | Weekly Repla. 2006$ (10) | Estimated Annual Cost Current $ (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | | 63 | | | | | | | | $0 |
| 2006 | | 64 | 2 | 0 | $9.42 | $11.41 | 21.40 | $244.13 | $252.18 | $6,138 |
| 2007 | 1.90% | 65 | 2 | 0 | $9.42 | $11.78 | 21.40 | $252.18 | $252.18 | $13,113 |
| 2008 | 2.40% | 66 | 2 | 0 | $9.33 | $11.89 | 33.00 | $392.48 | $385.16 | $20,409 |
| 2009 | 2.70% | 67 | 2 | 0 | $9.33 | $12.18 | 33.00 | $401.90 | $385.16 | $20,899 |
| 2010 | 2.80% | 68 | 2 | 0 | $9.33 | $12.51 | 33.00 | $412.75 | $385.16 | $21,463 |
| 2011 | 2.80% | 69 | 2 | 0 | $9.33 | $12.86 | 33.00 | $424.31 | $385.16 | $22,064 |
| 2012 | 2.80% | 70 | 2 | 0 | $9.33 | $13.22 | 33.00 | $436.19 | $385.16 | $22,682 |
| 2013 | 2.80% | 71 | 2 | 0 | $9.33 | $13.59 | 33.00 | $448.40 | $385.16 | $23,317 |
| 2014 | 2.80% | 72 | 2 | 0 | $9.33 | $13.97 | 33.00 | $460.96 | $385.16 | $23,970 |
| 2015 | 2.80% | 73 | 2 | 0 | $9.33 | $14.36 | 33.00 | $473.86 | $385.16 | $24,641 |
| 2016 | 2.80% | 74 | 2 | 0 | $9.33 | $14.76 | 33.00 | $487.13 | $385.16 | $25,331 |
| 2017 | 2.80% | 75 | 2 | 0 | $9.16 | $14.90 | 24.90 | $370.97 | $285.33 | $19,290 |
| 2018 | 2.80% | 76 | 2 | 0 | $9.16 | $15.32 | 24.90 | $381.36 | $285.33 | $19,831 |
| 2019 | 2.80% | 77 | 2 | 0 | $9.16 | $15.74 | 24.90 | $392.04 | $285.33 | $20,386 |
| 2020 | 2.80% | 78 | 2 | 0 | $9.16 | $16.19 | 24.90 | $403.01 | $285.33 | $20,957 |
| 2021 | 2.80% | 79 | 2 | 0 | $9.16 | $16.64 | 24.90 | $414.30 | $285.33 | $21,543 |
| 2022 | 2.80% | 80 | 2 | 0 | $9.16 | $17.10 | 23.41 | $400.34 | $268.21 | $20,818 |
| 2023 | 2.80% | 81 | 2 | 0 | $9.16 | $17.58 | 22.00 | $386.86 | $252.11 | $20,117 |
| 2024 | 2.80% | 82 | 2 | 0 | $9.16 | $18.06 | 20.68 | $373.83 | $236.99 | $19,439 |
| 2025 | 2.80% | 83 | 2 | 0 | $9.16 | $18.58 | 19.44 | $361.24 | $222.77 | $18,784 |
| 2026 | 2.80% | 84 | 2 | 0 | $9.16 | $19.10 | 18.27 | $349.07 | $209.40 | $18,152 |
| 2027 | 2.80% | 85 | 2 | 0 | $9.16 | $19.64 | 17.18 | $337.32 | $196.84 | $17,540 |
| 2028 | 2.80% | 86 | 2 | 0 | $9.16 | $20.19 | 16.15 | $326.96 | $185.03 | $16,950 |
| 2029 | 2.80% | 87 | 2 | 0 | $9.16 | $20.75 | 15.18 | $314.98 | $173.93 | $16,379 |
| 2030 | 2.80% | 88 | 2 | 0 | $9.16 | $21.33 | 14.27 | $304.37 | $163.49 | $15,827 |
| 2031 | 2.80% | 89 | 2 | 0 | $9.16 | $21.93 | 13.41 | $294.12 | $153.68 | $15,294 |
| 2032 | 2.80% | 90 | 2 | 0 | $9.16 | $22.54 | 12.61 | $284.21 | $144.46 | $14,779 |
| 2033 | 2.80% | 91 | 2 | 0 | $9.16 | $23.18 | 11.85 | $274.64 | $135.79 | $14,281 |
| 2034 | 2.80% | 92 | 2 | 0 | $9.16 | $23.82 | 11.14 | $265.39 | $127.65 | $13,800 |
| 2035 | 2.80% | 93 | 2 | 0 | $9.16 | $24.49 | 10.47 | $256.45 | $119.99 | $13,335 |
| 2036 | 2.80% | 94 | 2 | 0 | $9.16 | $25.18 | 9.84 | $247.81 | $112.79 | $12,886 |
| 2037 | 2.80% | 95 | 2 | 0 | $9.16 | $25.88 | 9.25 | $239.47 | $106.02 | $12,452 |
| 2038 | 2.80% | 96 | 2 | 0 | $9.16 | $26.61 | 8.70 | $231.40 | $99.66 | $12,033 |
| 2039 | 2.80% | 97 | 2 | 0 | $9.16 | $27.35 | 8.18 | $223.61 | $93.68 | $11,628 |
| 2040 | 2.80% | 98 | 2 | 0 | $9.16 | $28.12 | 7.68 | $216.08 | $88.06 | $11,236 |
| 2041 | 2.80% | 99 | 2 | 0 | $9.16 | $28.91 | 7.22 | $208.80 | $82.78 | $10,858 |
| 2042 | 2.80% | 100 | 2 | 0 | $9.16 | $29.71 | 6.79 | $201.77 | $77.81 | $3,562 |
| 2043 | 2.80% | 101 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2044 | 2.80% | 102 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2045 | 2.80% | 103 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2046 | 2.80% | 104 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2047 | 2.80% | 105 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2048 | 2.80% | 106 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2049 | 2.80% | 107 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2050 | 2.80% | 108 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2051 | 2.80% | 109 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2052 | 2.80% | 110 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2053 | 2.80% | 111 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2054 | 2.80% | 112 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2055 | 2.80% | 113 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |
| 2056 | 2.80% | 114 | 2 | 0 | $0.00 | $0.00 | 0.00 | $0.00 | $0.00 | $0 |

2.8%

Fenichel, Female Death, Services, Stief

| Year (12) | Age (13) | PBGC Rate Set (14) | Annual Losses Current $ (15) | Discount Factor (16) | Discounted Value of Services (17) | Losses, LX= 14.97 (18) | Joint Survival Probability (19) | Mkt.Value @ PBGC 2007$ (20) | Alternative Years of Expected Joint Life (21) | Alternative Losses Different Life Expectancies (22) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 63 | | $0 | | | | | | | |
| 2006 | 64 | 0.00% | $6,341 | 1.00000 | $6,341 | $6,341 | 1.00000 | $6,341 | 1.00 | $6,341 |
| 2007 | 65 | 5.20% | $13,113 | 1.00000 | $13,113 | $13,113 | 0.97749 | $12,818 | 2.00 | $19,454 |
| 2008 | 66 | 5.20% | $20,409 | 0.95057 | $19,400 | $19,400 | 0.95346 | $18,497 | 3.00 | $38,854 |
| 2009 | 67 | 5.20% | $20,899 | 0.90358 | $18,884 | $18,884 | 0.92769 | $17,518 | 4.00 | $57,738 |
| 2010 | 68 | 5.20% | $21,463 | 0.85892 | $18,435 | $18,435 | 0.90070 | $16,604 | 5.00 | $76,173 |
| 2011 | 69 | 5.20% | $22,064 | 0.81646 | $18,014 | $18,014 | 0.87219 | $15,712 | 6.00 | $94,187 |
| 2012 | 70 | 5.20% | $22,682 | 0.77611 | $17,604 | $17,604 | 0.84210 | $14,824 | 7.00 | $111,791 |
| 2013 | 71 | 5.20% | $23,317 | 0.73774 | $17,202 | $17,202 | 0.81063 | $13,844 | 8.00 | $128,993 |
| 2014 | 72 | 5.20% | $23,970 | 0.70128 | $16,809 | $16,809 | 0.77746 | $13,069 | 9.00 | $145,802 |
| 2015 | 73 | 5.20% | $24,641 | 0.66661 | $16,426 | $16,426 | 0.74230 | $12,193 | 10.00 | $162,228 |
| 2016 | 74 | 5.20% | $25,331 | 0.63366 | $16,051 | $16,051 | 0.70532 | $11,321 | 11.00 | $178,280 |
| 2017 | 75 | 5.20% | $19,290 | 0.60234 | $11,619 | $11,619 | 0.66818 | $7,741 | 12.00 | $189,899 |
| 2018 | 76 | 5.20% | $19,831 | 0.57257 | $11,354 | $11,354 | 0.62447 | $7,090 | 13.00 | $201,253 |
| 2019 | 77 | 5.20% | $20,336 | 0.54427 | $11,095 | $11,095 | 0.57993 | $6,436 | 14.00 | $212,348 |
| 2020 | 78 | 5.20% | $20,957 | 0.51736 | $10,842 | $344 | 0.53329 | $5,782 | 15.00 | $223,191 |
| 2021 | 79 | 5.20% | $21,543 | 0.49179 | $10,595 | $0 | 0.48512 | $5,140 | 16.00 | $233,786 |
| 2022 | 80 | 5.20% | $20,818 | 0.48748 | $9,732 | $0 | 0.43606 | $4,244 | 17.00 | $243,518 |
| 2023 | 81 | 5.20% | $20,117 | 0.44437 | $8,939 | $0 | 0.38766 | $3,465 | 18.00 | $252,457 |
| 2024 | 82 | 5.20% | $19,439 | 0.42241 | $8,211 | $0 | 0.33967 | $2,791 | 19.00 | $260,668 |
| 2025 | 83 | 5.20% | $18,784 | 0.40153 | $7,543 | $0 | 0.29410 | $2,218 | 20.00 | $268,211 |
| 2026 | 84 | 5.20% | $18,152 | 0.38168 | $6,928 | $0 | 0.25082 | $1,738 | 21.00 | $275,139 |
| 2027 | 85 | 5.20% | $17,540 | 0.36281 | $6,364 | $0 | 0.20947 | $1,333 | 22.00 | $281,503 |
| 2028 | 86 | 4.87% | $16,950 | 0.34597 | $5,864 | $0 | 0.17070 | $1,001 | 23.00 | $287,367 |
| 2029 | 87 | 4.87% | $16,379 | 0.32990 | $5,403 | $0 | 0.13571 | $733 | 24.00 | $292,770 |
| 2030 | 88 | 4.87% | $15,827 | 0.31458 | $4,979 | $0 | 0.10474 | $522 | 25.00 | $297,749 |
| 2031 | 89 | 4.87% | $15,294 | 0.29997 | $4,588 | $0 | 0.07837 | $360 | 26.00 | $302,337 |
| 2032 | 90 | 4.87% | $14,779 | 0.28604 | $4,227 | $0 | 0.05657 | $239 | 27.00 | $306,564 |
| 2033 | 91 | 4.87% | $14,281 | 0.27278 | $3,895 | $0 | 0.03945 | $154 | 28.00 | $310,460 |
| 2034 | 92 | 4.87% | $13,800 | 0.26009 | $3,589 | $0 | 0.02651 | $95 | 29.00 | $314,049 |
| 2035 | 93 | 4.87% | $13,335 | 0.24801 | $3,307 | $0 | 0.01692 | $56 | 30.00 | $317,357 |
| 2036 | 94 | 4.87% | $12,886 | 0.23650 | $3,048 | $0 | 0.01035 | $32 | 31.00 | $320,404 |
| 2037 | 95 | 4.87% | $12,452 | 0.22551 | $2,808 | $0 | 0.00606 | $17 | 32.00 | $323,212 |
| 2038 | 96 | 4.87% | $12,033 | 0.21504 | $2,588 | $0 | 0.00336 | $9 | 33.00 | $325,800 |
| 2039 | 97 | 4.87% | $11,628 | 0.20505 | $2,384 | $0 | 0.00177 | $4 | 34.00 | $328,184 |
| 2040 | 98 | 4.87% | $11,236 | 0.19553 | $2,197 | $0 | 0.00088 | $2 | 35.00 | $330,381 |
| 2041 | 99 | 4.87% | $10,858 | 0.18645 | $2,024 | $0 | 0.00041 | $1 | 36.00 | $332,406 |
| 2042 | 100 | 4.87% | $3,562 | 0.17779 | $633 | $0 | 0.00018 | $0 | 37.00 | $333,039 |
| 2043 | 101 | 4.87% | $0 | 0.16954 | $0 | $0 | 0.00000 | $0 | 38.00 | $333,039 |
| 2044 | 102 | 4.87% | $0 | 0.16166 | $0 | $0 | 0.00000 | $0 | 39.00 | $333,039 |
| 2045 | 103 | 4.87% | $0 | 0.15416 | $0 | $0 | 0.00000 | $0 | 40.00 | $333,039 |
| 2046 | 104 | 4.87% | $0 | 0.14700 | $0 | $0 | 0.00000 | $0 | 41.00 | $333,039 |
| 2047 | 105 | 4.87% | $0 | 0.14017 | $0 | $0 | 0.00000 | $0 | 42.00 | $333,039 |
| 2048 | 106 | 4.87% | $0 | 0.13366 | $0 | $0 | 0.00000 | $0 | 43.00 | $333,039 |
| 2049 | 107 | 4.87% | $0 | 0.12746 | $0 | $0 | 0.00000 | $0 | 44.00 | $333,039 |
| 2050 | 108 | 4.87% | $0 | 0.12154 | $0 | $0 | 0.00000 | $0 | 45.00 | $333,039 |
| 2051 | 109 | 4.87% | $0 | 0.11589 | $0 | $0 | 0.00000 | $0 | 46.00 | $333,039 |
| 2052 | 110 | 4.87% | $0 | 0.11051 | $0 | $0 | 0.00000 | $0 | 47.00 | $333,039 |
| 2053 | 111 | 4.87% | $0 | 0.10538 | $0 | $0 | 0.00000 | $0 | 48.00 | $333,039 |
| 2054 | 112 | 4.87% | $0 | 0.10048 | $0 | $0 | 0.00000 | $0 | 49.00 | $333,039 |
| 2055 | 113 | 4.87% | $0 | 0.09582 | $0 | $0 | 0.00000 | $0 | 50.00 | $333,039 |
| 2056 | 114 | 4.87% | $0 | 0.09137 | $0 | $0 | 0.00000 | $0 | 51.00 | $333,039 |
| 2057 | 115 | 4.87% | $0 | 0.08713 | $0 | $0 | 0.00000 | $0 | 52.00 | $333,039 |
| 2058 | 116 | 4.87% | $0 | 0.08308 | $0 | $0 | 0.00000 | $0 | 53.00 | $333,039 |
| 2059 | 117 | 4.87% | $0 | 0.07922 | $0 | $0 | 0.00000 | $0 | 54.00 | $333,039 |
| 2060 | 118 | 4.87% | $0 | 0.07554 | $0 | $0 | 0.00000 | $0 | 55.00 | $333,039 |
| | | | | | $212,692 | | 14.9683 | $204,042 | | |

SCHEDULE 3: VALUE OF LOST SERVICES

Fenichel, Female Death, Services, Slief

**SCHEDULE 4: HOURS PER WEEK OF HOUSEHOLD PRODUCTION & PROVIDING CARE, 1992-94**
Expectancy Data, *The Dollar Value of a Day:1998 Dollar Valuation* Composite Tables

**TABLE A, Single Adults**

| Single Adults | Children | No Children | | | | | | Disabled |
|---|---|---|---|---|---|---|---|---|
| Men | FT | FT | 18-34 | 35-44 | 45+ | PT | Retired | Disabled |
| Household Production | 12.5 | 13.4 | 12.3 | 13.8 | 14.5 | 17.8 | 22.5 | |
| Care to Own Children | 1.3 | - | - | - | - | - | - | |
| Average Hrs. Per Week | 13.8 | 13.4 | 12.3 | 13.8 | 14.5 | 17.8 | 22.5 | |
| Average Value of a Day | | | | | | | | |
| Household Production | $17.27 | $19.14 | $17.44 | $20.02 | $20.51 | $23.27 | $31.45 | |
| Care to Own Children | $5.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Hourly Rate | $11.57 | $10.00 | $9.93 | $10.16 | $9.90 | $9.15 | $9.78 | |
| Women | | | | | | | | |
| Household Production | 20.1 | 18.4 | 15.1 | 15.8 | 22.4 | 21.6 | 26.8 | 23.0 |
| Care to Own Children | 4.6 | - | - | - | - | - | - | - |
| Average Hrs. Per Week | 24.7 | 18.4 | 15.1 | 15.8 | 22.4 | 21.6 | 26.8 | 23.0 |
| Average Value of a Day | | | | | | | | |
| Household Production | $27.66 | $25.34 | $21.05 | $21.74 | $30.87 | $28.21 | $36.52 | $31.22 |
| Care to Own Children | $10.08 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Hourly Rate | $10.70 | $9.64 | $9.76 | $9.83 | $9.65 | $8.49 | $9.54 | $9.50 |

**TABLE B, Multiple Adult Households By Employment Status**

| Multiple Adult HH | Children | | | No Children | | | | Disabled |
|---|---|---|---|---|---|---|---|---|
| Men | FT | PT | Keeping House | FT | PT | Retired | Keeping House | Disabled |
| Household Production | 13.7 | 7.9 | | 14.3 | 13.4 | 22.9 | | 18.8 |
| Care to Own Children | 2.7 | 1.5 | | - | - | - | | - |
| Average Hrs. Per Week | 16.4 | 9.4 | | 14.3 | 13.40 | 22.9 | | 18.8 |
| Average Value of a Day | | | | | | | | |
| Household Production | $19.71 | $11.85 | | $18.62 | $18.99 | $33.18 | | $27.12 |
| Care to Own Children | $9.16 | $4.50 | | $0.00 | $0.00 | $0.00 | | $0.00 |
| Hourly Rate | $12.32 | $12.18 | | $9.11 | $9.92 | $10.14 | | $10.10 |
| Women | | | | | | | | |
| Household Production | 21.4 | 24.3 | 32.7 | 18.8 | 23.3 | 32.6 | 36.3 | 24.4 |
| Care to Own Children | 5.1 | 6.9 | 12.0 | - | - | - | - | - |
| Average Hrs. Per Week | 26.5 | 31.2 | 44.7 | 18.8 | 23.3 | 32.6 | 36.3 | 24.4 |
| Average Value of a Day | | | | | | | | |
| Household Production | $28.64 | $32.63 | $43.78 | $25.75 | $32.24 | $39.52 | $47.86 | $32.80 |
| Care to Own Children | $13.85 | $13.44 | $22.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Hourly Rate | $11.22 | $10.34 | $10.30 | $9.59 | $9.69 | $8.49 | $8.23 | $9.41 |

**TABLE C, Multiple Adult Households, By Number of Children**

| Multiple Adult HH | Number of Children | | | |
|---|---|---|---|---|
| Men, Full Time | 0 | 1 | 2 | 3+ |
| Household Production | 14.3 | 10.40 | 15.60 | 15.50 |
| Care to Own Children | 0.00 | 2.10 | 2.70 | 4.30 |
| Average Hrs. Per Week | 14.3 | 12.5 | 18.3 | 19.8 |
| Average Value of a Day | | | | |
| Household Production | $18.62 | $14.95 | $22.55 | $22.62 |
| Care to Own Children | $0.00 | $7.63 | $8.10 | $15.50 |
| Hourly Rate | $9.11 | $12.64 | $11.72 | $13.48 |
| Women, Full Time | | | | |
| Household Production | 18.80 | 19.80 | 23.50 | 20.10 |
| Care to Own Children | - | 3.6 | 5.5 | 7.9 |
| Average Hrs. Per Week | 18.8 | 23.4 | 29.0 | 28.0 |
| Average Value of a Day | | | | |
| Household Production | $25.75 | $27.01 | $31.19 | $26.62 |
| Care to Own Children | $0.00 | $10.82 | $14.28 | $20.61 |
| Hourly Rate | $9.59 | $11.32 | $10.98 | $11.61 |

HouseHold Production:housework,cooking&cleanup,outdoor chores,home&auto maintenance,obtaining goods&services
Providing Care to Own Children: child care, guidence, play and transportation

Fenichel, Female Death, Services, Stief

**SCHEDULE 4 (Continued): Hours Per Week of Household Production & Providing Care, 1992-94**
Expectancy Data, *The Dollar Value of a Day:1998 Dollar Valuation,* Composite Tables

**TABLE D, Multiple Adult Households by Age**

| Multiple Adult HH, No Children, By Age of Adult | | | | | | |
|---|---|---|---|---|---|---|
| | Full Time Employed | | | Retired | | |
| Men | 18-44 | 45-54 | 55+ | 55-64 | 64-74 | 75+ |
| Household Production | 13.0 | 15.6 | 16.4 | 27.7 | 22.51 | 18.1 |
| Care to Own Children | - | - | - | - | 0 | 0 |
| Average Hrs. Per Week | 13.0 | 15.6 | 16.4 | 27.7 | 22.5 | 18.1 |
| Average Value of a Day | | | | | | |
| Household Production | $18.68 | $22.37 | $23.52 | $39.92 | $32.80 | $25.87 |
| Care to Own Children | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Hourly Rate | $10.06 | $10.04 | $10.04 | $10.09 | $10.20 | $10.00 |
| Women | | | | | | |
| Household Production | 16.4 | 22.7 | 21.4 | 36.4 | 33.00 | 24.9 |
| Care to Own Children | - | - | - | - | 0 | 0 |
| Average Hrs. Per Week | 16.4 | 22.7 | 21.4 | 36.4 | 33.0 | 24.9 |
| Average Value of a Day | | | | | | |
| Household Production | $22.68 | $30.67 | $28.80 | $49.07 | $43.97 | $32.58 |
| Care to Own Children | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Hourly Rate | $9.68 | $9.46 | $9.42 | $9.44 | $9.33 | $9.16 |

Household Production: housework,cooking&cleanup,outdoor chores,home&auto maintenance,obtaining goods&serv.
Providing Care to Own Children: child care, guidence, play and transportation

**SCHEDULE 5:  D.C. AREA WAGES FOR SERVICES OCCUPATIONS**

Hourly Earnings For Selected Occupations
Washington-Baltimore, DC,-MD-VA-WA, NOV., 2003

| | Average |
|---|---|
| Domestic Tasks | |
| Waiters/Waitresses | $7.86 |
| Cooks | $12.22 |
| Home Health Aides | $9.67 |
| Maids & House Cleaners | $9.38 |
| Taxi Drivers and Chauffeurs | $15.02 |
| Child Care Workers | $9.75 |
| Pre-School Teachers | $12.55 |
| Child Social Workers | $21.49 |
| Office & Admin support, Bookkeepers, Clerks | $16.39 |
| Wholesale & Retail Buyers | $25.10 |
| Tax Preparers | $14.98 |
| Landscaping & Grounds Keeping | $10.86 |
| Source:    National Compensation Survey    Average: | $14.31 |

Bureau of Labor Statistics
U.S. Department of Labor, 2004
http://www.bls.gov/oes/current/oes_8840.htm

**SCHEDULE 6: NATIONAL TO AREA WAGE ADJUSTMENT FACTORS**

| | |
|---|---|
| District of Columbia | 1.18 |
| DC, MD, VA, WV PMSA | 1.07 |
| Maryland Statewide | 1.06 |
| Baltimore PMSA | 1.05 |
| Cumberland MD-WV MSA | 0.90 |
| Hagerstown PMSA | 0.94 |
| Virginia Statewide | 0.96 |
| Charlottesville MSA | 0.95 |
| Danville MSA | 0.89 |
| Lynchburg MSA | 0.88 |
| Norfolk, Va Beach, Newport News, VA-NC MSA | 0.90 |
| Richmond / Petersburg MSA | 0.94 |
| Roanoke MSA | 0.93 |
| West Virginia, Statewide | 0.86 |
| Charleston MSA | 0.88 |
| Huntington /Ashland WV-KY-OH MSA | 0.88 |
| Parkersburg / Marietta WV-OH MSA | 0.86 |
| Wheeling, WV-OH MSA | 0.86 |

# THOMAS C. BORZILLERI, PH.D.

Economic Consultant
One Democracy Plaza
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817

TELEPHONE (202) 862-3630
FACSIMILE (202) 862-3634
e-mail: TCB1011@verizon.net

June 3, 2008

TO: Gerard J. Stief, Esq.
    Janice Cole, Esq.

FROM: Tom Borzilleri  *Thomas C. Borzilleri*

Re: Fenichel Expense Records

I reviewed the spending data provided by Mr. Fenichel in this matter and it does not alter my opinions. Those opinions were contained in my reports of April 26, 2007 and May 3, 2007. The spending data provided simply allocates joint expenses between the two parties in proportion to their income levels. What is required for death cases is an estimate of total personal spending, not simply expenses that are jointly beneficial.

There are three matters raised in my original reports however, that I want to reemphasize.

1) Dr. Lurito's household service estimates assume that the replacement cost of household services is $30.00 an hour. That is an extremely high figure and I add that Dr. Lurito was "asked to assume" this level. He provides no explanation for this extraordinarily high replacement cost and he typically uses replacement costs in the $12.00 an hour range.

2) Dr. Lurito performs his lost earnings calculation using $118,677 as her earnings base. I have no information that her earnings were that high. Her 2005 W-2 shows wages of $95,346 and Medicare wages of $113,346.

3) Dr. Lurito adds 7% of that $118,677 amount as the employer contribution to her pension account. If that $118,677 is "Medicare Wages", it already includes the 7% employer contribution. It is therefore probable that Dr. Lurito has double-counted the 7% pension contribution.

# THOMAS C. BORZILLERI, PH.D.

Economic Consultant
One Democracy Plaza
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817
_____

TELEPHONE: (202) 862-3630
FAX: (202) 862-3634
E-MAIL: tcb1011@verizon.net

## SUMMARY OF PROFESSIONAL QUALIFICATIONS

**ACADEMIC DEGREES:**
  Ph.D., Economics, University of Maryland, College Park, 1979
  M.A., Economics, University of Maryland, College Park, 1973
  B.S., Economics, University of Maryland, College Park, 1970

**COMPREHENSIVE FIELD EXAMINATIONS:** Industrial Organization and Anti-Trust, Monetary Theory and Policy, Macro and Micro Economic Theory, Social Policy.

**OTHER FIELDS OF GRADUATE STUDY:** Econometrics and Statistics, Input-Output modeling, Microsimulation modeling, Monte Carlo techniques, Urban and Regional Economics, Environmental Economics.

**DOCTORAL DISSERTATION**: "A Microanalytic Simulation Model of the Retirement Decision and Social Security Costs"

## PROFESSIONAL EXPERIENCE

**1989-PRESENT, ECONOMIC CONSULTANT:** Private practice, economic analysis concerning a variety of economic issues and expert testimony in Washington, D.C. area courts.  Areas of analysis include damage computations, anti-trust economics, business and professional practice valuation, analyses of lost profits, earnings losses from personal injury and wrongful death, competitive market analysis, pension valuation, wrongful discharge, statistical analysis in discrimination matters, and other subjects.   Qualified as an economic and/or actuarial expert in Anne Arundel, Charles, Baltimore City & County, Frederick, Howard, Montgomery, Prince George's, Washington and St. Mary's County Circuit Courts in Maryland, Superior Court in D.C., Arlington, Alexandria, Fairfax, Loudoun, Orange, and Prince William Circuit Courts in Virginia, Circuit Court in Sacramento California, Federal Courts in Baltimore & Greenbelt, Maryland, Houston, Texas, Washington, D.C., Wilmington, Delaware, and Alexandria, Virginia.  Appointed Special Master by Prince George's County Court, Court Appointed Expert by Prince George's County Court, Served as Judge's Consultant in Public Utility Condemnation Proceedings, Prince George's County Court..

**1985-1989, SENIOR ECONOMIC CONSULTANT, DIRECTOR OF INSURANCE STUDIES, J. W. WILSON & ASSOCIATES:** Fields of expertise included damage estimates in anti-trust and lost profit cases, econometric and simulation modeling and analysis, survey research, and economic analysis of competitive issues and profitability.   Emphasis on the insurance industry and preparation of expert testimony in property-casualty insurance rate-making cases.  Studies included analyses of medical malpractice insurers (West Virginia, North Carolina), workers compensation insurers (Louisiana, Texas, Maine, Virginia), automobile insurance (New Jersey, South Carolina, California, Washington, D.C.).  Expert economist testimony concerning profitability, rate of return,

extent of competition, statistical analysis before the Maine Insurance Commission, Virginia Corporation Council, D.C. Public Service Commission.

**1978-1985, ECONOMIC CONSULTANT**

**NATIONAL ASSOCIATION OF RETIRED FEDERAL EMPLOYEES:** Authored an independent study of the historical effects of inflation on Civil Service retirement income and the effect of proposed Congressional legislation to alter the cost-of-living adjustment provisions of the Civil Service Retirement System.

**AMERICAN ASSOCIATION OF RETIRED PERSONS:** Authored numerous independent studies including an analysis of the rates of return for workers from participation in the Social Security System, analyses of the effect of inflation on the income and wealth of the retired population, analyses of the accuracy of the Consumer Price Index, analyses and evaluations of employment programs, the preparation of macro-economic forecasts, and the preparation of legislative and public policy analyses.

**THE PRESIDENT'S COMMISSION ON PENSION POLICY:** Authored two independent studies published by the Commission, one valuing the contribution to retirement income made by twelve Federal programs providing non-cash benefits (Medicare, Food Stamps, Housing Programs, etc.) to the retired population, the other analyzing income adequacy standards (the official poverty level, BLS family budgets, etc.) and developing an original income adequacy standard which was adopted by the Commission in its report to the President.

**OFFICE OF TECHNOLOGY ASSESSMENT:** Retained to consult for OTA staff, prepare analyses, and provide professional independent review of a study prepared by OTA for the Congress of the effects of technological change on the U.S. economy and consumer income.

**UNITED STATES SENATE:** Authored an independent study published by the U.S. Senate on the effects of macro-economic events on the income, wealth, and employment of the older population.

**1973-1978, CHIEF ECONOMIST, AMERICAN ASSOCIATION OF RETIRED PERSONS:** Responsibilities included preparation of economic analyses for presentation to the Congress, testifying and lobbying for the Association, studies of Association older-worker employment programs, legislative analyses, development of policy positions on a wide variety of public policy issues, survey research, economic forecasting, and the development of financial service products for the AARP members.

Fedrule.xls

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|------|------|------|--------------|-------|
| 3/9/2004 | Choe | dical Practice Valuation | Fairfax County Circuit Court | Trial |
| 3/25/2004 | Brady's Black Orchard | Lost Profits | Montgomery County Circuit | Deposition |
| 4/13/2004 | Boone | Injury | Montgomery County Circuit | Trial |
| 4/23/2004 | Nasir | Computation | Prince Georges County Circuit | Deposition |
| 4/26/2004 | Mong | Life Care Cost | Washington County Circuit | Deposition |
| 5/3/2004 | Calderon | Death Case | 9/11 Commission | Hearing |
| 5/3/2004 | Halmon | Death Case | 9/11 Commission | Hearing |
| 5/7/2004 | Leahy | Life Care Cost | Middlesex County, New Jersy | Depositon |
| 5/12/2004 | Harrison | Injury Case | DC Superior Court | Trial |
| 5/18/2004 | Medwed | Injury Case | Alexandria Circuit Court | Trial |
| 5/20/2004 | Johnson | Death Case | Baltimore Circuit Court | Deposition |
| 5/26/2004 | Gross | Death Case | Baltimore Circuit Court | Deposition |
| 6/2/2004 | Boss | Injury Case | Baltimore Circuit Court | Deposition |
| 6/10/2004 | Wood | Injury Case | Baltimore Circuit Court | Deposition |
| 6/14/2004 | Anrdiozzi | Injury Case | Providence RI Circuit | Deposition |
| 6/15/2004 | Laydon | Pension Value | Fairfax County Circuit Court | Deposition |
| 6/16/2004 | Chaudry | Injury Case | Baltimore Circuit Court | Trial |
| 7/13/2004 | Lynn | Injury Case | Prince Georges County Circuit | Deposition |
| 7/15/2004 | Conyers | Injury Case | Williamsburg Va Circuit | Deposition |
| 7/19/2004 | Green | Injury Case | DC Superior Court | Deposition |
| 7/19/2004 | Smith | Injury Case | Baltimore Circuit Court | Deposition |
| 7/22/2004 | O'Grady | Injury Case | Anne Arundal Circuit Court | Deposition |
| 8/24/2004 | DeSantos | Injury Case | Montgomery County Circuit | Deposition |
| 8/25/2004 | Myers | Death Case | Louden County Circuit | Trial |
| 8/27/2004 | Wooden | Injury Case | Middlesex County, New Jersy | Deposition |
| 9/14/2004 | Utley | Injury Case | Howard County | Trial |
| 9/17/2004 | Willis | Death Case | Prince Georges County Circuit | Deposition |
| 9/28/2004 | Conyers | Injury Case | Williamsburg Va Circuit | Trial |
| 10/1/2004 | Maybin | Injury Case | Middlesex County, New Jersy | Deposition |
| 10/4/2004 | Riner | Wrongful Termination | Berkley County Circuit | Deposition |
| 10/4/2004 | Ward | Sexual Harrassment | Berkley County Circuit | Deposition |
| 10/6/2004 | Jednorski | Injury Case | Baltimore County Circuit | Trial |
| 10/8/2004 | McCoy | Injury | Baltimore City | Deposition |
| 10/18/2004 | Baucom | Injury | Baltimore City | Deposition |
| 10/22/2004 | McCaulley | Injury | PG County | Deposition |
| 10/26/2004 | Govan | Injury | PG County | Deposition |
| 11/12/2004 | Keller | Products | Middlesex County, New Jersy | Deposition |
| 11/12/2004 | Tageson | Products | Middlesex County, New Jersy | Deposition |
| 11/12/2004 | Brown | Injury | Montgomery County | Deposition |
| 11/15/2004 | Renaldue | Injury | PG County | Deposition |
| 11/22/2004 | Norwood | Injury | Fairfax County Circuit Court | Deposition |
| 11/23/2004 | Leyva | Wrongful Termination | Federal Court in Wilmington Del. | Deposition |
| 12/6/2004 | Engles | Death Case | Montgomery County Circuit | Trial |
| 12/8/2004 | Burns | Injury Case | DC Superior Court | Deposition |
| 12/14/2004 | Norwood | Death Case | Fairfax County Circuit Court | Trial |
| 1/7/2005 | Inge | Injury | Danville Virginia Circuit | Deposition |
| 1/10/2005 | Walker | Injury | Prince William County Circuit | Trial |
| 1/11/2005 | Ceron | Injury | Montgomery County Circuit | Trial |
| 1/31/2005 | Inge | Injury | Fairfax County Circuit Court | Deposition |
| 2/28/2005 | Williams | Injury | PG County | Deposition |
| 3/2/2005 | Rhee | Injury | Alexandria Circuit Court | Trial |
| 3/4/2005 | Wade | Injury | DC Superior Court | Deposition |
| 3/9/2005 | McCauley | Injury | PG County | Trial |
| 3/10/2005 | Cesnaro | Injury | DC Superior Court | Deposition |
| 3/31/2005 | O'Brian | Death | Baltimore City Circuit | Deposition |

Fedrule.xls

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|------|------|------|--------------|-------|
| 4/6/2005 | Williams | Death | Baltimore County Circuit | Trial |
| 4/18/2005 | Brown | Injury | PG County | Deposition |
| 4/20/2005 | Moore | Death | Prince  William Country | Trial |
| 5/5/2005 | Bertin | Death | Baltimore City Circuit | Trial |
| 5/26/2005 | Silver | Injury | Baltimore City Circuit | Deposition |
| 5/27/2005 | Stanton Trial | Valuation of Award | Baltimore City Circuit | Trial |
| 6/6/2005 | Taylor | Death | Fairfax County Circuit Court | Trial |
| 6/13/2005 | Watkins | Injury | DC Superior Court | Deposition |
| 6/18/2005 | Price | Injury | Fairfax County Circuit Court | Deposition |
| 6/18/2005 | Zimmerman | Injury | Montgomery County Circuit | Deposition |
| 7/25/2005 | Padget | Death | Arlington County Circuit | Trial |
| 7/26/2005 | Jenrette | Injury | Prince Georges County Circuit | Deposition |
| 7/25/2005 | Pagent | Injury | Arlington County Circuit | Trial |
| 7/28/2005 | Silver | Wrongful Termination | Martinsburg WV | Deposition |
| 7/28/2005 | Nolan | Wrongful Termination | Willmington Delaware | Deposition |
| 8/24/2005 | Henderson | Injury | DC Superior Court | Deposition |
| 8/24/2005 | Stout Deposition | Injury | Baltimore City Circuit | Deposition |
| 8/26/2005 | Kelly | Injury | Baltimore City Circuit | Deposition |
| 8/29/2005 | Schmitt | Injury | Baltimore City Circuit | Deposition |
| 8/30/2005 | Murdock | Injury | Baltimore City Circuit | Deposition |
| 9/7/2005 | Alston | Injury | DC Superior Court | Deposition |
| 9/8/2005 | Korzag | injury | Alexandria Federal Court | Trial |
| 9/19/2005 | Wyvill | Wrongful Termination | Prince Georges County Circuit | Trial |
| 9/20/2005 | Ring | Injury | Baltimore City Circuit | Deposition |
| 9/21/2005 | Zimmerman | Injury | Montgomery County Circuit | Trial |
| 9/26/2005 | Feldman | Injury | Baltimore City Circuit | Deposition |
| 9/26/2005 | Kisamore | Injury | Montgomery County Circuit | Deposition |
| 9/30/2005 | Sisis | Injury | Anne Arundal Circuit Court | Trial |
| 10/4/2005 | Hurley | Injury | Prince Georges County Circuit | Deposition |
| 10/11/2005 | Riley | Injury | Prince Georges County Circuit | Deposition |
| 10/18/2005 | Mabini | Death | Fairfax County Circuit Court | Trial |
| 10/26/2005 | Diacount | Injury | Prince Georges County Circuit | Deposition |
| 11/1/2005 | Madden | Death | Baltimore City Circuit | Deposition |
| 11/4/2005 | Grimstead | Death | Baltimore City Circuit | Trial |
| 11/8/2005 | Clay | Death | DC Superior Court | Trial |
| 11/9/2005 | Ballerini | Injury | Montgomery County Circuit | Trial |
| 11/9/2005 | Maybin | Injury | DC Superior Court | Trial |
| 11/11/2005 | Shemenski | Injury | Jefferson County | Trial |
| 11/11/2005 | Hall | Injury | Baltimore City Circuit | Trial |
| 11/16/2005 | Spiro | Death | Baltimore County Circuit | Deposition |
| 11/21/2005 | Goodarzi | Death | Montgomery County | Deposition |
| 12/5/2005 | Hood | Injury | Baltimore City | Deposition |
| 12/6/2005 | Computer Application Sevices | Lost Profits | Montgomery County | Deposition |
| 12/9/2005 | Bystry | Injury | Baltimore City | Trial |
| 12/13/2005 | Ziegler | Injury | DC Superior Court | Trial |
| 12/20/2005 | Wilson | Injury | Montgomery County | Deposition |
| 1/12/2006 | Touzelin | Injury | Baltimore City | Deposition |
| 1/18/2006 | Levy | Injury | Baltimore Federal | Deposition |
| 1/30/2006 | Offutt | Injury | Prince Georges County Circuit | Deposition |
| 2/1/2006 | Fleming | Death | DC Superior Court | Trial |
| 2/2/2006 | Coleman | Injury | DC Superior Court | Trial |
| 2/7/2006 | Murdock | Injury | Baltimore City | Deposition |
| 2/8/2006 | NIE | Lost Profits | Prince Georges County Circuit | Trial |
| 2/14/2006 | Levy Trial | Injury | Baltimore Federal Court | Trial |
| 2/22/2006 | McCauley | Injury | Prince Georges County Circuit | Trial |

Fedrule.xls

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|------|------|------|--------------|-------|
| 3/30/2006 | Wright | Death | Frederick County Circuit Court | Trial |
| 3/31/2006 | Miller | Termination | Wilmington Delaware Federal | Trial |
| 4/6/2006 | Coleman | Injury | DC Superior Court | Trial |
| 4/21/2006 | Smoot | Injury | DC Superior Court | Deposition |
| 5/9/2006 | Tarquini | Injury | Fairfax County Circuit Court | Trial |
| 5/19/2006 | Foraker/Price/Warren | Termination | Wilmington Delaware Federal | Trial |
| 5/23/2006 | Fleming | Death | DC Superior Court | Trial |
| 5/25/2006 | Wenz | Death | Baltimore City Circuit | Trial |
| 5/30/2006 | Cofield | Injury | Montgomery County Circuit | Trial |
| 6/8/2006 | Conley | Emp. Discrimination | Wilmington Delaware Federal | Trial |
| 6/14/2006 | Kerr | Injury | DC Superior Court | Trial |
| 6/24/2006 | Canales-Higgins | Injury | DC Superior Court | Trial |
| 6/28/2006 | WIlson | Injury | Greenbelt Federal Court | Trial |
| 6/28/2006 | Herlinger | Death | Howard County  Circuit Court | Trial |
| 7/24/2006 | Loney | Injury | Prince Georges County Circuit | Deposition |
| 7/31/2006 | Loney | Injury | Prince Georges County Circuit | Trial |
| 8/18/2006 | McDonough | Death | Montgomery County Circuit | Depositon |
| 8/31/2006 | Mendez | Death | Berkley County Circuit | Trial |
| 9/6/2006 | Tsaknis | Death | Federal Court DC | Deposition |
| 9/26/2006 | Smith | Injury | Montgomery County Circuit | Deposition |
| 10/9/2006 | Goodwin | Injury | Montgomery County Circuit | Deposition |
| 10/12/2006 | Lucabaugh | Injury | Baltimore City | Trial |
| 10/19/2006 | Garcia-Sanchez | Injury | Prince Georges County Circuit | Deposition |
| 11/9/2006 | Wright | Death | Warrenton Virginia Circuit | Trial |
| 11/29/2006 | Hartman | Death | DC Superior Court | Trial |
| 12/11/2006 | Sealock | Injury | Federal District Court DC | Deposition |
| 12/12/2006 | Carlson | Death | Federal District Court, Richmond | Trial |
| 12/13/2006 | Long | Employment | Federal District Court, DC | Trial |
| 12/18/2006 | Smallenberg | Death | Newport News Circuit | Trial |
| 12/21/2006 | Carver | Injury | | Deposition |
| 1/9/2007 | Williams | Injury | DC Superior Court | Trial |
| 1/9/2007 | Blue | Injury | DC Superior Court | Deposition |
| 1/11/2007 | Minter | Death | DC Superior Court | Trial |
| 1/12/2007 | Euzagable | Injury | Baltimore County Circuit | Deposition |
| 1/23/2007 | Baxter Jenkins | Injury | Washington County Circuit | Trial |
| 1/24/2007 | Layton | Injury | Anne Arundal Circuit Court | Trial |
| 1/24/2007 | Roth | Injury | Federal District Court, Greenbelt | Deposition |
| 2/7/2007 | Daniels | Injury | Prince Georges County Circuit | Deposition |
| 2/19/2007 | Daniels | Injury | Prince Georges County Circuit | Trial |
| 2/22/2007 | Toledo | Injury | DC Superior Court | Deposition |
| 2/23/2007 | Casamento | Injury | Prince Georges County Circuit | Deposition |
| 2/26/2007 | Saunders | Injury | Arlington County Circuit | Deposition |
| 3/7/2007 | Toledo | Injury | DC Superior Court | Trial |
| 3/19/2007 | Williams | Death | Fairfax County | Trial |
| 3/26/2007 | Simms | Injury | Baltimore City | Deposition |
| 3/27/2007 | Hedricks | Injury | DC Federal Court | Trial |
| 4/5/2007 | Blosis | Wrongful Termination | Wilmington Delaware Federal | Deposition |
| 4/17/2007 | Zambrana | Injury | Prince Georges County Circuit | Trial |
| 5/2/2007 | Flores | Injury | Fairfax County Circuit | Trial |
| 5/9/2007 | Raymond | Injury | Fairfax County Circuit | Trial |
| 5/10/2007 | Holcomb | Termination | Baltimore County Circuit | Deposition |
| 5/15/2007 | Weadon | Injury | DC Superior Court | Deposition |
| 5/16/2007 | Beuchamp | Injury | Charles County | Deposition |
| 5/22/2007 | Howes | Injury | Baltimore City | Deposition |
| 5/31/2007 | Jaindl | Injury | Montgomery County Circuit | Trial |

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|---|---|---|---|---|
| 6/5/2007 | Holcomb | Termination | Baltimore County Circuit | Hearing |
| 6/12/2007 | Gaters | Injury | Baltimore City | Deposition |
| 6/13/2007 | Wilburn | Injury | Anne Arundal County | Deposition |
| 6/20/2007 | Torres | Injury | Florida/Jamaica | Deposition |
| 6/22/2007 | Williams | Injury | Baltimore City | Deposition |
| 7/12/2007 | Croom | Injury | Prince William County Circuit | Deposition |
| 7/17/2007 | Balmford | Injury | Allegany County | Deposition |
| 7/27/2007 | Wise, Watts, Muse | Injury | Baltimore City | Deposition |
| 7/27/2007 | Warwick | Injury | Charles County Circuit | Trial |
| 8/7/2007 | Meechum | Discrimination | Martinsburg WV Circuit | Deposition |
| 8/17/2007 | Biles | Injury | Baltimore City | Deposition |
| 9/4/2007 | Brierley | Injury | Baltimore City | Deposition |
| 9/11/2007 | Gary | Injury | Baltimore City | Trial |
| 9/26/2007 | Gallimore | Injury | Baltimore City | Deposition |
| 10/1/2007 | Kolan | Injury | Fairfax Circuit Court | Trial |
| 10/2/2007 | Torres | Injury | Federal Court, Palm Beach Florida | Trial |
| 10/3/2007 | Singleton | Injury | Baltimore City | Deposition |
| 10/9/2007 | Kaufman | Injury | DC Surperior Court | Trial |
| 10/17/2007 | Balmford | Injury | Washington County Circuit | Trial |
| 10/18/2007 | Hottman | Injury | DC Superior Court | Deposition |
| 10/19/2007 | Cooney | Injury | Providence Rhode Island | Deposition |
| 10/23/2007 | Housain | Death | Fairfax County Circuit | Deposition |
| 10/25/2007 | Marx | Death | Frederick Circuit Court | Trial |
| 11/6/2007 | Housain | Death | Fairfax County Circuit | Trial |
| 11/7/2007 | Cosgrove | Injury | Baltimore County Circuit | Deposition |
| 11/14/2007 | White | Injury | Baltimore City | Deposition |
| 11/15/2007 | Wardell | Injury | DC Superior Court | Deposition |
| 11/15/2007 | Harris | Injury | Montgomery County Circuit | Deposition |
| 11/16/2007 | Hottman | Injury | DC Superior Court | Deposition |
| 11/28/2007 | Evans | Injury | DC Superior Court | Trial |
| 12/11/2007 | Davey | Injury | Baltimore County Circuit | Deposition |
| 12/21/2007 | White | Injury | Fairfax County Circuit | Deposition |
| 1/3/2008 | Atkinson | Injury | Montgomery County Circuit | Deposition |
| 1/11/2008 | Mathews | Injury | Baltimore County Circuit | Deposition |
| 1/14/2008 | Morris | Injury | Fairfax County Circuit | Deposition |
| 1/20/2008 | Johnson | Death | Prince Georges County Circuit | Trial |
| 2/5/2008 | Parrish | Injury | Fairfax County Circuit | Deposition |
| 2/15/2008 | Iannacone | Death | Montgomery County Circuit | Deposition |
| 2/19/2008 | Mefford | Injury | DC Superior Court | Deposition |
| 2/25/2008 | Cole | Death | Prince Georges County Circuit | Deposition |
| 2/27/2008 | Iannacone | Death | Baltimore County Circuit | Trial |
| 3/10/2008 | Jones | Injury | Prince Georges County Circuit | Deposition |
| 3/10/2008 | Barnes | Injury | Baltimore County Circuit | Deposition |
| 3/11/2008 | Walters | Death | DC Superior Court | Deposition |
| 3/12/2008 | Holtman Trial | Injury | Baltimore City | Trial |
| 3/17/2008 | Layfield | Injury | Montgomery County Circuit | Trial |
| 3/27/2008 | Harvin | Injury | Montgomery County Circuit | Deposition |
| 4/3/2008 | Johnson | Injury | Baltimore City  Circuit | Deposition |
| 4/7/2008 | Burns | Injury | Baltimore City Circuit | Deposition |
| 4/8/2008 | Fields | Death | Prince Georges County Circuit | Trial |
| 4/9/2008 | Maenner | Injury | Frederick County Circuit | Trial |
| 4/10/2008 | Crowder | Injury | Anne Arunndal Circuit | Trial |
| 4/11/2008 | Johnson | Injury | Montgomery County Circuit | Deposition |
| 4/14/2008 | Scott | Termination | Federal Court, Baltimore | Deposition |
| 4/24/2008 | Gilmartin | Injury | Anne Arunndal Circuit | Trial |

# DETECTIVE MICHAEL MILLER
# MAJOR CRASH INVESTIGATIONS UNIT
# METROPOLITAN POLICE DEPARTMENT

## Police Experience:

| | |
|---|---|
| 1997 to Present | Major Crash Investigations Unit |
| 1996 to 1997 | Special Events Branch |
| 1992 to 1996 | Traffic Enforcement Branch |
| 1990 to 1992 | Sixth Patrol District |
| 5/90 to 9/90 | Police Academy |

## General Police Education:

1992    Doppler Radar Certification (D.C. Police Department)

1993    Alcohol Intoxilyzer Certification (D.C. Police Department)

1993    Standardized Field Sobriety Testing Certification (D.C. Police Department)

1993    Civil Disturbance Unit Training (D.C. Police Department)

1996    Seatbelt Usage and Enforcement Certification (D.C. Police Department)

## Specialized Training Courses:

1993    At Scene/Vehicular Homicide Accident Investigation (IPTM, University of North Florida)

1994    Occupant Kinematics (Maryland State Police)

1995    Advanced Accident Investigation (IPTM, University of North Florida)

1995    Reconstruction Accident Investigation (IPTM, University of North Florida)

**EXHIBIT**
tabbies®
Miller #1
GW 4.9.08

**Specialized Training (con't)**

1995   Pedestrian/Human Factors Accident Investigation (IPTM, University of North Florida)

1996   Gun Recovery and Interdiction (D.C. Police Department)

1996   Department of State Protection Course (U.S. State Department)

1997   Commercial Motor Vehicle Accident Investigation (IPTM, University of North Florida)

1998   Emergency Medical Technician (EMT) re-certification (D.C. Fire Department)

1999   Motorcycle Accident Investigation (IPTM, University of North Florida)

1999   Special Problems in Accident Investigation (IPTM, University of North Florida)

1999   Vehicle Damage and Energy Relationships in Collision Investigations (Texas Engineering Extension Service, Texas A & M)

1999   Total Mapping Station Training Course (MJC & Associates)

1999   Basic Investigator School (D.C. Police Department)

2001   Map Scenes Software Training for Total Station (MJC & Associates)

2002   CDR (Crash Data Retrieval) Systems Operator Certification Course (IPTM, University of North Florida)

2002   14th Annual Traffic Safety Conference (Traffic Institute for Police Services, Pennsylvania)

2002   North American Standard Level 3, (Part A, Driver) Motor Carrier Inspection (University of Missouri)

2002   Advanced Traffic Crash Reconstruction with WinCrash (IPTM, University of North Florida)

2003   Vehicle Damage and Energy Relationships (CRUSH) (Collision Safety Institute)

2004   Chemical Protective Clothing Team (CPC) STAT Training (Louisiana State University)

## Specialized Training (con't)

2004   Chemical Sampling Techniques and Guidelines STAT Training (Louisiana State University)

2004   Vericom Training (Vericom Computers, Inc.)

2004   North American Standard Level 3, (Part B, Vehicle) Motor Carrier Inspection (University of Missouri)

2004   Bendix Brake Systems (Bendix Brake Corporation)

2004   Traffic Crash Reconstruction Update (IPTM, University of North Florida)

2005   Emergency Traffic Control for Emergency Responders (Incident Management) (American Traffic Safety Services Association, ATSSA)

2005   Applied Physics for the Traffic Crash Investigator (IPTM, University of North Florida)

2005   General Hazardous Materials, Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration)

2005   Cargo Tanker Inspection, Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration)

2006   Methodology and Techniques of Crash Data Retrieval (IPTM, University of North Florida)

2006   Special Problems in Crash Reconstruction (IPTM, University of North Florida)

2006   Accreditation Commission for Traffic Accident Reconstruction (ACTAR# 1728)

2006    Hazardous Waste Operations Refresher (STAT Training)

2007   Hazardous Materials Technician (COBRA) Training (Center for Domestic Preparedness, Anniston, Alabama)

2007   Heavy Vehicle Crash Reconstruction (Northwestern University Center for Public Safety, Chicago, Illinois)

## Instructor Certifications:

1998   Adjunct Police Academy Driver Training Instructor

## Instructor Experience:

January 1999          Recruit Class Driver Training Instructor

April 1999            Recruit Class Driver Training Instructor

October 1999          Recruit Class Driver Training Instructor

## Memberships/Associations

National Association of Professional Accident Reconstruction Specialists (NAPARS)

Accreditation Commission for Traffic Accident Reconstruction (#1728)

## Requested Guest Lectures:

American University
    Vehicle Pursuit Fatalities
    Accident Investigation

United States Attorney's Office, Washington, D.C. (Accident Investigation and Reconstruction)

D.C. Corporation Counsel's Office, Civil Division, District of Columbia

Secret Reader for "Trial Magazine" (Accident Reconstruction)

Metropolitan Police Department, Forensic Sciences Division, Mobile Crime Unit

United States Secret Service Uniform Division, Crime Scene Search Unit

Metropolitan Police Department, Institute for Police Science (IPS), In-Service Detective Training (2006)

Metropolitan Police Department, Institute for Police Science (IPS), Newly Promoted
Sergeant Training (2007)

Metropolitan Police Department, Institute for Police Science (IPS), Newly Promoted
Sergeant Training (2008)

5

Metropolitan Police Department, Institute for Police Science (IPS), Newly Promoted
Sergeant Training (2007)

Metropolitan Police Department, Institute for Police Science (IPS), Newly Promoted
Sergeant Training (2008)






## OFFICE OF THE CHIEF OF POLICE
### Office of Security Services
### Special Operations Division
### Traffic Safety & Special Enforcement Branch
### Vehicle Homicide Investigations Unit/Motor Carrier Safety Unit

501 New York Avenue, N.W., Washington, D.C. 20001 Fax (202) 727-8240

SUBJECT:      Case Closure: Traffic Death# 06-22 Fenichel, Emily, at Wisconsin
Avenue and Jenifer Street, N.W.

Overview:

On Thursday, June 8, 2006, at approximately 2259 hours, Ms. Emily Fenichel, W/F,
DOB of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was walking
eastbound in the south cross walk, across the intersection of Wisconsin Avenue and
Jenifer Street, N.W.  At approximately 21 feet into the crosswalk, Ms. Fenichel was
struck by a 1997 Orion TBU Washington Metropolitan Area Transit Authority
(WMATA) bus, bearing D.C. registration B37901, which was operated by Ms. Michelle
N. Ferguson, B/F, DOB of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
The bus was traveling eastbound on Jenifer Street and making a right turn onto
southbound Wisconsin Avenue when the collision occurred.  After the impact, Ms.
Fenichel was "run over" by the left front tire and pushed forward.  Ms. Fenichel's right
arm and right chest area was pinned between the tire and the roadway.  The impingement
caused severe tearing of her flesh from that area.  The bus continued to turn and came to
stop approximately 24 feet south of the impact area.  Ms. Fenichel, who was trapped
underneath the tire was removed and transported to Washington Hospital Center MED-
STAR Unit in critical condition.  At 2350 hours, Ms. Fenichel was pronounced dead by
Dr. Boyer of staff.

The collision scene is a "plus" type intersection.  Wisconsin Avenue traverses northwest
and southeast bound, and Jenifer Street traverses east and westbound.  Wisconsin Avenue
has three lanes of travel in each direction, separated by a double yellow line.  The
individual travel lanes are separated by broken white lines.  East and westbound traffic
Jenifer Street is separated by a double yellow line.  There are crosswalks located at all
four sides of the intersection.  The intersection is controlled by traffic control signals
located on the northeast, northwest, southeast, and southwest corners.  The asphalt paved
roadway was dry and free of any debris.  Overhead lighting was in effect at the time of
the collision.  The temperature was warm with medium humidity.  There were no adverse
atmospheric conditions at the time of the crash.  The posted speed limit for this area is 25
miles per hour.  The undersigned marked the scene for future usage of Total Station.

Reconstruction Overview:

The crash reconstruction was based on the following: The initial crash report, the on-scene investigation, witness statements and interviews, pictures from the crash scene, the traffic light timing sequence for the intersection, the scaled diagram of the scene, a time distance reconstruction of the collision events, Ms. Fenichel's autopsy report, and a review of D.C. Municipal Regulations (DCMR) Title 18, Section 2300.2, 2302.2, 2302.3., 2303.2, and 2305.1

1.  Ms. Ferguson was interviewed at the Second District Police Station by Detective Elgin Wheeler (Major Crash Unit). She explained that she had exited the WMATA garage onto 44th Street and made a right turn onto Jenifer Street heading eastbound. As she entered the intersection of Wisconsin Avenue with the green light, she waited for pedestrians to cross. Ms. Ferguson then explained that she saw a MPD car making a left onto Wisconsin Avenue from Jenifer Street (They were facing each other) She checked her mirrors. (Saying right-left-right-left) Ms. Ferguson also observed a red truck, which was parked on the west curb on Wisconsin Avenue. As she continued her turn, she "bumped something". She said that she was not speeding. Then Ms. Ferguson heard a lady screaming. Ms. Ferguson stopped the bus and exited. Ms. Ferguson then saw a lady underneath the left front tire of the bus. She saw that the lady was still conscious. Upon the police direction, Ms. Ferguson backed up the bus. Ms. Ferguson explained that "She never saw her." Further questioning revealed that the bus had no passengers on board and had the interior lights on the "normal" setting. Ms. Ferguson works an eight hour shift and that she had a lunch break at 2230 hours. Ms. Ferguson did have a cell phone, but does not use it while driving the bus. The previous day (Wednesday) was Ms. Fenichel's day off, and she awoke at approximately 1345 to 1400 hours on Thursday. Ms. Ferguson explained that her medical history includes having diabetes (which is controlled) by taking medication daily. She did not consume any other medications.

2.  Ms. Ferguson consented to a breath analyzer which revealed a BAC of .00. A urine sample was also obtained and after being chemically tested, revealed no illegal drugs in her system.

3.  Officer Sandra Connor, Badge # 3700, of the Second Police District, was interviewed at the Second Police District by Detective Elgin Wheeler (Major Crash Unit) Officer Connor explained that she was the driver of a marked police car, facing west, and getting ready to turn onto southbound Wisconsin Avenue, with the green light. Officer Connor saw the WMATA bus on the opposite side of the street. Officer Connor then saw a female in the crosswalk, crossing the street, and using her hands in the air, saying "Hey, hey". She also observed another pedestrian walking westbound. Officer Connor, further explained that the female pedestrian (Ms. Fenichel), had just stepped off the sidewalk when the bus hit her. She estimated that Ms. Fenichel was approximately 5 to 7 feet inside the crosswalk. Officer Connor also explained that she could see that the bus driver was looking in the direction of the pedestrian who was walking westbound in the crosswalk. When Officer Connor observed Ms. Fenichel, she also observed that the southwest corner pedestrian walk signal, facing eastbound was illuminated with the amber number "4" and "hand" signal. Officer

Connor further explained that the parked van was not in the way of the crash and that Ms. Fenichel was "short" in height. After the collision, Officer Connor heard the bus driver state "I didn't see her"

4. Officer William Belton, Badge# 4272, who was Officer Connor's partner, was interviewed at the Second Police District by Detective Elgin Wheeler (Major Crash Unit). He stated that was the right front seated passenger in the patrol car. The police car was stopped/standing, waiting to turn left onto Wisconsin Avenue, N.W., from Jenifer Street. It was at this time that he observed a pedestrian step off the curb and walk into the crosswalk, across Wisconsin Avenue. And at the same time, he saw the WMATA metro bus making a right onto southbound Wisconsin Avenue. Officer Belton heard a "scream" and a "thump" and saw the pedestrian "roll up under the bus". After the crash, Officer Belton went over to the scene and stayed with the pedestrian. Officer Belton then heard a witness tell the bus driver to "back up". After which, the bus backed up off of the pedestrian. The pedestrian was conscious and alert.

5. Mr. Matthew Clark, W/M, DOB of ███████████████████████████ ███████████████████, Mr. Clark was interviewed by the undersigned. Mr. Clark stated that he was walking westbound across the south crosswalk of the intersection of Wisconsin Avenue and Jenifer Street, N.W. and Ms. Fenichel had passed him on his left. He explained that he was walking across Wisconsin Avenue and talking on his cell phone, while he observed the WMATA bus on Jenifer Street, approximately 30 to 40 feet away from his position. Mr. Clark saw that the bus was not in service and had its turn signal on to make the turn. The bus was "inching forward to prepare to make its turn". Mr. Clark also could see that the driver of the bus was looking directly in his direction. At this time, Mr. Clark saw Ms. Fenichel pass him on his left. Mr. Clark said that she appeared to "be in a hurry" and carrying "bags". As Mr. Clark took approximately two steps onto the curb, he heard "Ooh, ooh, ooh" coming from Ms. Fenichel. After which, Mr. Clark heard a "Thud", and then he turned around and saw the bus. Mr. Clark then heard another man run over and yell "Stop" to the bus driver. The bus then stopped. Mr. Clark saw the bus driver get off the bus and walk around it and see the pedestrian underneath it. The bus driver then got back onto the bus and backed the bus off of the Ms. Fenichel. When asked about the traffic light timing sequence, Mr. Clark explained that when he crossed Wisconsin Avenue, there were 5 to 4 seconds left while he was in the crosswalk after it happened. Mr. Clark stated that he did not consume any drugs or alcoholic beverages earlier in the evening and that he does wear glasses, and had them on at the time of the crash.

6. Mr. Chris McGuire, W/M, DOB of ███████████████████████████ ███████████████ was interviewed by the undersigned. Mr. McGuire stated as he was talking on his cell phone, he was standing at the bus stop, just south of the intersection, on the west side of the street. He saw that the traffic light had changed and he saw the WMATA bus pull onto Wisconsin Avenue. He then saw a lady crossing the street. Mr. McGuire explained that the "lady didn't seemed very agile". Mr. McGuire heard the lady scream something. Then the bus hit her once, possibly twice and the lady lost her balance and fall onto the road. Mr. McGuire then saw the bus continue and run over the lady with the left front tire of the bus. At that point, the

bus driver got out and went around the bus. A person told the bus driver to back up the bus and she did. Mr. McGuire further stated that he estimated the speed of the bus to be between 5 and 10 miles per hour. Mr. McGuire explained that he had consumed one beer earlier in the evening and was not on any medications.

7. Mr. Luis Urbina, H/M, DOB of ████████████████████████ ████████████, was interviewed by the undersigned. Mr. Urbina stated that he was speaking to another person on the southeast corner of the intersection, when he observed (out of his peripheral vision) the WMAT bus on Jenifer Street and approaching Wisconsin Avenue. Mr. Urbina saw that the traffic signal was green for Jenifer Street and red for Wisconsin Avenue. He saw the bus make a right turn onto Wisconsin Avenue. Mr. Urbina observed an "arm" and heard a "thump" and a lot of "hollering". Mr. Urbina told the person he was with to call 911. Mr. Urbina ran across Wisconsin Avenue and saw that a lady was pinned underneath the left front tire of the bus. The lady underneath the bus was conscious, but in distress. He saw that the bus driver had exited the bus and said "I didn't see her; I didn't know where she was". Mr. Urbina then told the bus driver to back up the bus. After which, she did. Mr. Urbina estimated the bus's speed on Jenifer Street at 30 miles per hour. Mr. Urbina did not see the pedestrian before impact and did not consume any alcoholic beverages or medications earlier in the evening, nor does he wear glasses or contact lenses.

8. Dr. Aysha Farooqi, I/F, DOB of ████████████████████████████ ████████████ was interviewed by the undersigned. Dr. Farooqi stated that she did not see the collision, but assisted in the treatment of Ms. Fenichel. Dr. Farooqi explained that she was driving northbound on Wisconsin Avenue, and she saw the WMATA bus and a woman lying underneath the bus. The woman was awake and conscious. Dr. Farooqi began to assess the woman and obtained a brief medical history of her.

9. According to the Department of Motor Vehicles in the District of Columbia, Ms. Ferguson has a valid Class "B" commercial driver's license (CDL), with an endorsement to transport passengers. She has no traffic violations on record.

10. The Metropolitan Police Department's Motor Carrier Safety Unit performed a Level 4 mechanical inspection of the bus. There were no mechanical violations; however, Ms. Ferguson did not have a current medical certificate in her possession. (Her medical certificate expired on 06/04/2006) But Ms. Ferguson stated that she did recently see a doctor and that WMATA did possess a current copy of the medical certificate. MCS# ████████████ The bus displayed a safety/emissions certificate with an expiration date of June 2, 2007.

11. Mobile Crime Technician Durham utilized available light photography technique to take pictures of the scene.

12. According to the radio tape and CAD report, the only incoming notification for the collision was the transmission made from Officer Sandra Conner, who was the first MPD member on the scene.

13. The traffic light timing sequence indicated that the intersection is a "one" cycle traffic light sequence. Meaning, when northwest and southeast bound Wisconsin Avenue traffic have the green signal, east and westbound Jenifer Street have the red signal. Likewise, when east and westbound Jenifer Street traffic have a green signal,

northwest and southeast bound traffic on Wisconsin Avenue have a red signal. The walk signal located on the northeast corner (which faces west) begins the walk cycle with 27 seconds and displays a white "walk symbol". At 15 seconds, the walk signal changes to an amber "hand symbol." The "hand" signal flashes until the time counts down to zero seconds. After which, the amber hand signal displays continuously as the traffic signal changes to yellow (4 seconds) and then red (2 seconds) for the intersection.

14. The undersigned met with Ms. Fenichel's husband, Dr. Robert Fenichel. According to Dr. Fenichel, Ms. Fenichel was experiencing some discomfort in her ankles recently. Ms. Fenichel did not walk with a limp or use a cane for assistance, but did have surgery to replace both the right and left knees last year. (August and November 2005 respectively)

15. Ms. Fenichel, (height of 5 feet, 1 inch, and a weight of 162 pounds) was posted on June 9, 2006, by Dr. Sarah Colvin, of the D.C. Medical Examiner's Office (DCME# ████████. The autopsy revealed multiple fractures of both the right and left ribs, and lacerations to the left lung. The front and back of the right arm had a large avulsion of skin and several large abrasions. A large abrasion was also located on Ms. Fenichel's right upper back shoulder area as well as some abrasions on her facial region. Both the right and left thighs have contusions located approximately 25 inches above the heel. Femoral blood was screened for the presence of basic drugs. The following were detected: ████████████████ ███████████ No illegal narcotics were detected. The cause of death was blunt impact trauma of torso and extremities.

16. Ms. Fenichel was clothed in a red floral dress. It is unknown what style of footwear was worn.

17. Using published data from several sources revealed a walking speed range from 4.1 feet per second to 4.3 feet per second, for a female within the 65+ age group. Therefore, it would take Ms. Fenichel approximately 5 seconds to traverse the approximately 21 feet to the area of impact.

18. The WMATA bus was forensically mapped for the dimensions. The length was 32 feet and the width was 7 feet, 9 inches. The front overhang was 7 feet, 5 inches. The diagonal distance from the center of the left front tire to the front bumper was approximately 7 feet, 11 inches. The height of the front bumper was 25 inches from the ground. The height of the bottom of the front windshield was 61 inches from the ground. The height of the fare box was 41 inches. The height of the route number box was 33 inches. The height of the hand rail to the right of the entry steps was 40 inches. The fare box, route number box, and the hand rail, were all measured from the bottom of the interior floor. The height of the interior floor to the ground was 35 inches. The bus is equipped with three mirrors. The first one is located on the driver's side. The mirror is mounted near the bottom of the driver's side window. The mirror is split horizontally, which gives the operator two different views. The second mirror is on the passenger side of the bus. That mirror is located on a bracket protruding from the "A pillar" and faces the passenger side of the bus. The mirror is also a "split" type. The third mirror's location is on the driver's left side, on top of the dashboard area. That mirror is focused on the area by bicycle rack, located in front of the bus.

19. A time distance reconstruction was completed using the identical WMATA bus which was involved in the collision. The bus was positioned on Jenifer Street so that all four tires would roll over the same markings on the roadway that was marked at time of the initial crash. The placement of the bus in the intersection was also corroborated by Officer Connor, who was on the scene of the reconstruction. The bus made several turns from eastbound Jennifer Street to southbound Wisconsin Avenue. After several runs with the bus stopping at the same markings on the road, the left front and rear tires were marked with different color chalk. These markings would allow the tires' path to be followed for measurement. The left front tire had a path distance of approximately 47 feet to the area of impact. The distance from the left front tire to the front bumper was then subtracted from the 47 feet total distance. This "bumper" distance traveled was calculated to be approximately 40 feet. For the bus to travel 40 feet in approximately 5 seconds revealed an 8 feet per second velocity. Once this velocity was established, then the bus was "backed up" in "time" to correspond to the "time" placement of Ms. Fenichel. (Meaning, as Ms. Fenichel moved in one second of time, the bus would move corresponding in that same one second of time. Ms. Fenichel and the WMATA bus would move at different velocities, but in the same time sequence.) The bus and Ms. Fenichel were then placed in position at the four second time mark. Ms. Fenichel was at the curb and the bus was positioned approximately 40 feet back (in an arc) in the intersection.

20. According to Ms. Ferguson's statement, she did not see the pedestrian until after impact. Therefore, using a corresponding braking percentage for inner city transit buses of 70 to 85 percent, using a coefficient of friction of .75, and assigning a perception and reaction time of 1.6 seconds (80th percentile), revealed a maximum speed of 8.5 miles per hour for the WMATA bus. This speed then correlates to approximately 12 feet per second.

21. An exemplar individual (An on-duty MPD Officer who was approximately 5 feet two inches in height) was used as a stand in for Ms. Fenichel.

22. Photographs were taken from three different positions during the time distance reconstruction: The first, from the seated bus operator's position. (Facing left, facing forward, and facing right). The second position was from Officers' position facing westbound on Jenifer Street. And the third, from the position facing northbound Wisconsin Avenue, south of the intersection, in the northbound lanes of travel.

   • At time "5 seconds", Ms. Fenichel was on the west sidewalk and the bus was 40 feet back from the area of impact. The bus had already broken the plane of the intersection and was turned facing southeast. The bus operator could not have seen Ms. Fenichel because of the frame of the bus.

   • At time "4 seconds", Ms. Fenichel was 4.1 feet in the roadway and the bus was still in its turn. At this point, Ms. Fenichel could not be seen because of the bus frame.

   • At time "3 seconds", Ms. Fenichel was 8.2 feet in the road and the bus was further in the intersection. Ms. Fenichel can be seen briefly because she is in between the "A pillar" and the center door frame.

   • At time "2 second", Ms. Fenichel is 12.3 feet in the road and the bus has broken the plane of the north crosswalk bar. Only the extreme front portion can be seen of Ms. Fenichel because of the "A pillar" blocking the line of sight.

- At time "1 second", Ms. Fenichel is 16.4 feet in the road and the bus's left front tire has crossed into the crosswalk. Ms. Fenichel cannot be seen because of the fare box, the interior hand rail, and the height of the lower frame of the front windshield.
- At time "0 second" (impact), Ms. Fenichel is already struck and pushed forward.

23. According to DCMR Title 18, Section 2300.2, it states "every driver of a vehicle shall....exercise due care to avoid colliding with any pedestrians upon any roadway" According to Section 2302.2, it states "pedestrians facing a "WALK" signal my proceed across the roadway ...and shall be given the right-of-way by the drivers of all vehicles". According to Section 2302.3, it states "no pedestrian shall start to cross the roadway in the direction of a "DON'T WALK" or "WAIT" signal. According to Section 2303.2, it states "no pedestrian shall suddenly leave a curb.....and walk ...into a path of a vehicle which is so close that it is impossible for the driver to yield". And according to Section 2305.1, it states "whenever possible, pedestrians shall walk on the right half of crosswalks".

Conclusions:

1. Ms. Ferguson currently possesses a valid Class B commercial driver's license (CDL) with a passenger endorsement.
2. Ms. Ferguson submitted to a chemical/urine test which revealed no drugs or alcoholic beverages in her system.
3. According to the autopsy report, Ms. Fenichel was not intoxicated at the time of death
4. Multiple witnesses explained that the WMATA bus was not speeding. This fact is supported by the maximum speed of 8 miles per hour by utilizing the slide to stop formula and perception and reaction time stopping distance.
5. Matching the injury area on Ms. Fenichel's legs to the height of the front bumper of the bus revealed that it was the front bumper that struck Ms. Fenichel's legs.
6. Conducting a time distance reconstruction revealed that it was possible for Ms. Ferguson not to see Ms. Fenichel prior to the impact. Ms. Ferguson explained that she "looked right-left-right-left", before the impact. During this turning of the head, Ms. Fenichel could have entered one of several blind spots located on the front of the bus. The blinds spots are created by the nomenclature of the bus frame itself and the additional placement of the fare box, the route number box, and the interior hand rail.
7. The traffic light timing sequence revealed that the pedestrian walk signal begin at 27 seconds and then counts down to zero. At 15 seconds, the walk signal changes color to amber and the symbol changes to a hand signal. Using the 5 seconds in which Ms. Fenichel traveled in the roadway, and the fact that Officer Connor observed the pedestrian signal at "4 seconds" at the time of impact, revealed that if Ms. Fenichel started to walk off the curb at 9 seconds, the pedestrian signal would have been flashing the amber hand signal.

Final Recommendations:

The collision resulted in the impact of a WMATA bus and a pedestrian. The bus was traveling eastbound on Jenifer Street and turning southbound onto Wisconsin Avenue., N.W. The pedestrian was crossing eastbound Wisconsin Avenue in the south crosswalk. A time distance reconstruction of the collision revealed that the operator of the bus most likely did not see the pedestrian prior to impact. Also, the pedestrian entered the crosswalk during the "don't walk" stage of the light timing sequence.

Therefore, with all the facts stated above, the undersigned recommends that this case be classified as CLOSED and forwarded to the United States Attorney's Office for review and declination of criminal charges on the part of the operator of the bus, Ms. Ferguson.


Michael Miller
Detective
Major Crash Unit